UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PETER MAKHLOUF, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| TAILORED BRANDS, INC. and DOUGLAS S. EWERT, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff Peter Makhlouf ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tailored Brands, Inc. ("TLRD" or the "Company")[1], analysts' reports and advisories about the Company, and information readily available in the public record.   Plaintiff believes that substantial

---

[1] On January 29, 2016, Men's Wearhouse Inc. announced that it would convert to a holding-company structure under the name Tailored Brands, Inc.  Pursuant to this restructuring, Men's Wearhouse shareholders exchanged their shares one-for-one with the new company, which trades on the New York Stock Exchange under the symbol "TLRD."  The change went into effect on February 1, 2016.  While, at all times during the Class Period (as defined herein), the Company was known as Men's Wearhouse, in order to maintain consistency throughout the pleadings, this Complaint will refer to the Company only as Tailored Brands.

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      Plaintiff brings this federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons and entities who purchased or otherwise acquired TLRD securities between June 18, 2014 and December 9, 2015, inclusive (the "Class Period"), against the Company and certain of its officers and directors for disseminating materially false and misleading statements about the Company's true financial condition, business prospects, and practices.

2.      TLRD's fight over a series of dueling bids to buy its one-time rival Jos. A. Bank Clothiers, Inc. ("Jos. A. Bank" or "JOSB") ended on or about June 18, 2014.  Ultimately, the final price tag to combine the two retailers was $1.8 billion, or $65 per share.

3.      The first attempt to combine the two companies occurred just months after TLRD ousted its founder and executive chairman George Zimmer, who promised customers that, "You're going to like the way you look."  The ensuing takeover battle became very costly and resulted in TLRD ultimately paying a steep premium for JOSB.

4.      The deal represented a remarkable shift from a firestorm of criticism on both sides that raged since JOSB launched its own buyout bid.  It also ended JOSB's plans to absorb private equity-backed Eddie Bauer LLC ("Bauer"), an outdoor clothing brand, in an $825 million deal proposed as an alternative to TLRD's merger proposal.  Commentators noted that JOSB's play for Bauer forced TLRD to raise its bid in a win for JOSB and thus force TLRD to overpay.

5.      At first, JOSB offered to acquire TLRD in a $2.3 billion merger.  TLRD resisted and JOSB grew impatient.  Until that point, TLRD was subject to severe criticism that alleged infighting on its board a few months earlier had undermined the Company, inviting shareholder

criticism that ramped up when it shied away from the tie-up.  Facing the do-or-die move from its rival, TLRD opted to go on the offensive, a bold maneuver that carried considerable risk.

6.       TLRD was also confronted by New York hedge fund Eminence Capital LLC, which had earlier disclosed a substantial minority stake in TLRD, proclaimed itself a vocal advocate for the retailers' merger, and emerged as a potential proxy threat.

7.       When JOSB yanked the offer, TLRD pressed ahead with a merger plan of its own. Eminence Capital LLC, also a JOSB stockholder, soon bolstered the effort by launching a proxy fight to oust a pair of prominent directors up for election at JOSB, Chairman Robert Wildrick and CEO Neal Black.

8.       The original TLRD-led proposal offered JOSB shareholders a $55-per-share payout — good for a total consideration of $1.6 billion.  The suitor-turned-target swiftly shot down the offer, and then spurned a beefed-up bid worth $57.50 per share.

9.       On the eve of trial, TLRD unveiled a sweetened offer worth $63.50 per share.

10.       The offer represented a 56 percent premium over JOSB's share price before the retailers' buyout battle became public.

11.       TLRD also agreed to pay a $48 million breakup fee to Golden Gate Capital (the owner of Bauer) in connection with JOSB's effort to acquire Bauer.

12.       Specifically, on March 11, 2014, Mr. Ewert stated in a press release that "[w]e are pleased to have reached this agreement with Jos. A. Bank, which we believe will deliver substantial benefits to our respective shareholders, employees and customers…  Together, [Tailored Brands] and Jos. A. Bank will have increased scale and breadth, and Jos. A. Bank's strong brand and complementary business model will broaden our customer reach.  We expect the transaction will be accretive to [Tailored Brand]'s earnings in the first full year."

13.     Mr. Ewert continued, "The combined company will have the operational flexibility to successfully execute on strategic plans at both brands.  We are excited by the opportunities this transaction presents and are confident that our combined best-in-class offerings for our valued customers will drive significant shareholder value.  All of us at [Tailored Brands] have great respect for the Jos. A. Bank management team and are eager to work with Jos. A. Bank's talented employees. I am confident that, together, we will create a truly great company for all of our stakeholders."

14.     The press release announcing the transaction further touted the myriad strategic benefits, synergies, and ensuing smooth transaction:

> Strategic and Financial Benefits of the Combination: Provides compelling value for both companies' shareholders: The combination provides Jos. A. Bank's shareholders immediate liquidity and substantial value for their investment. The transaction represents a 65% premium over Jos. A. Bank's unaffected enterprise value and a 56% premium over Jos. A. Bank's closing share price on October 8, 2013, the day prior to the public announcement of Jos. A. Bank's proposal to acquire [Tailored Brands]. Further, the transaction represents a 10x enterprise value to last twelve months ("LTM") Adjusted EBITDA[1] multiple (assuming an estimated $137 million of Adjusted EBITDA for Jos. A. Bank's fiscal 2013 ending February 1, 2014).
>
> [Tailored Brands] shareholders will benefit from approximately $100 to $150 million of run-rate annual synergies realized over three years, through improving purchasing efficiencies, optimizing customer service and marketing practices, and streamlining duplicative corporate functions. Additionally, [Tailored Brands]'s vertical direct sourcing model will be leveraged to improve combined merchandising and sourcing across the combined company and rationalize inventory over time.
>
> Combined company positioned to succeed: The combined company will be the fourth largest U.S. men's apparel retailer with pro forma sales of approximately $3.5 billion. This transaction brings together a high-value collection of national and owned brands. Building on the two companies' complementary business models, the combined company will better serve an expanded

customer base in more locations and optimize merchandising and sourcing capabilities.

Smooth transition expected: [Tailored Brands] and Jos. A. Bank expect a smooth integration, as there will be no rebranding or remodels required – Jos. A. Bank's store banner will remain in place. In addition, Tailored Brands management team has a proven track record of successful acquisitions, having integrated approximately 600 stores and over 7,000 employees in connection with its previous acquisitions of Joseph Abboud, After Hours and Moores. [Tailored Brands] expects to implement the best practices of both companies to drive further operational and financial success. Management will consist of the most qualified individuals from both organizations.

15.    Mindful that the markets were concerned with integration issues, on March 31, 2014, TLRD announced that it had hired an advisor to lead the integration of Jos. A. Bank. Commenting on the retention, Mr. Ewert stated as follows:

We are pleased to announce that we have engaged AlixPartners to support our integration of Jos. A. Bank. AlixPartners' vast experience in retail as well as in large merger integration situations will provide significant support to our company's goal of achieving an estimated $100 to $150 million of annual run-rate synergies over three years through improving purchasing efficiencies, optimizing customer service and marketing practices and streamlining duplicative corporate functions.

The combination of [Tailored Brands] and Jos. A. Bank will produce the fourth largest U.S. men's apparel retailer with pro forma sales of approximately $3.5 billion. Once the transaction has received all necessary regulatory approvals, we expect to close in a timely fashion and begin a smooth integration. As we have previously stated, there will be no rebranding or remodels required – Jos. A. Bank's store banner will remain in place. [Tailored Brands] expects to implement the best practices of both companies to drive further operational and financial success. Management will consist of the most qualified individuals from both organizations.

16.    The reality was that TLRD purchased a deeply troubled company in JOSB and that the ensuing integration would be a costly and lengthy process.  Mr. Ewert failed to disclose to investors that TLRD had overpaid for JOSB to both avoid being acquired by JOSB and to

appease private equity/activist investors prepared to launch a proxy contest seeking control over TLRD to satisfy their own short-term goals.  For example, Eminence Capital first backed JOSB's bid to take over TLRD, and then switched allegiances when hunted became hunter and TLRD went on the attack.  On the other hand, Golden Gate Capital was the owner of Eddie Bauer, which Jos. A. Bank had agreed to buy for $825 million in a bid to scuttle TLRD's bid for JOSB. It was spelled out in that merger agreement that if someone (*e.g.*, TLRD) came along with a higher takeout offer, JOSB would pay Golden Gate $48 million as a breakup fee.

17.     Many industry watchers theorized that, although there was some sense that JOSB was bidding for Bauer in order to diversify away from men's suits, the real purpose of the offer was to squeeze a higher offer out of TLRD.  Indeed, Golden Gate had been involved in JOSB's original offer for TLRD, agreeing to underwrite that deal.

18.     Accordingly, once TLRD turned into the buyer, and first offered $55 a share and then $57.50, it had to deal with JOSB's Bauer play.  In the end, TLRD bumped up its offer first to $63, and finally to the $65 per share.

19.     In the end, Golden Gate Capital helped Jos. A. Bank shareholders gain an additional $210 million (or TLRD to pay an addition $210 million).  The problem, as would play out during the Class Period, was that TLRD was forced to overpay for an asset that it knew required substantive restructuring through a rough transition phase.  Defendants knew that integration was not proceeding as represented during the Class Period and that ultimately TLRD would have to disclose to the market that its Class Period statements were untrue, that integration, system alliance, and the realization of synergies were not on pace, and that drastic restructuring was actually necessary.  Investors would soon punish TLRD's stock.

## JURISDICTION AND VENUE

20.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

22.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District and because TLRD has its principal place of business in this District.

23.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

24.     Plaintiff Peter Makhlouf purchased TLRD securities during the Class Period, as set forth in the certification attached hereto, and has been damaged thereby.

25.     TLRD operates as a specialty apparel retailer in the United States, Puerto Rico, and Canada.  The Company operates in two segments: Retail and Corporate Apparel.  The Retail segment offers suits, suit separates, sport coats, slacks, formalwear, business casual, sportswear, outerwear, dress shirts, dress pants, overcoats, ties, shoes, and accessories for men in classic, modern, and slim fits in various sizes, as well as a selection of tuxedo rental products.  It also offers ladies' career apparel, sportswear, shoes, and accessories; children's apparel; alteration services; and retail dry cleaning, laundry, and heirlooming services.  TLRD was founded in 1973 and is based in Houston, Texas.

26.     Before a recent restructuring, TLRD operated under the name Men's Wearhouse Inc. and traded on the New York Stock Exchange under the symbol "MW."

27.     Defendant Douglas S. Ewert is and was at all relevant times CEO and a member of the board of directors.

28.     Mr. Ewert issued statements in press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of his position with the Company and his access to material information available to him but not to the public, Mr. Ewert knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Mr. Ewert is liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

29.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about TLRD. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TLRD stock was a success, as it: (a) deceived the investing public regarding TLRD's prospects and business; (b) artificially inflated the price of TLRD common stock; and (c) caused Plaintiff and other members of the Class, as defined below, to purchase TLRD stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired TLRD securities during the Class Period and who were damaged thereby (the "Class").  Excluded from

the Class are: defendants; members of the immediate family of Mr. Ewert; any subsidiary or affiliate of TLRD and the directors, officers and employees of the Company or its subsidiaries or affiliates; any entity in which any excluded person has a controlling interest; and the legal representatives, heirs, successors and assigns of any excluded person.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, TLRD common stock was actively traded on an open and efficient market under the symbol "TLRD."  Record owners and other members of the Class may be identified from records maintained by TLRD and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)      whether defendants participated in and pursued the common course of conduct complained of herein;

(c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's investors during the Class Period misrepresented material facts;

(d)      whether the market price of TLRD securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(e)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

35.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

36.      The Class Period begins June 18, 2014 when TLRD announced over the *PRNewswire* that the "successful completion" of its acquisition of JOSB had been effected through an all-cash tender offer.  Commenting on the acquisition, Defendant Ewert stated as follows:

> We are thrilled to have closed on the acquisition of Jos. A. Bank and are eager to begin the integration process with their talented employees to create a truly great company for all of our stakeholders. With more than 1,700 stores, approximately 26,000 employees and sales of $3.5 billion on a pro forma basis, our

combined company has increased scale and breadth that broadens our best-in-class offerings for our valued customers and new customers alike.

Looking forward, our strong balance sheet provides operational flexibility to successfully execute strategic plans at both brands. We continue to expect this acquisition to be accretive to our earnings in the first full year of operations as well as to achieve $100 million to $150 million of run-rate synergies by the end of fiscal 2016," concluded Ewert.

37.     On September 10, 2014, TLRD released its fiscal 2014 second quarter results and six month figures, which reported in part as follows:

Q2 2014 GAAP diluted earnings per share were $0.25 compared to $0.85 Q2 2013

GAAP diluted earnings per share primarily due to acquisition and integration costs

Q2 2014 adjusted diluted earnings per share were $1.10 compared to $1.01 Q2

2013 adjusted diluted earnings per share (see attached non-GAAP reconciliations)

[Tailored Brands] second quarter comparable sales increased 4.4%

Jos. A. Bank second quarter comparable sales increased 1.0%

Moores second quarter comparable sales increased 10.2%

38.     Commenting on the integration of JOSB, Mr. Ewert stated as follows:

While we are very early in the Jos. A. Bank integration process, we look forward to communicating our progress and continue to expect between $100 million to $150 million in synergies. Subsequent to the end of the second quarter, we secured the early termination of the Jim's Formal Wear contract to supply tuxedo rental inventory to Jos. A. Bank. We will begin leveraging our tuxedo rental inventory and logistics to serve the Jos. A. Bank rental customers for the 2015 wedding season[.]

39.     On December 10, 2014, the Company released fiscal 2014 third quarter and nine month results that were headlined with the statement "Jos. A. Bank integration ahead of

schedule." Mr. Ewert further touted the integration program and synergies being realized:

> We continue to be pleased with the progress we are making on the Jos. A. Bank integration. In addition, we are pleased with the overwhelmingly positive reaction of the Jos. A. Bank employees to our culture and are very optimistic about our opportunities to expand consolidated sales and margins as we complete the integration. We remain confident in our 2017 guidance and our cost synergy run-rate at the end of the third quarter is well ahead of our original $15 million projection for the end of the 2014 fiscal year and our systems conversions are on target.

> During the quarter, Jos. A. Bank's comparable sales were slightly below our internal expectations but, as part of our operating strategy for the brand, we are very encouraged by the positive increase of 123 basis points in the maintained product margin rate, added Ewert. We also completed our review of Jos. A. Bank's inventory and concluded we will dispose of approximately $50 million of product which will be recorded as a reduction in the inventory value at the date of acquisition; a purchase price accounting adjustment. This product will be pulled from the stores as part of our regular physical inventory process in January. Additionally, we wrote off approximately $10 million of slower renting tuxedo inventory to make room for more productive inventory in anticipation of the tuxedo rollout. As a reminder, we will begin renting tuxedos from our existing rental inventory in Jos. A. Bank beginning in January 2015. The in-store training has begun and we are excited about this revenue synergy opportunity.

> Excluding Jos. A. Bank results, the third quarter adjusted operating income increased low double digits driven by strong performances at [Tailored Brands], Moores and K&G, posting comparable sales increases of 2.2%, 8.8% and 4.4%, respectively. We are also excited about our recent announcements of in-home wedding consultations beginning early next year, the premiere of the Joseph Abboud website and the future Joseph Abboud flagship store in New York City.

> We have completed our strategic review of K&G. As part of the review, we considered offers to acquire the business, none of which were acceptable. We concluded that continuing to operate K&G as a part of the Company's overall portfolio will provide the most value to our shareholders. We would like to thank K&G's management and employees for continuing to work diligently, which has led to the strong results that have been posted this year[.]

40.     On March 11, 2015, the Company released fiscal 2014 results that highlighted the following:

>  -  Legacy business continued strong performance
>
>  -  Integration synergy run-rate ahead of schedule
>
>  -  Company increases fiscal year 2017 EPS guidance to include K&G

41.     Commenting on the quarter and year end results, Defendant Ewert stated as follows:

> We continue to be pleased with the robust earnings performance of our legacy brands.  Fueling this performance in the fourth quarter are comparable sales increases of 6.8% at [Tailored Brands], 8.6% at Moores and 6.8% at K&G.   And while Jos. A. Bank's comparable sales were negative 6.6%, they were above our expectations."
>
> We are extremely proud of the work done to date to incorporate Jos. A. Bank.  We have made significant progress on integrating Jos. A. Bank into the infrastructure of [Tailored Brands] and have developed a robust process around synergy identification and realization.  In the nine months since the acquisition, Jos. A. Bank has transitioned many of the back office functions, began store training programs, began the work to instill its employees with Tailored Brands culture, and launched tuxedo rental in all its Jos. A. Bank locations.  All of this progress was made while exceeding our initial synergy run-rate target of $15 million as we ended the year with run-rate synergies of $35 million.
>
> Fiscal year 2015 will be the year of strategic transition for Jos. A. Bank as we work on unlocking customer facing opportunities.  Much of this work lies in systems conversions which will be completed in the second half of 2015.  As such, we are looking forward to the growth in sales and gross margins that we anticipate achieving in late 2015 and into 2016.
>
> We continue to be confident in our 2017 EPS guidance which has now been increased to include K&G. We expect profits to accelerate in 2016 with rebounding sales after three consecutive

years of negative comps at Jos. A. Bank, realized cost synergies
and modest growth in the legacy business. With the stable platform
our legacy brands provide, we are able to focus on this transitional
year for Jos. A. Bank as we complete the transition and integration
of all the key areas during the year[.]

42.     On June 10, 2015, the Company released fiscal 2015 first quarter results that again

touted in the headline that "Jos. A. Bank integration remains on track."

43.     Further commenting on the integration process, Defendant Ewert stated as

follows:

We made another important step in the Jos. A. Bank integration as
we completed the merchandise systems conversions at the
beginning of May," added Ewert. "This conversion will help us in
unlocking retail inventory efficiency and distribution synergies.
Cost synergies continue to be on plan and we are beginning to see
some revenue synergies. We continue to expect Jos. A. Bank
comparable sales to be down in the second quarter with
improvement in the back half of the year and gross margin
increases to follow a similar pattern. We continue to be confident
in our 2015 and 2017 EPS guidance[.]

44.     On September 8, 2015, the Company released Fiscal 2015 second quarter and six

month results.  Again, Ewert stated that the integration process was progressing smoothly:

We continue to be pleased with the performance of our legacy
brands. Comparable sales increased 3.1% at [Tailored Brands],
0.7% at Moores and 6.7% at K&G. Excluding rental revenue,
[Tailored Brands] clothing comps were 6.5% driven by higher
average unit retails. [Tailored Brands] comparable rental revenue
decreased 3.3% which was slightly better than internal
expectations. The Jos. A. Bank business struggled in the second
quarter with comparable sales decreasing 9.4%, added Ewert. Now
that we have a full year under our belt, we have become even more
convinced that changing the promotional messages to be clear and
compelling without unusual quantity requirements, like buy one
get three free offers, will broaden the appeal of the Joseph A. Bank
brand. This fall we will be well positioned to fully implement our
strategy as all systems will be integrated, new products will be
introduced, the new customer rewards program will be available,
we will have new sales force incentives supported with extensive
training and we will have new marketing strategies in place. We
are focused on rebuilding the Jos. A. Bank profit model. In doing

so, we expect topline volatility as we establish a promotional model with broader customer appeal and strengthen the margin profile. Taking this into consideration, as well as the impact of the second quarter results, we still expect to be within our EPS guidance range of $2.70 to $2.90 and continue to be confident in On November 5, 2015 (after the market closed), TLRD issued a press release in which the Company announced preliminary Q3 2015 results and updated the fiscal year 2015 outlook. Although the Company had provided an auspicious picture to analysts only two months earlier and solid statements concerning integration, the press release admitted that comparable sales at Jos. A. Bank during the third quarter had decreased 14.6%, far below the Company's earlier expectations.

**The Truth is Only Partially Disclosed**

45.     On November 5, 2015, TLRD issued a press release in which the Company announced preliminary results for the third quarter of 2015 and updated the fiscal year 2015 outlook. Although the Company had provided an auspicious picture to analysts only two months earlier, the press release admitted that comparable sales at Jos. A. Bank during the third quarter had decreased 14.6%, far below the Company's earlier expectations.

46.     The Company attributed this "significant comparable sales weakness at Jos. A. Bank" primarily to a "decline in traffic as the Company began the transition away from the Buy-One-Get-Three promotional events."

47.     TLRD also lowered its expected adjusted earnings per share ("EPS") from $0.87 to between $0.46 and $0.51 for the third quarter, and updated its guidance for fiscal 2015, stating that adjusted EPS for the fiscal year would likely be between $1.75 and $2.00, as compared to the Company's previous guidance of $2.70 to $2.90.

48.     Additionally, the Company stated that it expected fourth quarter 2015 comparable sales at Jos. A. Bank to decrease between 20% and 25% as a result of the decline in traffic continuing from the third quarter trend, coupled with the previously-expected decline in units per transaction "as customers adapt to the shift in the promotional strategy."

15

49.     The November 5 press release also disclosed that gross margin dollars "are now expected to be well below last year's fourth quarter given the anticipated traffic declines."

50.     In response to this press release, Defendant Ewert claimed that TLRD had not "anticipate[d] that the impact from the traffic decline would occur to this degree, primarily because the prior year comparisons got progressively easier as the quarter progressed."

51.     Even in the face of these weaknesses, Mr. Ewert stated that, "[d]espite these results, we continue to believe that transitioning away from the unsustainable promotional strategy we inherited from Jos. A. Bank and accelerating our new promotional strategy is the right thing to do for the long-term success of the Jos. A. Bank business."

52.     In fact, Mr. Ewert touted purported success in the integration, asserting:

> We have already begun to strategically rebuild Jos. A. Bank for consistent and profitable long-term growth.  We implemented several strategies that we believe are potentially offsetting variables to the expected traffic and unit declines including new, updated and expanded assortments, higher average unit retail prices to go along with our new promotional strategy, additional investments in new promotional and brand building marketing, a new rewards-based customer loyalty program, and better selling behaviors, supported with extensive training and an updated incentive compensation structure for the Jos. A. Bank store employees.  We are focused on and committed to rebuilding the Jos. A. Bank profit model and remain confident our long-term strategy is the right one despite the disappointing short-term results.

53.     The market did not share Mr. Ewert's confidence in the TLRD strategy, as the Company's share price plummeted 43% from its closing price of $40.10 on November 5, 2015 to a closing price of only $22.70 at the close of the market the following day.

**DEFENDANTS' CLASS PERIOD STATEMENTS WERE FALSE AND MISLEADING AND OMITTED MATERIAL INFORMATION**

54.     Defendants' Class Period statements were false and misleading and omitted material information:

- Defendants issued misleading statements concerning the Company's deteriorating

sales momentum and poor results at the acquired JOSB;

- Defendants failed to disclose during the Class Period that TLRD, in fact, overpaid for JOSB in light of JOSB's pervasive structural issues, including a troubled business model;

- Defendants misled the market concerning JOSB's margin damaging promotional strategy;

- Defendants failed to disclose all material information concerning accelerating same-store sales declines that were in excess of management predictions;

- Defendants failed to disclose that integration was not proceeding as planned and failed to update the market concerning observed problems in the process;

- Defendants failed to disclose that JOSB's business had been deteriorating faster than expected due to a failure to recalibrate promotions and product mix;

- Defendants failed to disclose that the JOSB brand's persistent weakness was worse than expected, leading to downside pressure on EBITDA and operating income;

- Defendants failed to disclose that pressure on comparable sales figures had been under great pressure stemming from weakness at JOSB;

- Defendants failed to disclose that system integration was not proceeding at a pace that comported with Defendants' statements concerning same;

- Defendants failed to disclose that projected synergies were unattainable given the inherent weakness at JOSB;

- Defendants failed to disclose that point of sale of billing systems used by [Tailored Brands] were instituted at Jos A. Bank and that they were not

compatible with JOSB's business practices including JOSB's multi-product promotional sales strategy; and

- Defendants failed to disclose that integration problems were so severe that they threatened the Company's credit ratings and, in fact, caused ratings agencies to place negative outlooks on the Company's debt.

## THE TRUTH IS FINALLY REVEALED

55.     After months of flaunting the alleged success of the Company's integration with Jos. A. Bank, the December 9 press release finally disclosed that "if the Jos. A. Bank trend continues through the remainder of the [fourth] quarter, the Company runs the risk of missing the lower end of the guidance given on November 5, 2015."

56.     Commenting on these results, Mr. Ewert stated:

> When we acquired [Jos. A. Bank], we knew that we needed to correct the promotional model.  However, we underestimated the impact to the near-term performance as we began to execute the difficult, but necessary, corrective steps. We remain confident that these steps will restore a long-term, sustainable, profit model and reshape the business for a healthy and growing Jos. A. Bank.

57.     Mr. Ewert also stated that TLRD was taking additional steps to correct the course of the business, such as performing a deep dive on data analysis using both the Company's customer data and data from a third party to uncover actionable insights.  Public sources suggest, however, that employees of the Company have very little faith in the systems in place to track customer data.

58.     The Company also announced that, while it had already made its scheduled fourth quarter principal payment of $1.75 million on its term loan, it would not likely make any additional debt principal payments during the period.

59.     TLRD carries approximately $1.6 billion in net debt, up from just $35 million two years ago.  This does not include the Company's lease obligations that, according to an analyst

with Tigress Financial Partners, would bring the company's debt up to a staggering $2.8 billion.

60.     Conversely, shareholder equity is a measly $985 million.  While operating profit in the past nine months more than covered net interest costs, further deterioration in profitability could pose severe problems for the Company.

61.     Although analysts have suggested that selling or spinning off Jos. A. Bank, or closing some of the combined company's stores, could help to revive the struggling Company, Mr. Ewert ruled out the sale of Jos. A. Bank in response to an analyst question during the December 9 earnings conference call.

62.     All told, TLRD stock has dropped roughly 78% since June, as analysts and the financial press review how the Company has come apart at the seams.  *The Wall Street Journal* has noted that "[t]he discounts have seemingly moved from the store shelves to the stock price," and *Barron's* is suggesting that the Company's "purchase of Jos. A. Bank was one of the worst mergers of the millennium."

63.     Following the release of the third-quarter 2015 results, the Company held a teleconference with investors and analysts.  Mr. Ewert and Company CEO Jon W. Kimmins participated.

64.     During the call, Mr. Kimmins readily admitted that Jos A. Bank was struggling, that the Company would delay any decision on making a principal prepayment on its debt until 2016, and that Jos A. Bank sales were dismal.

65.     Mr. Ewert admitted that Jos. A Bank's promotion strategies were "toxic," and while certain structural synergies and cost synergies were underway, revenue strategies and opportunities were not in effect.  Also, the Company was forced to hire AlixPartners to advise on numerous issues, "including store rationalization."

66. Analysts were highly critical of the results and Mr. Ewert's assessment of the future. Jefferies published a report on December 10, 2015 that stated "visibility on the brands' turnaround has worsened" and shareholders should "remain sidelined until better clarity emerges."

67. Cowen & Co. issued a similarly negative report. Noting that the Company's problems are "[d]eeper issues than the elimination of one promotion," Cowen noted that the depth of issues justified the creation of a holding company.

68. At all relevant times, the market for TLRD securities was open, well-developed and efficient. As a result of the materially false and misleading statements and omissions described herein, TLRD's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information and have been damaged thereby.

69. During the Class Period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material, adverse, non-public information and misrepresented the truth about the Company, and its business and operations, as alleged herein.

70. At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false and misleading

statements about the Company's true financial condition, including its operating liquidity and business prospects. These material misstatements and omissions created an unrealistically positive assessment of TLRD and its business, prospects and operations, thus causing the Company's securities to trade at artificially-inflated levels at all relevant times. Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially-inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

71.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected." Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

72.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because, at the time that each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of TLRD who knew those statements were false when made.

## SCIENTER ALLEGATIONS

73.    As alleged herein, Mr. Ewert acted with scienter in that he knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be

issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

74.     As set forth herein, Mr. Ewert, by virtue of his receipt of information reflecting the true facts regarding TLRD, his control over, receipt and/or modification of TLRD's allegedly materially misleading statements and omissions, and/or his position with the Company, which made him privy to confidential information concerning TLRD, participated in the fraudulent scheme alleged herein.

75.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Mr. Ewert.

## LOSS CAUSATION

76.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of TLRD's securities and operated as a fraud or deceit on Class Period purchasers of TLRD's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.   When defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of TLRD's securities fell precipitously.   As a result of their purchases of TLRD's securities during the Class Period, Plaintiff and the other Class members suffered significant economic losses and damages.

77.     Because defendants failed to disclose material facts concerning the Company's looming liquidity crisis, investors were not aware of the Company's true financial condition. Therefore, defendants presented a misleading picture of TLRD's business and prospects.

78.     Defendants' false and misleading statements caused TLRD's securities to trade at

22

artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light, TLRD's common stock price fell sharply from its Class Period high, causing real economic loss to investors who purchased the Company's securities during the Class Period.

79.     The decline in the price of TLRD's securities after the truth came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of TLRD's securities price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of TLRD's securities and the subsequent decline in the value of TLRD's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICATION OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

80.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and the other members of the Class purchased the Company's securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

81.    At all relevant times, the market for TLRD securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, TLRD filed periodic public reports with the SEC;

(b)    TLRD regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    Several hundreds of thousands of TLRD shares were traded on a weekly basis, demonstrating a strong presumption of an efficient market;

(d)    TLRD was followed by numerous analysts that issued reports about the Company;

(e)    New company-specific information was rapidly reflected in the price of the Company's securities; and

(f)    Dozens of market makers made a market in the Company's securities.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

82.    Plaintiff incorporates the above allegations as if fully set forth herein.

83.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

84.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

>     (a)     employed devices, schemes and artifices to defraud;

>     (b)     made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

>     (c)     engaged in acts, practices and a course of business that operated as a fraud

or deceit upon Plaintiff and others similarly situated in connection with their purchases of TLRD securities during the Class Period.

85.     Plaintiff and the Class have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for TLRD securities.  Plaintiff and the other members of the Class would not have purchased TLRD securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against Mr. Ewert

86.     Plaintiff incorporates the above allegations as if fully set forth herein.

87.     Defendant Ewert acted as a controlling person of TLRD within the meaning of Section 20(a) of the Exchange Act.  By virtue of his position with the Company, and ownership of TLRD securities, Ewert had the power and authority to cause TLRD to engage in the wrongful conduct complained of herein.  TLRD controlled Ewert and all of its employees.  By reason of such conduct, Defendant Ewert is liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

DATED: March 29, 2016.


_____/s/ Thomas E. Bilek_____
Thomas E. Bilek
Texas Bar No. 02313525
**THE BILEK LAW FIRM, LLP**
700 Louisiana, Suite 3950
Houston, Texas  77002
Telephone: 713.227.7720
tbilek@bileklaw.com

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**
Gregory M. Nespole
270 Madison Avenue
New York, New York  10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
nespole@whafh.com

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller
Sharon S. Almonrode
950 West University Drive, Suite 300
Rochester, Michigan  48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852

***Counsel for Plaintiff***