UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| PETER MAKHLOUF, Individually and on Behalf of All Others Similarly Situated, | § | Civil Action No. 4:16-cv-00838 |
| | § | |
| | § | CLASS ACTION |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| TAILORED BRANDS, INC., DOUGLAS S. EWERT, JON W. KIMMINS and MARY BETH BLAKE, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff, Strathclyde Pension Fund, on behalf of itself and all other persons similarly situated, alleges the following based upon personal knowledge as to itself and its own acts, and upon an investigation conducted by and through its attorneys, which included, among other things, a review of Tailored Brands, Inc.'s ("Tailored Brands" or the "Company"), The Men's Wearhouse, Inc. ("Men's Wearhouse" or "MW") and Jos. A. Bank Clothiers Inc.'s ("Jos. A. Bank" or "JAB") Securities and Exchange Commission ("SEC") filings, press releases, conference calls, public statements, media reports, analyst reports, industry reports, and consultation with persons familiar with each entity's business. The investigation of the facts pertaining to this case is continuing. Lead Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF THE ACTION**

1. This is a securities fraud class action brought against Tailored Brands and three of its senior executive officers, Douglas S. Ewert ("Ewert") (the Chief Executive Officer) ("CEO"), Jon W. Kimmins ("Kimmins") (the Chief Financial Officer) ("CFO"), and Mary Beth Blake ("Blake") (the Chief Merchandising Officer), for violations of the Securities Exchange Act of 1934 (the "1934 Act"). This action is brought on behalf of purchasers of Men's Wearhouse common stock between July 29, 2014 and December 9, 2015, inclusive (the "Class Period") in connection with defendants' alleged violations of the federal securities laws.

2. During the Class Period, defendants made a series of statements that omitted material facts about Jos. A. Bank's business and operations, the omission of which rendered defendants' statements false and misleading. Specifically, during the Class Period, defendants concealed from investors known trends and uncertainties associated with dramatic shifts in the Jos. A. Bank business model – *i.e.*, fundamentally changing the suits it sold and the manner in which it sold those suits – and defendants knew, or at a minimum were reckless in disregarding, that those specific changes

would necessarily alienate Jos. A. Bank's existing customers and cause catastrophic sales declines of 30% at Jos. A. Bank.

3. The Men's Wearhouse-Jos. A. Bank saga began in October 2013 when Jos. A. Bank, the smaller company, launched an unsolicited $2.3 billion bid to buy Men's Wearhouse in the wake of the abrupt ouster of George Zimmer ("Zimmer") Men's Wearhouse's founder and longtime spokesperson (of "You're going to like the way you look, I guarantee it" fame). Men's Wearhouse swiftly rejected the offer just hours later, despite the fact that the offer represented a 42% premium to the closing price of Men's Wearhouse stock the day before the offer was made, citing antitrust concerns, risks, and a buyout price that supposedly undervalued Men's Wearhouse.

4. Fast forward a month to November 2013, and Men's Wearhouse turned the tables on Jos. A. Bank, offering to acquire Jos. A. Bank for $1.2 billion, an offer that would effectively double the size of Men's Wearhouse instantly. While Jos. A. Bank initially adopted Men's Wearhouse's tactic of refusing to engage with its potential acquirer, and even launched a bid to acquire the parent of Eddie Bauer in an attempt to kill Men's Wearhouse's offer, the companies eventually came to an agreement on a $1.8 billion purchase price and inked a merger agreement in March 2014.

5. As in any merger, some executives stay and some go. By successfully deploying the "Pac-Man defense," however, the Men's Wearhouse executives had ensured they would keep their corporate positions and the emoluments associated therewith, and the Board rewarded them with special one-time bonuses in June 2014, upon the closing of the merger:[1]

---

[1] *See generally* http://www.investopedia.com/terms/p/pac-man-defense.asp ("The Pac-Man defense is a defensive tactic used by a targeted firm in a hostile takeover situation. In a Pac-Man defense, the target firm then tries to acquire the company that has made the hostile takeover attempt.

| Name | 2014 Total As Reported Above ($) | Special Jos. A. Bank Completion Bonus Paid in June 2014 ($) | Stock Awards Granted in September 2014 ($) | Option Awards Granted in September 2014 ($) | 2014 Total Without Special Bonus and September 2014 Equity Grants ($) | 2013 Total As Reported Above ($) |
|---|---|---|---|---|---|---|
| Douglas S. Ewert | 9,672,031 | 500,000 | 2,968,892 | 1,200,006 | 5,003,133 | 3,622,131 |
| Jon W. Kimmins | 2,488,276 | 300,000 | 586,991 | 239,994 | 1,361,291 | 2,055,778 |
| Mary Beth Blake | 2,326,148 | 50,000 | 733,803 | 300,002 | 1,242,343 | 907,076 |

6. Men's Wearhouse senior executives, including defendants Ewert, Kimmins and Blake, also received special accelerated stock and option awards ("deferred stock units") in September 2014 as a result of the Jos. A. Bank merger to "provide a strong incentive for our Named Executive Officers to remain with the Company, and achieve strong results, during and following the integration of Jos. A. Bank." Notably, the vesting of these deferred stock units was directly linked to the defendants' ability to achieve specific adjusted earnings per share ("EPS") targets for FY17 and the Company's total shareholder return ("TSR") compared to the TSR of other select companies over a pre-defined period.[2] The impact of these awards was dramatic for FY14, defendant Ewert's reported compensation ballooned to $9.7 million, an amount nearly 300% of the size of his 2013 reported compensation ($3.6 million).

[2] Men's Wearhouse's fiscal quarters are abbreviated by quarter and year. For example, 3Q15 represents the third quarter of fiscal year 2015. Men's Wearhouse's fiscal quarters encompassed the following time periods: 2Q14 (May 4, 2014-August 2, 2014); 3Q14 (August 3, 2014-November 1, 2014); 4Q14 (November 2, 2014-January 31, 2015); 1Q15 (February 1, 2015-May 2, 2015); 2Q15 (May 3, 2015-August 1, 2015); and 3Q15 (August 2, 2015-October 31, 2015). Men's Wearhouse's fiscal years are abbreviated by "FY" and year (*e.g.*, FY15). Men's Wearhouse's FY14 ended on January 31, 2015 and its FY15 ended on January 30, 2016. The Company has not disclosed what the targets were in SEC filings. After the disastrous 3Q15 in which the devastating impact of changing Jos. A. Bank's business was revealed, the Company has stated in multiple Definitive Proxy Statements that "the Company has determined that the performance units granted in September 2014 and throughout 2015 to each of our Named Executive Officers are no longer likely to vest given the Company's performance." Considering the temporal proximity between when these incentives were granted and the defendants' announcement of expected $5.50-$6.00/share adjusted EPS guidance for 2017, it is reasonable to infer that defendants' incentive targets were similar to those announced at the July 29, 2014 Analyst Day.

7. To justify the $1.8 billion price-tag for Jos. A. Bank, defendants promised investors $100-$150 million in merger synergies from "improving purchasing efficiencies, optimizing customer service and marketing practices, and streamlining duplicative corporate functions" – repeatedly expressing their "confidence" in these figures throughout the Class Period – and announced guidance of $5.50-$6.00 per share in adjusted EPS through 2017.[3] They also (falsely and misleadingly) assured investors and customers alike that they would achieve all these benefits while "mov[ing] slowly and deliberately making sure that significant changes are tested on a small scale before proceeding on a large scale" and that Men's Wearhouse would not "alienate the Joseph Bank existing customer while introducing products, services and messaging designed to attract new customers."

8. As investors would painfully come to later learn, defendants planned to dramatically change Jos. A. Bank all along and were then-aware of (but failed to disclose) the material negative impact the intended changes would have on Jos. A. Bank's loyal customers and business. Contrary to their public statements, upon consummation of the Jos. A. Bank acquisition, defendants intended to do away with Jos. A. Bank's long-time, low-cost suppliers and replace them with more-expensive suppliers used by Men's Wearhouse. By switching suppliers, defendants were aware that Jos. A. Bank's margins would be squeezed and that Jos. A. Bank could no longer operate under its highly promotional and lucrative "Buy-One-Get-Three-Free" strategy. In fact, defendants were warned on numerous occasions that changing the price of a Jos. A. Bank suit by as little as $1, eliminating the

[3] By the end of 2015, the Company had reported $75 million in merger synergies, but stopped reporting this metric in June 2016. As defendant Kimmins explained: "As to synergies, it has been over two years since we initiated the myriad work streams that would produce $100 million in cost synergies. We have tracked these efforts and reported them as clearly as we could. You will recall that we exited 2015 with a run rate of $75 million of merger synergies. And we committed to be at a run rate $100 million by the end of this year. At this point, we are fully confident that all of those original initiatives have been or will be completed by the end of this year. But isolating their impact amidst all the other business activity is becoming less clear and less useful. So we will stop reporting on merger synergies and focus more attention to current initiatives." Stated far more simply, Men's Wearhouse was aware it could not achieve the stated merger synergies and never did.

ubiquitous yet essential Buy-One-Get-Three promotions, or altering the mix/style/fit of the Jos. A. Bank suits in an attempt to attract younger Millennial customers to the brand would be devastating and have a disastrous 30% negative impact on sales as loyal customers would flee in droves. Despite being so apprised, and to justify their $1.8 billion purchase, defendants assured investors at the time of the acquisition that Jos. A. Bank would be accretive to the Company's earnings, create significant cost synergies and generate meaningful shareholders returns (which, not coincidentally, their deferred stock units were tied to).

9. Between September 9, 2015 and December 10, 2015 investors began to learn the truth when defendants were forced to disclose the impact of their radical changes to the Jos. A. Bank business model.

- On September 9, 2015, Men's Wearhouse stunned investors, analysts and customers with their decision "to accelerate our timeline in a more aggressive and comprehensive way" with respect to Jos. A. Bank's business, stating the Company would "move away from buy one, get three free" and "we'll deliver much more newness to our [Jos. A. Bank] stores," which news sent Men's Wearhouse stock price down 12%.

- Two months later, on November 5, 2015, the 3Q15 results were so bad that defendants took the highly unusual step of announcing Men's Wearhouse's ***preliminary*** results and updating its FY15 guidance. The Company was forced to admit that comparable sales at Jos. A. Bank during the third quarter had decreased 14.6% and provided downward revisions to adjusted EPS, far below the Company's stated expectations just two months before (when they were already a month into 3Q15), attributing these results to a "decline in traffic as the Company began the transition away from the Buy-One-Get-Three promotional events." As a result, Men's Wearhouse lowered its expected adjusted EPS by nearly 50% for the third quarter and updated its guidance for FY15, stating that adjusted EPS for the FY would likely be between $1.75 and $2.00, a decrease of more than 30% from the Company's previous guidance of $2.70 to $2.90, and expected 4Q15 comparable sales at Jos. A. Bank to decrease between 20% and 25% as a result of the decline in traffic continuing from the third quarter trend, coupled with the previously expected decline in units per transaction "as customers adapt to the shift in the promotional strategy." As a result of this news, the price of Men's Wearhouse stock plummeted $17.40 per share, a single-day decline of 43%.

- Finally, after months of emphasizing the supposed success of the Jos. A. Bank integration, on December 9, 2015, the Company announced a $90.1 million non-cash

impairment charge as a result of the decrease in Jos. A. Bank sales and revealed that "[t]hrough the first week of December, the quarter-to-date ***comparable sales at Jos. A. Bank were down 35.1%***." The release also revealed that "[i]f the Jos. A. Bank trend continues through the remainder of the [fourth] quarter, the Company runs the risk of missing the lower end of the guidance given on November 5, 2015." As a result of this news, the price of Men's Wearhouse stock dropped another $3.30 per share, a decline of nearly 18%.

10. At the end of the Class Period, over $1.5 billion of Men's Wearhouse's market capitalization had been erased – nearly the entire price of the Jos. A. Bank $1.8 billion acquisition – as investors learned of the known (or recklessly disregarded), but undisclosed, risks and impact associated with abandoning the Jos. A. Bank business model. Ultimately, by the end of FY15, Jos. A. Bank's comparable sales had decreased 31.9% and Men's Wearhouse took a $1.1 billion goodwill and intangible asset impairment charge – writing off the majority of the $1.8 billion acquisition price.

11. The wrongdoing alleged herein had a devastating and lingering impact, as the Company has yet to recover, with Tailored Brands stock hovering around $10 per share at the time of the filing of this Complaint.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa) as the claims asserted herein arise under and pursuant to §10(b) and §20(a) of the 1934 Act (15 U.S.C. §78j(b) and §78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).

14. In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

15. Lead Plaintiff Strathclyde Pension Fund was established in 1974 by Act of Parliament and transferred to Glasgow City Council in 1996. Glasgow City Council, the administering authority for Strathclyde Pension Fund, delegates managing responsibility of the fund to the Strathclyde Pension Fund Committee which oversees over $20 billion in assets for the benefit of approximately 200,000 members. As detailed in the previously-filed Certification incorporated herein by reference (Dkt. No. 11-2), Strathclyde Pension Fund purchased Men's Wearhouse (n/k/a Tailored Brands) common stock at artificially inflated prices during the Class Period and suffered damages as a result of the misconduct alleged herein.

16. Founded in 1973, defendant Tailored Brands (f/k/a Men's Wearhouse) operates as a specialty apparel retailer in the United States, Puerto Rico, and Canada.[4] During the Class Period, Men's Wearhouse stock was listed and traded on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker MW. After the Class Period, Men's Wearhouse changed its name to Tailored Brands, which is listed and trades on NYSE, an efficient market, under the ticker TLRD. There were more than 48 million shares of Men's Wearhouse stock outstanding during the Class Period.

17. Defendant Douglas L. Ewert served as the Company's CEO during the Class Period and, since March 2016, as its President as well. Defendant Ewert joined the Company in 1995 and has been an executive officer since 2000. As CEO and President, defendant Ewert spoke on Men's Wearhouse's behalf in releases, conference calls and SEC filings. Pursuant to §302 and §906 of the

---

4 For ease of reference, Tailored Brands is referred to as Men's Wearhouse and/or Jos. A. Bank, as appropriate, during the Class Period.

Sarbanes-Oxley Act of 2002, SEC Rules 13a-14(a), 13a-15(e)-(f) and 15d-15(e)-(f), and 18 U.S.C. §1350, defendant Ewert certified the Company's Form 10-Qs filed with the SEC on September 11, 2014, December 11, 2014, June 11, 2015, September 9, 2015 and December 10, 2015 and signed and certified the Company's Form 10-K filed with the SEC on March 11, 2015. Ewert also signed the Company's Form 10-K filed with the SEC on March 11, 2015 on behalf of Men's Wearhouse.

18. Defendant Jon W. Kimmins served as the Company's Executive Vice President, CFO, Treasurer and Principal Financial Officer during the Class Period. Kimmins joined the Company in 2013 as Executive Vice President, CFO, Treasurer and Principal Financial Officer. As CFO, Treasurer and Principal Financial Officer, defendant Kimmins spoke on Men's Wearhouse's behalf in releases, conference calls and SEC filings. Pursuant to §302 and §906 of the Sarbanes-Oxley Act of 2002, SEC Rules 13a-14(a), 13a-15(e)-(f) and 15d-15(e)-(f), and 18 U.S.C. §1350, defendant Kimmins certified the Company's Form 10-Qs filed with the SEC on Men's Wearhouse's behalf on September 11, 2014, December 11, 2014, June 11, 2015, September 9, 2015, and December 10, 2015, and the Company's Form 10-K filed with the SEC on March 11, 2015. Kimmins also signed the Company's Form 10-Qs filed with the SEC on Men's Wearhouse's behalf on September 11, 2014, December 11, 2014, June 11, 2015, September 9, 2015 and December 10, 2015.

19. Defendant Mary Beth Blake served as the Company's Executive Vice President and Chief Merchandising Officer during the Class Period until September 10, 2014 when her title was changed to President and Chief Merchandising Officer. As the Company's Chief Merchandising Officer, defendant Blake spoke on Men's Wearhouse's behalf during the July 29, 2014 Analyst Day conference call.

20. Defendants Ewert, Kimmins and Blake are sometimes collectively referred to herein as the "Individual Defendants."

21. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Men's Wearhouse, were in possession of and privy to confidential and proprietary information concerning Men's Wearhouse, its products, global operations, finances, financial condition, and present and future business prospects for all of its product lines and business segments. Because of their positions as Men's Wearhouse's senior-most executive officers, the Individual Defendants obtained, had access to and/or were in possession of material, adverse non-public information concerning Men's Wearhouse via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof) and via the reports, presentations and other information provided to them in connection therewith. As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

(a) Each of the other Individual Defendants reported directly to Ewert:




(b) During the July 29, 2014 Analyst Day, Men's Wearhouse "emphasize[d] the open door, so employees feel empowered to speak up to raise concerns, suggestions and solution[s].

Doug [Ewert] regularly gets e-mails from our employees, and anyone can e-mail him by a click on our internal Internet. We've also established an open door e-mail address for the Joseph A. Bank employees to e-mail their comments and suggestions as well." That same day, Kelly Dilts, MW's Senior Vice President of Finance and Investor Relations informed the participants that "[a]ll of us in senior management, most of whom you'll hear from today," including defendants Blake and Kimmins, "work closely with Doug [Ewert] on a day-to-day basis."

22. As senior executive officers and controlling persons of a publicly-traded company whose common stock was registered with the SEC pursuant to the 1934 Act during the Class Period, and was actively traded on the NYSE and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Men's Wearhouse's operations, business and financial statements and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Men's Wearhouse stock would be based upon truthful and accurate information. Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## BACKGROUND TO THE CLASS PERIOD

### The Acquisition Battle

23. In June 2013, Men's Wearhouse fired founder, Executive Chairman and longtime pitchman, George Zimmer, as it tried to appeal to a younger generation.[5] Before his ouster, Zimmer had reportedly clashed with his handpicked CEO, defendant Ewert, over Ewert's strategy to attract Millennial customers and Zimmer was seeking to take Men's Wearhouse private.

---

5 Zimmer became known to audiences for his signature tagline at the end of Men's Wearhouse commercials: "You're going to like the way you look. I guarantee it."

24. Seeing an opening to take over a rival it perceived as weakened and in turmoil, Jos. A. Bank launched an unsolicited $2.3 billion takeover bid for Men's Wearhouse in October 2013, a move that set the two companies spiraling down a turbulent (and dramatic) path.[6] Just hours after receiving the unsolicited bid, Men's Wearhouse rejected the offer, stating that the "Jos. A. Bank proposal significantly undervalues Men's Wearhouse" and implemented a shareholder rights plan (also known as a "poison pill") to entrench Men's Wearhouse management in their positions and thereby protect the significant payments and benefits associated therewith.

25. Thereafter, Men's Wearhouse further explained its rejection of Jos. A. Bank's unsolicited proposal because it "fails to compensate Men's Wearhouse for its strong prospects for continued growth and value creation, and is not in the best interest of Men's Wearhouse shareholders." An October 28, 2013, investor presentation further outlined the reasons for Men's Wearhouse's rejection of Jos. A. Bank's offer:

Men's Wearhouse Board has rejected Jos. A. Bank's unsolicited and non-binding proposal

**Jos. A. Bank's $48 non-binding and highly conditional proposal fails to compensate Men's Wearhouse for its strong prospects for continued growth and value creation, and is not in the best interest of Men's Wearhouse shareholders**

1. **Jos. A. Bank's proposal fails to compensate Men's Wearhouse for its industry-leading market position**
   - Men's Wearhouse is the leading men's specialty retailer in North America
   - With sales of $2.5 billion, Men's Wearhouse has more than 2x the sales of Jos. A . Bank, the next largest competitor
   - Men's Wearhouse's valuable market position provides opportunities to deliver outsized growth
2. **Men's Wearhouse's standalone value proposition is superior to Jos. A. Bank's proposal and will be driven by:**
   - Compelling near- and long-term growth prospects
   - Significant margin improvement opportunity
   - Continued strong return of capital
3. **The Jos. A. Bank proposal is highly opportunistic**
   - Blatantly opportunistic attempt to exploit a temporary dislocation in the Men's Wearhouse stock price
   - Ignores the value of recent growth initiatives not yet fully realized for the benefit of Men's Wearhouse shareholders
   - Would deprive Men's Wearhouse shareholders of the intrinsic value of their investment
   - Non-binding and highly conditional and subject to unacceptable risks and contingencies

3

[6] At the time of Jos. A. Banks' $2.3 billion unsolicited offer, Men's Wearhouse's market capitalization was approximately $1.8 billion, ironically the same price it ultimately paid for Jos. A. Bank.

26. At the time it rebuffed Jos. A. Bank's offer, Men's Wearhouse also stated it "has a superior platform and value proposition," and specifically recognized that Jos. A. Bank's core customer is "[v]ery price sensitive:"




27. Even from afar, Men's Wearhouse also understood and recognized that Jos. A. Bank's customers "have been accustomed to significant discounts:"






1269698_1

28. In response to Men's Wearhouse's outright rejection of Jos. A. Bank's offer without engaging in any discussions, Men's Wearhouse's largest shareholder, Eminence Capital, LLC, which then owned 9.8% of the Company's stock, issued a release on November 15, 2013 stating that:

> Eminence Capital, LLC, which owns 9.8% of the common stock of The Men's Wearhouse, Inc. (MW) and is the single largest shareholder, today expressed its disappointment that MW's Board of Directors has so far failed to engage in merger discussions with Jos. A. Bank Clothiers, Inc. (JOSB). Eminence Capital believes that by allowing yesterday's deadline to expire, the Board has confirmed that it is not committed to exercising its basic fiduciary duties to shareholders and is satisfied with the status quo.
>
> In light of MW's failure to engage with JOSB, Eminence Capital announced today that it has filed a preliminary solicitation statement with the Securities and Exchange Commission in connection with calling a special meeting of MW shareholders to vote on a number of bylaw amendments that, if approved, will permit shareholders to remove directors without cause before the next annual meeting of shareholders. Pursuant to Texas law the special meeting may be called by holders of at least ten percent (10%) of all of the shares of MW entitled to vote at the special meeting.
>
> Ricky C. Sandler, Chief Executive Officer of Eminence Capital, stated:
>
> "We are disappointed that Men's Wearhouse has so far failed to engage in merger discussions with JOSB. In light of the Board's actions, we are forced to launch this initiative that will give shareholders the opportunity to effect important corporate governance changes at Men's Wearhouse. In our view the governance changes implemented last month by the Board in response to the premium proposal made by JOSB, including the imposition of a super-majority vote for shareholder amendments to the bylaws and implementation of a poison pill with a 10% threshold, are not in the best interests of shareholders. More fundamentally, these actions reflect a troubling mindset by the Board and its advisors regarding shareholders' rights.
>
> "We continue to encourage the Board to take immediate steps to complete its review of strategic options, including a merger with JOSB, that was disclosed in our November 12 letter. If the Board fails to do so, our special meeting initiative will give shareholders the tools to hold the Board accountable for its failed leadership."

29. In calling for a special meeting, Eminence Capital LLC also prepared slides for investors to assess Jos. A. Bank's offer, noting that "Jos. A. Bank HAS OUTPERFORMED Men's Wearhouse across a broad range of operating metrics:"

**We Believe Jos. A. Bank Will Make an Excellent Merger Partner**

| Category | Metric | Time Period | JOS. A. BANK | MW |
|---|---|---|---|---|
| Jos. A. Bank has achieved superior operating margins to Men's Wearhouse | Adjusted Operating Margins | LTM | 10.2% | 7.9% |
| | | FY07 to FY12 | 14.6% | 6.9% |
| Jos. A. Bank has achieved superior returns on invested capital to Men's Wearhouse | ROIC [1] | LTM | 31.5% | 23.1% |
| | | FY07 to FY12 | 56.6% | 18.6% |
| Jos. A Bank has achieved superior SSS growth to Men's Wearhouse | Same Store Sales Growth | FY07 to FY12 | 5.5% | 0.9% |
| Jos. A. Bank has achieved superior cash generation efficiency to Men's Wearhouse | Cumulative FCF as a Percentage of Net Sales | FY07 to FY12 | 6.5% | 4.0% |
| Jos. A Bank has achieved superior employee productivity to Men's Wearhouse | Sales per Employee | LTM | $160,233 | $143,040 |

Jos. A. Bank HAS OUTPERFORMED Men's Wearhouse across a broad range of operating metrics

30. Rebuffed, on November 15, 2013, Jos. A. Bank withdrew its offer to acquire Men's Wearhouse.

31. Less than two weeks later, on November 26, 2013, under immense pressure from its largest shareholder to provide returns, Men's Wearhouse abruptly turned the tables on Jos. A. Bank, offering $55 per share in cash. In a slide presentation regarding the proposal, Men's Wearhouse touted a "compelling strategic rationale," highlighted "[s]ignificant synergy potential" and stated that Men's Wearhouse had "specific ideas on how to better position the Jos. A. Bank brand and business in the market and operate in a more efficient manner:"




32. Men's Wearhouse also shared its "[p]reliminary integration plan," which stated that "Jos. A. Bank's store banner will remain in place:"




33. After several months of back-and-forth, including a defensive offer by Jos. A. Bank to acquire Eddie Bauer, adverse litigation, several raised offers and public hostilities exchanged in the press and SEC filings, Men's Wearhouse and Jos. A. Bank ultimately entered into a merger

agreement providing for the acquisition of Jos. A. Bank by Men's Wearhouse for $65 per share in cash, or approximately $1.8 billion, on March 11, 2014. At the time of the merger, Men's Wearhouse and Jos. A. Bank said in a joint statement that Jos. A. Bank's brand would remain independent.

34. In connection with the merger, on April 17, 2014, the Compensation Committee of the Board of Directors of Men's Wearhouse approved equity grants to certain of the Company's executive officers, including defendants Ewert and Kimmins, comprised of

> (i) performance-based deferred stock units ("DSUs"), which will vest in one year (i.e., April 13, 2015) if a performance metric based on increased EBIT (as defined in the award agreement) is attained during fiscal 2014, and (ii) options to purchase common stock of the Company, which would vest in equal installments in each of years two and three (i.e., April 13, 2016 and April 13, 2017), the latter of which would inherently attain value based on the performance of the Company's common stock and allow management to participate in the upside potential of the acquisition of JOSB.

**Distinct Customer Bases**

35. Men's Wearhouse and Jos. A. Bank have entirely distinct customer bases, as Men's Wearhouse acknowledged in its July 29, 2014 Analyst Day presentation:



36. The Men's Wearhouse targets male consumers between 25 to 55 years old and its merchandise styling is contemporary and on-trend, comprised of exclusive (56%) and branded (44%) products. By contrast, Jos. A. Bank targets male career professionals between 35 to 59 years old and its merchandise styling is traditional and conservative, substantially all of which (98%) was sold under the exclusive JAB label. While slim fit suits totaled 45% of Men's Wearhouse's sales as of mid-2013, Jos. A. Bank sold only 13% slim fit as of mid-2013, compared to 59% classic/traditional fit:




37. Compared with the typical Men's Wearhouse customer, the Jos. A. Bank customer is generally older and has a higher household income. Furthermore, the typical Jos. A. Bank customer is much more price sensitive than the typical Men's Wearhouse customer. Shortly after the acquisition, Men's Wearhouse determined there was only 7% overlap between the brands by comparing each brands' customer databases:




38. Before the merger, Jos. A. Bank maintained a proprietary database of millions of active customers and, based on this proprietary database and historical sales data, Jos. A. Bank knew that its customers favored aggressive promotional prices over higher out-the-door promotional pricing. Jos. A. Bank also knew that one of the biggest opportunities for the company was with its existing loyal customers, about whom Jos. A. Bank knew a lot. As such, for several years leading up to the merger, strong promotional activity consistently and effectively drove Jos. A. Bank's sales and margin growth.

39. Jos. A. Bank's proprietary database and historical sales data also informed the company that while trendier slim fit suits were attracting some younger customers, Jos. A. Bank's tailored fit and classic style suits were the primary drivers of the business for the company and its very loyal customer base. In addition, Jos. A. Bank's direct marketing segment drove a good portion of the business.

40. Before the Men's Wearhouse acquisition, Jos. A. Bank had tested dropping and/or changing their various promotions and they learned early on that the losses would be catastrophic. Even changing the price of a JAB suit by $1 would negatively affect sales with the traditional Jos. A.

Bank customer. Thus, Jos. A. Bank had a strong history with their sales promotions and knew the effects of limiting the amount of days of a particular promotion would have on sales.

41. Before the acquisition, Men's Wearhouse also acknowledged they "'need data and luckily we have a ton of it,'" including "'transaction data from stores, we have Web site data to track the user experience, we have data from loyalty programs. We want to gather everything we know about [the customers] . . . .'"

**Post-Merger Plans for the Combined Company Take Shape**

42. After the acquisition, during the July 29, 2014 Analyst Day presentation, defendant Ewert told analysts that "[c]ustomers like what we're doing right now, as each of our brands are performing well." Defendant Ewert also acknowledged that Men's Wearhouse and Jos. A. Bank are different brands with very different customers:

> [JAB] targets a customer who appreciates quality, value and classic styling; is older than the typical Men's Wearhouse customer; has a higher household income; and isn't influenced by the latest trends.

43. During the Analyst Day event, defendant Blake acknowledged that "[w]e believe that it will be paramount to our future growth and increased market share potential to continue to differentiate these two brands, positioning them each with an unique voice ensuring that each brand is distinctive and coherent to its customer."

44. Also during the Analyst Day event, defendant Kimmins explained that Men's Wearhouse had established a "disciplined" and "controlled processes to make sure that we can accomplish what we set out to do" with respect to merger synergies. For each category in which potential synergies were identified, Men's Wearhouse "detailed work plans in senior management accountability for each line item," including "supplier/factory consolidation" as part of the cost of goods sold ("COGS") synergies, which was defendant Blake's primary responsibility as Executive Vice President & Chief Merchandising Officer.

45. As defendant Kimmins also explained during the Analyst Day presentation, the Company developed a work stream to summarize the anticipated merger synergies, which "is then presented to senior management for sign off" and then "we go to the action plan" which "shows – every step it shows the timing that's required and it shows importantly who is accountable, who in the senior management team is accountable." Defendant Kimmins emphasized that "[w]hat I'm really trying to impress on you is that we have done detailed work here" and "each synergy is receiving this amount of rigor."

46. Next to G&A synergies, COGS synergies (which included sourcing and vendors) comprised nearly a third of defendants' $100-$150 million in estimated synergies:

Quantified Synergies

| | Midpoint of Estimates |
|---|---|
| G&A | $46 |
| COGS | $30 |
| Stores | $14 |
| E-Commerce | $8 |
| Advertising Media | $6 |
| Other | TBD |
| Total Quantified to Date | Over $100 |

Note: Dollars in millions.

164 MEN'S WEARHOUSE®

47. And, achieving the COGS synergies was key to attaining the gross margin guidance (and, by extension, adjusted EPS and earnings before interest and taxes ("EBIT") guidance) through 2017:




48. Once Men's Wearhouse's $1.8 billion acquisition of Jos. A. Bank was completed, analysts, investors (and customers) turned their focus to the business; specifically, whether defendants would be able to alter the promotional cadence and fit/style of suits sold at Jos. A. Bank to attract new customers without alienating existing customers. As Cowen & Co. analysts noted in March and June 2014, "[a] critical question among investors is how the promotional intensity will

change." Heading into the summer and the July 29, 2014 Analyst Day, analysts, investors, and customers alike were eager to learn Men's Wearhouse post-merger plans for Jos. A. Bank.

**DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS**

**July 29, 2014 Analyst Day**

49. On July 29, 2014, Men's Wearhouse hosted an Analyst Day led by defendants Ewert, Kimmins, Blake and several other senior Men's Wearhouse executive officers. Among several topics concerning the post-acquisition plans for the combined companies, defendant Blake's presentation addressed the two brands' approaches to promotions and outlined the strategy going forward for Jos. A. Bank's promotional cadence:




50. Defendant Blake stated that "[i]n the near term, we will continue to promote using buy one get two free and buy one get three free handles at Joseph Bank," while also stating that "*[o]ur long-term strategy is to wean off the most margin erosive sale events*."

51. Defendant Ewert reassured analysts that "[o]ur focus is on the customer and the need to respect their loyalty to their favorite clothing store. They like the quality and styling of their favorite brands. They respond to the considerable marketing investments and promotional discounts.

While we see opportunity for improvement, ***we will move slowly and deliberately making sure that significant changes are tested on a small scale before proceeding on a large scale***." Defendant Ewert emphasized that "***[o]ur objective is to further engage, but not alienate the Joseph Bank existing customer while introducing products, services and messaging designed to attract new customers***."

52. Defendant Ewert also engaged in the following colloquy with an unidentified securities analyst:

> [UNKNOWN ANALYST]: I had a couple of questions. The first is on the pricing strategy, it's my impression that you'll maintain the pricing strategy currently in place at Jos. A. Bank. So will you be testing opportunities to maybe offer buy one get one free instead of get two or three free, or will you be maintaining that policy through the period you've just guided to? . . .
>
> [EWERT]: Sure. Yes, of course. We're going to be testing many marketing and pricing and promotion strategies. ***We're going to do it in a way in a localized way so that we don't put the enterprise at risk***. And it's too soon to tell what kind of pricing strategies we're going to deploy. What they are doing now works well, drives a tremendous amount of, repeat business drives a tremendous amount of new customer acquisition. The margins on these price promotion activities is healthy. And so we don't see that is an immediate cause of concern, but ***certainly over time we will be testing many different strategies to try to get the average ticket higher, to get the average out the door unit price higher*** and ultimately the volume.

53. Another analyst, Kohn Kernan of Cowen & Co., followed up with a question about advertising spending as a percentage of sales of Jos. A. Bank and "[w]ill banks continue to be as aggressive with advertising as they are now?" Defendant Ewert responded: "[w]ell the Jos. A. Banks customer certainly responds to frequent and aggressive price promotion offers and it helps drive the business. ***We're not going to make any sudden changes there***."

54. Defendant Kimmins informed participants that, based on their extensive detailed analysis, "we expect to be essentially at $100 million of cost synergies for the full year of 2017." Defendant Kimmins also stated that: "[t]he assumptions we provided so far with the synergies at the low-end of the range would lead us to an earnings per share of a little more than $5.50."

55. Defendants Men's Wearhouse, Ewert, Kimmins and Blake's July 29, 2014 statements were materially false and misleading when made in that they omitted the true facts, which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytical tools described herein, including that:

(a) Their plan to attain $100-$150 million in merger synergies (of which COGS was $40 million) included replacing Jos. A. Bank's merchandise sourcing vendors with Men's Wearhouse vendors, which they knew or recklessly disregarded would have a devastating ripple-down corrosive effect on margins, as, unlike Men's Wearhouse, Jos. A. Bank directly sourced products that yielded better product margins. By replacing Jos. A. Bank's directly sourced products with Men's Wearhouse's more expensive branded suits and products, defendants knew that Men's Wearhouse would necessarily need to raise prices for Jos. A. Bank suits, and could not run the same promotions on these suits that customers expected and responded well to, to maintain sufficient margins. But, as Jos. A. Bank senior executives informed Men's Wearhouse senior executives (including defendants Ewert and Blake) at weekly Monday marketing meetings, their prior analysis and testing showed that Jos. A. Bank customers were extremely sensitive to price, and changing the sales price of a Jos. A. Bank suit by as little as $1 would have a tremendous negative impact on sales.

(b) As soon as the acquisition closed, defendants intended to eliminate the lucrative Buy-One-Get-Three Jos. A. Bank promotions and introduce tailored branded suits and slim fit suits into Jos. A. Bank stores, which defendants knew or recklessly disregarded would cause sales to decline by 30%. Before and throughout the Class Period, Jos. A. Bank senior executives attended marketing meetings on Monday mornings to discuss key aspects of the business. After the merger, senior Men's Wearhouse executives, including defendants Ewert and Blake, also participated in these meetings. During initial post-merger meetings, the Men's Wearhouse executives commented

to the Jos. A. Bank executives that Jos. A. Bank's margins were low and the Buy-One-Get-Three promotions would be eliminated. In response, Jos. A. Bank executives emphasized to the Men's Wearhouse executives (including defendants Ewert and Blake) that the Buy-One-Get-Three promotions generated a tremendous amount of revenue that could not be made up without the promotions. The Jos. A. Bank executives also informed the Men's Wearhouse executives (including defendants Ewert and Blake) at many of the Monday morning meetings that if the Buy-One-Get-Three promotions were discontinued, Jos. A. Bank sales would decline by 30%.

(c) As a result of (a)-(b), defendants' 2017 guidance lacked a reasonable basis when made and omitted material facts necessary to make the guidance not misleading.

**2Q14 Earnings Release, Conference Call and Form 10-Q**

56. On September 10, 2014, Men's Wearhouse announced the Company's 2Q14 results for the period ended August 2, 2014 in a release, stating that Jos. A. Bank's 2Q14 comparable sales increased 1%.[7] In that release, defendant Ewert stated "'we are pleased with the progress we are making on the integration'" and "'***we . . . continue to expect between $100 million to $150 million in synergies***.'"

57. On September 11, 2014, Men's Wearhouse hosted a conference call led by defendants Ewert and Kimmins to discuss the Company's 2Q14 results. Defendant Kimmins stated that Men's Wearhouse was "beginning to test ways to improve Joe Bank's promotional and advertising strategies and to stabilize gross margins" and assured investors that the Company "***will be judicious in how we do this***." Defendant Ewert reiterated that "[o]f course, ***we'll be careful to make sure we don't take our eye off our loyal [Jos. A. Bank] customers by seeking their permission through testing before making widespread changes***."

---

[7] The acquisition closed during 2Q14 on June 18, 2014.

58. Responding to a Cowen & Co. analyst's question regarding Jos. A. Bank's profitability in the quarter, defendant Ewert emphasized that Jos. A. Bank's 2Q14 performance was "all as we anticipated," stated that "[o]ur eyes are set on 2017," and explained that "[w]e have to overcome some unsustainable habits in the Jos. Bank pricing and marketing strategies. And ***our first line of attack is to stabilize the margin, and stop the erosion, and test alternative messaging and promotional strategies to then start building and, obviously, at the same time, working on driving revenue synergies***."

59. Defendant Ewert also engaged in the following colloquy with a JP Morgan analyst regarding the merger synergies and the Company's work on the integration process since July:

> **Dina Moyne – JPMorgan – Analyst**:
>
> Hi, everyone. This is [Dina Moyne] on for Brian. Thanks for taking our question. I guess, first, wanted to dig a little deeper into the synergies. You had [far more] work on the integration process since you updated us at the Investor Day.
>
> You're maintaining the guidance for $100 million to $150 million. Are there any areas you feel stronger or, conversely, less enthusiastic about now? Or are there other items that you could expect toward the synergy items that could come through faster than you originally planned?
>
> **Doug Ewert – Men's Wearhouse Inc. – CEO**:
>
> ***We're very confident in the range of $100 million to $150 million***. What you heard at Analyst Day was a very clear, defined path to get into that range on cost alone. Prior to closing on the transaction, we knew that it was going to take cost and retail to get us there, but once we got inside the business and understood where all the lever opportunities were, we know we can get into the range on cost alone.
>
> ***So, we're very confident that a minimum of $100 million at cost***. Retail, through our revenue synergies, are all upside to that, and we see significant opportunity for revenue synergies. But as I said in my prepared remarks, they rely upon customer acceptance, and so it's hard to quantify what those are going to look like, but they're going to be sizable. And as we dig deeper into this and get to know the business more, and the nuances of the business, ***we're only more confident on the opportunity. And like I said before, our eye is on 2017, and we're very confident we're going to get the synergies***.

60. Defendants Men's Wearhouse, Ewert and Kimmins' September 10-11, 2014 statements were materially false and misleading when made in that they omitted the true facts, which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytical tools described herein, included that:

(a) Their plan to attain $100-$150 million in merger synergies (of which COGS was $40 million) included replacing Jos. A. Bank's merchandise sourcing vendors with Men's Wearhouse vendors, which they knew or recklessly disregarded would have a devastating ripple-down corrosive effect on margins, as, unlike Men's Wearhouse, Jos. A. Bank directly sourced products that yielded better product margins. By replacing Jos. A. Bank's directly sourced products with Men's Wearhouse's more expensive branded suits and products, defendants knew that Men's Wearhouse would necessarily need to raise prices for Jos. A. Bank suits, and could not run the same promotions on these suits that customers expected and responded well to, to maintain sufficient margins. But, as Jos. A. Bank senior executives informed Men's Wearhouse senior executives (including defendants Ewert and Blake) at weekly Monday marketing meetings, their prior analysis and testing showed that Jos. A. Bank customers were extremely sensitive to price, and changing the sales price of a Jos. A. Bank suit by as little as $1 would have a tremendous negative impact on sales.

(b) As soon as the acquisition closed, defendants intended to eliminate the lucrative Buy-One-Get-Three Jos. A. Bank promotions and introduce tailored branded suits and slim fit suits into Jos. A. Bank stores, which defendants knew or recklessly disregarded would cause sales to decline by 30%. Before and throughout the Class Period, Jos. A. Bank senior executives attended marketing meetings on Monday mornings to discuss key aspects of the business. After the merger, senior Men's Wearhouse executives, including defendants Ewert and Blake, also participated in these meetings. During initial post-merger meetings, the Men's Wearhouse executives commented

to the Jos. A. Bank executives that Jos. A. Bank's margins were low and the Buy-One-Get-Three promotions would be eliminated. In response, Jos. A. Bank executives emphasized to the Men's Wearhouse executives (including defendants Ewert and Blake) that the Buy-One-Get-Three promotions generated a tremendous amount of revenue that could not be made up without the promotions. The Jos. A. Bank executives also informed the Men's Wearhouse executives (including defendants Ewert and Blake) at many of the Monday morning meetings that if the Buy-One-Get-Three promotions were discontinued, Jos. A. Bank sales would decline by 30%.

(c) As a result of (a)-(b), defendants' 2017 guidance lacked a reasonable basis when made and omitted material facts necessary to make the guidance not misleading.

61. Also on September 11, 2014, Men's Wearhouse's 2Q14 Form 10-Q for the period ended August 2, 2014, which was prepared, reviewed, and signed by defendants Ewert and Kimmins, was filed with the SEC. Defendant Kimmins signed the Form 10-Q and defendants Ewert and Kimmins each certified that the document "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

62. The Form 10-Q was false and misleading when filed with the SEC because it failed to disclose known trends, demands, commitments, events, or uncertainties regarding Jos. A. Bank which comprised approximately 25% of the Company's sales. The material omitted information that was required to be disclosed to investors, including trends or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii)-(iii), and the SEC's interpretive releases thereto, included the information described in ¶60 above.[8]

[8] *See, e.g.*, Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Exchange Act Release No. 34-26831, 54 FR 22427 (May 18, 1989).

63. The Form 10-Q also stated that "[t]here have been no material changes in our risk factors from those disclosed in Item 1A contained in Part I of our Annual Report on Form 10-K for the fiscal year ended February 1, 2014, except as [identified therein]." The Form 10-Q was materially false and misleading when filed with the SEC. The risk factors were materially false and misleading because defendants failed to disclose the true facts, as required by 17 C.F.R. §229.503(c), which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytic tools described herein, including the material changes in the Company's risk factors as detailed in ¶60 above.

**Men's Wearhouse Substantially Alters and Enhances Executive Compensation**

64. On September 16, 2014, Men's Wearhouse filed a Form 8-K with the SEC announcing that the "Board of Directors of the Company approved a modified equity compensation structure for senior executive officers, including certain of the named executive officers, as part of an overall compensation structure that is designed to be reflective of the increased size of the Company and includes performance criteria aligned with the performance expectations communicated by the Company in its Analyst Day presentation on July 29, 2014."[9] The Form 8-K further explained that:

> As a result, the Board of Directors also approved changes in the form of award agreements to be issued for equity grants to senior executive officers, including certain named executive officers, under the Company's 2004 Long-Term Incentive Plan. . . . [T]he performance unit award agreements, which underlying awards are scheduled to vest in April 2018, have been further revised in part to include performance-based vesting conditions based on certain adjusted earnings per share targets being met for fiscal 2017, subject to adjustment as to the number of shares which shall actually vest based upon certain adjusted earnings per share targets for fiscal 2017 and relative total shareholder return of the Company as compared to the companies in the S&P Apparel Index.

[9] The performance criteria communicated by the Company in its July 29, 2014 Analyst Day presentation included adjusted EPS of $5.50 to $6.00 per share for 2017.

65. These material changes to defendants' Ewert's and Kimmins' compensation directly tied their performance-based awards to the Company's 2017 adjusted EPS targets.[10]

66. As the May 19, 2015, Definitive Proxy Statement more fully explained, the September 2014 new compensation program materially enhanced and altered compensation for the Company's senior executive officers, including the Individual Defendants:

> In light of the significant changes the Company experienced in fiscal 2014, the Compensation Committee, with the assistance of Pay Governance, a prominent consulting firm specializing in advisory services related to executive and director compensation, undertook a comprehensive review of the Company's compensation practices following the completion of the Jos. A. Bank acquisition. As a result of this review, and taking into consideration the input from the Company's Chief Executive Officer and Pay Governance, in September 2014, the Compensation Committee determined that it was in the best interest of the Company to increase certain executive officers' base salaries and to revise and adjust various aspects of the Company's compensation practices pertaining to both our annual cash incentive plan and equity-based long term incentive awards. Under the new compensation program, senior executive officers, including each of our continuing Named Executive Officers other than Mr. Ewert, will receive equity awards in the following ratio: 40% performance units, 30% stock options and 30% time-vested DSUs, and Mr. Ewert will receive equity awards as follows: 50% performance units, 30% stock options and 20% time-vested DSUs. The annual cash incentive plan for 2015 will be established as a percentage of base salary and allow for payout based 80% on financial metric objectives based primarily on net consolidated earnings before interest and taxes ("EBIT") and 20% on personal performance objectives. These changes are designed and intended to reflect the substantially increased demands upon and responsibilities of our executives and the material impact the Jos. A. Bank acquisition will have on the size of the Company's operations and the Company's overall financial performance for the current and successive fiscal years. The Compensation Committee believes it is imperative to retain and incent our management team in order to successfully integrate the Jos . A. Bank operations with the Company.

67. The 2015 Proxy Statement further detailed that:

> Each of the performance units issued on September 12, 2014 represents the right to receive up to a maximum of 2.25 shares of Common Stock. The performance units will cliff-vest with respect to all shares covered thereby on April 13, 2018 if the specified adjusted earnings per share performance target for fiscal 2017 is achieved. Assuming the performance target is achieved, the number of performance units

[10] The prior agreements triggered awards based on a percentage of consolidated sales for each fiscal year.

earned will be adjusted based on multipliers, ranging from 50% to 150%, related to each of (1) the Company's adjusted earnings per share for fiscal 2017 and (2) the Company's relative total shareholder return ("TSR") compared to the TSR of the apparel companies in S&P's Retail Select Index from the grant date to the last trading day of fiscal year 2017. In 2018, the Company will provide information regarding the relative achievement of the targets and the number of shares actually earned with respect to these performance units. In September 2014, the Company issued 57,480 performance units to our Named Executive Officers, which cover a potential maximum of 129,330 shares of our Common Stock.

68. A review of Men's Wearhouse's Proxy Statements from 2008-2016 indicate that the Company had not previously granted deferred stock units of the type, volume or magnitude as those granted in September 2014.

69. These changes substantially increased compensation across the board and directly induced defendants to immediately and dramatically affect the changes in Jos. A. Bank's business by tying the Individual Defendants' bonuses and stock/option awards to the merger synergies:

| Executive | Year | Salary | Bonus[11] | Stock Awards[12] | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|---|---|
| Ewert | 2014 | $1.25 million | $500,000 | 4,135,552 | 2,051,278 | $1,718,750 | $9.6 million |
| | 2013 | $1.1 million | --- | 1,999,999 | --- | $416,667 | $3.6 million |
| Kimmins | 2014 | $484,615 | $300,000 | 670,310 | 410,249 | $618,750 | $2.4 million |
| | 2013 | $380,769 | $275,000 | 1,000,013 | 249,996 | $150,000 | $2 million |
| Blake | 2014 | $560,769 | $50,000 | 817,123 | 470,256 | $412,500 | $2.3 million |
| | 2013 | $536,335 | --- | 249,995 | --- | $100,000 | $907,076 |

**New Brand President Named at Jos. A. Bank**

70. On September 30, 2014, Men's Wearhouse announced it named Paul Fitzpatrick ("Fitzpatrick") as President of Jos. A. Bank.

[11] For FY14, the one-time cash bonus related to a special bonus paid in June 2014 to Men's Wearhouse executive officers upon the consummation of the acquisition of Jos. A. Bank.

[12] The Stock Awards and Option Awards were an "accelerated issuance of equity awards" paid to Men's Wearhouse's "Named Executive Officers" in September 2014 "in recognition of the outstanding efforts by senior management in connection with the successful conclusion of the Jos. A. Bank transaction."

**Mid-Quarter November 2014 Analyst Meeting with Management**

71. On November 24, 2014, Jefferies, LLC issued a report titled "Meeting with Mgmt Leaves Us Positive" with a "BUY" rating and $60 price target for Men's Wearhouse stock. The report stated the "Key Takeaway" was that:

> We had an opportunity to catch up with MW management in NY. Our discussions left us with greater confidence in the potential to improve the Jos. A. Bank business and realize substantial cost and revenue synergies. We believe the market's reservations about near-term volatility are overshadowing the implicit underlying value in this name and likelihood for meaningfully accelerated EPS growth over the next few years. Reiterate Buy and $60 PT.
>
> **Integration of Jos. A. Bank progressing well.** CEO Doug Ewert and CFO Jon Kimmins assured us that the JOSB integration is moving along as planned. while stabilizing the cycle of margin erosion from excessive promotion and bloated inventory will take time, we are comfortable that management's tactics are beginning to show early progress.

**3Q14 Earnings Release, Conference Call, and Form 10-Q**

72. On December 10, 2014, Men's Wearhouse announced the Company's 3Q14 results in a release, again emphasizing that Men's Wearhouse was confident in its ability to "achieve the high end of our synergy range" and that the Jos. A. Bank integration was proceeding positively and "ahead of schedule." Defendant Ewert stated:

> "We continue to be pleased with the progress we are making on the Jos. A. Bank integration. In addition, we are pleased with the overwhelmingly positive reaction of the Jos. A. Bank employees to our culture and are very optimistic about our opportunities to expand consolidated sales and margins as we complete the integration. ***We remain confident in our 2017 guidance and our cost synergy run-rate at the end of the third quarter is well ahead of our original $15 million projection for the end of the 2014 fiscal year*** and our systems conversions are on target.
>
> . . . "We also completed our review of Jos. A. Bank's inventory and concluded we will dispose of approximately $50 million of product which will be recorded as a reduction in the inventory value at the date of acquisition; a purchase price accounting adjustment."

73. On December 11, 2014, Men's Wearhouse hosted a conference call led by defendants Ewert and Kimmins to discuss the Company's 3Q14 results. Defendant Kimmins started the call by

stating that "we are pleased with both" "the integration as well as our legacy businesses" and acknowledged that "we know that our investors" are "paying a lot of attention to [Jos. A. Bank]." Defendant Kimmins continued, stating:

> While we are more cautious about the Jos. A. Bank top line in the near term, ***we remain confident that we're on the right track for our long-term plans***. As part of these longer-term plans, we have said that ***we need to improve the fit and styling of the Jos. A. Bank inventory***. Now that we've had time to analyze the inventory in a very detailed way, we have identified approximately $50 million of inventory at cost that we will eliminate from the stores and distribution facilities. ***These goods are significantly out of fashion, and this move will accelerate our efforts to make the Jos. A. Bank inventory more trend right***.

74. With respect to acquisition synergies, defendant Kimmins stated:

> As to the other elements of the integration of Jos. A. Bank into Men's Wearhouse, we're very pleased with our progress. We are on or ahead of schedule in every aspect of integrating the operations of the two businesses. As we previously stated, the integration is a gating item for most of the key improvements in synergies that we expect from the combination. ***We are extremely confident in our ability to achieve the high end of our synergy range, as presented in late July***.
>
> At this point, ***we're ahead of schedule in getting to those numbers***. We had previously estimated that we could reach a run rate amount of $15 million by the end of this fiscal year. But as of the end of Q3, we have already reached a run rate in excess of $30 million.

75. Also during the 3Q14 conference call, defendant Ewert engaged in the following colloquy with a securities analyst:

> **Janet Kloppenburg** – JJK Research – Analyst:
>
> Good morning, everyone. I was wondering if you could talk a little bit about your strategy of [JAB's] promotional activity. I think you have some ability to control that, and it sounds like you are pulling back here and that's hurting the top line.
>
> I'm wondering, Doug, if you could talk about how long you think that will continue when the assortments will be upgraded to help you rely more on product than on promotion to improve sales? . . . .

**Doug Ewert** – Men's Wearhouse Inc. – CEO:

> That's all right. ***We see revenue synergies starting to gain traction in 2015, as we start to right-size the fit and fashion and make it more trend right. It will certainly start building in spring and gain more traction in fall***.

76. Defendants' Men's Wearhouse, Ewert and Kimmins' December 10-11, 2014 statements were materially false and misleading when made in that they omitted the true facts, which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytical tools described herein, including that:

(a) Their plan to attain $100-$150 million in merger synergies (of which COGS was $40 million) included replacing Jos. A. Bank's merchandise sourcing vendors with Men's Wearhouse vendors, which they knew or recklessly disregarded would have a devastating ripple-down corrosive effect on margins, as, unlike Men's Wearhouse, Jos. A. Bank directly sourced products that yielded better product margins. By replacing Jos. A. Bank's directly sourced products with Men's Wearhouse's more expensive branded suits and products, defendants knew that Men's Wearhouse would necessarily need to raise prices for Jos. A. Bank suits, and could not run the same promotions on these suits that customers expected and responded well to, to maintain sufficient margins. But, as Jos. A. Bank senior executives informed Men's Wearhouse senior executives (including defendants Ewert and Blake and JAB President Fitzpatrick) at weekly Monday marketing meetings, their prior analysis and testing showed that Jos. A. Bank customers were extremely sensitive to price, and changing the sales price of a Jos. A. Bank suit by as little as $1 would have a tremendous negative impact on sales.

(b) As soon as the acquisition closed, defendants intended to eliminate the lucrative Buy-One-Get-Three Jos. A. Bank promotions and introduce tailored branded suits and slim fit suits into Jos. A. Bank stores, which defendants knew or recklessly disregarded would cause sales to decline by 30%. Before and throughout the Class Period, Jos. A. Bank senior executives attended

marketing meetings on Monday mornings to discuss key aspects of the business. After the merger, senior Men's Wearhouse executives, including defendants Ewert and Blake and JAB President Fitzpatrick, also participated in these meetings. During initial post-merger meetings, the Men's Wearhouse executives commented to the Jos. A. Bank executives that Jos. A. Bank's margins were low and the Buy-One-Get-Three promotions would be eliminated. In response, Jos. A. Bank executives emphasized to the Men's Wearhouse executives (including defendants Ewert and Blake and JAB President Fitzpatrick) that the Buy-One-Get-Three promotions generated a tremendous amount of revenue that could not be made up without the promotions. The Jos. A. Bank executives also informed the Men's Wearhouse executives (including defendants Ewert and Blake and JAB President Fitzpatrick) at many of the Monday morning meetings that if the Buy-One-Get-Three promotions were discontinued, Jos. A. Bank sales would decline by 30%.

(c) Despite telling investors they would "be judicious" and "be careful to make sure we don't take our eye off our loyal [JAB] customers by seeking their permission through testing before making widespread changes," defendants did not do so. Before the merger, if Jos. A. Bank planned to sell a new item, it ordered a small amount of that item to gauge its prospects for success. Men's Wearhouse declined to take this measured approach. In late 2014, Men's Wearhouse embarked on a $50 million inventory reduction project at Jos. A. Bank by collecting tens of millions of dollars of Jos. A. Bank inventory from stores that was then incinerated. This inventory was incinerated to make room for new products placed in Jos. A. Bank stores by the 2014 holiday season, including branded tailored suits (including Tommy Hilfiger) and slim fit suits, without first testing customer response. Defendants did so against the advice of Jos. A. Bank senior executives who had previously tested slim fit suits and knew that typical Jos. A. Bank customers did not purchase such suits. As the Jos. A. Bank executives warned, the Men's Wearhouse slim fit suits and branded tailored suits did not resonate with the typical Jos. A. Bank customer base that preferred a quality,

classic fit suit. Sales immediately declined, leaving the stores full of unsold product. Defendants were aware of these adverse developments, as Men's Wearhouse electronically polls stores nightly and receives real-time sales data daily in the corporate office. The polling data is broken down by style, size and color and is assessed on a daily, weekly, monthly and yearly basis. This daily sales polling demonstrated to defendants that the branded tailored suits (like Tommy Hilfiger) and slim fit suits were not resonating with the typical Jos. A. Bank customers and were not selling. The sales problem exacerbated the margin compression problem created by the synergy-driven sourcing change to more expensive tailored branded suits, as defendants, at a minimum, recklessly disregarded that Jos. A. Bank could not alter the fit, pricing or promotions without alienating its existing customers and causing a 30% sales decline.

(d) As a result of (a)-(c), defendants' 2017 guidance lacked a reasonable basis when made and omitted material facts necessary to make the guidance not misleading.

77. Also on December 11, 2014, Men's Wearhouse's 3Q14 Form 10-Q for the period ended November 1, 2014, which was prepared, reviewed and signed by defendants Ewert and Kimmins, was filed with the SEC. Defendant Kimmins signed the Form 10-Q and defendants Ewert and Kimmins each certified that the document "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

78. The Form 10-Q was false and misleading when filed with the SEC because it failed to disclose known trends, demands, commitments, events, or uncertainties regarding JAB which comprised approximately 26% of the Company's sales. The material omitted information that was required to be disclosed to investors, including trends or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in violation of Item 303 of

Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii)-(iii), and the SEC's interpretive releases thereto, the information described in ¶76 above.

79. The Form 10-Q also stated that "[e]xcept as described in Part 1A of our Quarterly Report on Form 10-Q for the quarterly period ended August 2, 2014, as filed with the Securities and Exchange Commission on September 11, 2014 and which is incorporated herein by reference, there has not been a material change to the risk factors set forth in the Form 10-K for the fiscal year ended February 1, 2014." The risk factors were materially false and misleading because defendants failed to disclose the true facts, as required by 17 C.F.R. §229.503(c), which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytic tools described herein, including the material changes in the Company's risk factors as detailed in ¶76 above.

**4Q14/FY14 Earnings Results and Conference Call**

80. On March 11, 2015, Men's Wearhouse announced the Company's 4Q14/FY14 results in a release, including adjusted EPS of $2.58 (excluding non-operating items), and stated that the "[i]ntegration synergy run-rate [is] ahead of schedule" and defendant Ewert stated "'while Jos. A. Bank's comparable sales were negative 6.6%, they were above our expectations.'" Defendant Ewert also stated that:

> "We are extremely proud of the work done to date to incorporate Jos. A. Bank. We have made significant progress on integrating Jos. A. Bank into the infrastructure of Men's Wearhouse and have developed a robust process around synergy identification and realization. In the nine months since the acquisition, Jos. A. Bank has transitioned many of the back office functions, began store training programs, began the work to instill its employees with the Men's Wearhouse culture, and launched tuxedo rental in all its Jos. A. Bank locations. All of this progress was made while exceeding our initial synergy run-rate target of $15 million as we ended the year with run-rate synergies of $35 million."
>
> * * *
>
> "***We continue to be confident in our 2017 EPS guidance which has now been increased to include K&G. We expect profits to accelerate in 2016 with***

> ***rebounding sales after three consecutive years of negative comps at Jos. A. Bank***, realized cost synergies and modest growth in the legacy business."

81. The Company also provided the following financial guidance:

> The Company has increased its 2017 guidance to include K&G operations and ***now expects adjusted EPS to be in the range of $5.75 to $6.25***.
>
> ***For fiscal year 2015, the Company expects adjusted diluted earnings per share in a range of $2.70 to $2.90***, an increase of 13.9% to 22.4% over the prior year historical baseline diluted earnings per share of $2.37. The historical baseline diluted earnings per share is calculated using adjusted weighted average diluted shares of 48.2 million, adjusted tax rate of 34.8% and the expected fiscal year 2015 net interest expense of approximately $105 million.
>
> ***The Company expects Jos. A. Bank comparable sales to continue to be down throughout the first half of the year with improvement in the second half and gross margin to increase for the year but follow a similar pattern to sales***.

82. On March 12, 2015, Men's Wearhouse hosted a conference call led by defendants Ewert and Kimmins to discuss the Company's 4Q14/FY14 results. In his opening remarks, Kimmins stated:

> At Jos. A. Bank we saw a negative 6.6% comp sales decline for the quarter. This was better than expected. The decline resulted from a decrease in average ticket and a reduction in the number of transactions, but we believe we mitigated further declines by taking some additional seasonal markdowns. So overall, we're very pleased with the top-line performance for the quarter.
>
> * * *
>
> Jos. A. Bank on a full year basis had a comp sales decline of 2.5%. While we only owned the business for a little more than half the year, we set our long-term goals against a baseline for 2013, so it was important for us to track the full-year change in sales.
>
> This full-year decline is well within the range of outcomes that we had expected. So even in these early days of the merger and transition, ***we are on track with our internal plans for sales***.
>
> * * *
>
> On a full year-on-year basis, the Jos. A. Bank retail clothing gross margin rate was more than 500 basis points below our Men's Wearhouse brand. And this is part of the opportunity we see for the future. So we're pleased with our legacy margins and ***we see a lot of opportunity for the Jos. A. Bank margin***.

83. During the same conference call, defendant Ewert downplayed the adverse impact to Jos. A. Bank's performance, explaining that the "***Jos. A. Bank customer is loyal and has been responding well to the small amount of newness that they've seen***." Ewert further noted, "***[s]tarting this spring, we'll begin balancing the assortments with more of the best-selling tailored and slim fits and less of the slow-selling traditional fit***." Defendant Ewert also stated that:

> This spring we'll also be introducing the Joseph Abboud brand into the Jos. A. Bank stores. The Joseph Abboud brand DNA targets the modern, traditional customer with superior fabrics, high-quality construction and timeless style. The Joseph Abboud collection, including tailored clothing made in our US factory, and custom clothing will resonate with many of our existing and prospective Jos. A. Bank customers.
>
> * * *
>
> This fall the assortments will take a major leap forward as we introduce in the Jos. A. Bank stores new styles in every product category including updated fashion and seasonal basics, a new collection targeting a younger traditional customer, further expansion of Joseph Abboud, and custom tailored clothing and dress shirts.
>
> * * *
>
> ***There is obvious opportunity to improve the Jos. A. Bank brand perception and awareness while creating a more sustainable promotional model and by establishing a new value proposition on the products we sell. While it would be difficult and risky to do all at once, we will be introducing new pricing and value propositions over time and as new products are introduced***. To give you a sense of the timing, we anticipate introducing new pricing on about 25% of the assortment this spring, increasing to about 50% in the back half of the year.
>
> Marketing is a broad opportunity beyond just changing the promotional cadence. In recent years the Jos. A. Bank messaging has been almost exclusively focused on deep quantity discounts deployed with a high frequency and low reach media buy.
>
> We see opportunity to broaden the messaging and the audience reach to stimulate both customer retention and acquisition. And to further customer retention and reward our loyal customers we will introduce a Jos. A. Bank customer loyalty program later this year.
>
> ***We're moving quickly and carefully, being mindful that we have a loyal customer who likes the quality of the Jos. A. Bank products, while we introduce changes that will improve the customer experience and overall satisfaction with our products and services***. While much has been completed in the first nine months, there is much more to do.

84. During the conference call, a Goldman Sachs analyst (Taposh Bari) asked "can you give us some insight into what the average out-the-door suit price is at the two concepts, where you think that gap should [be] in a couple years?" Defendant Ewert responded:

> Men's Wearhouse average out-the-door prices of suits today is operating in the range of about $290 a suit. The average out-the-door price of a suit at Jos. Bank last year was about $225. ***We see opportunity to recover that average out-the-door retail price of the suits at Jos. Bank***. They were historically at higher levels and ***we think we're going to be able to achieve that through adjustments to the mix, like, for example, bringing in the higher-quality, higher-priced Joseph Abboud product into Jos. Bank***.

85. Defendants' Men's Wearhouse, Ewert, and Kimmins' March 11-12, 2015 statements were materially false and misleading when made in that they omitted the true facts, which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytical tools described herein, including that:

(a) Their plan to attain $100-$150 million in merger synergies (of which COGS was $40 million) included replacing Jos. A. Bank's merchandise sourcing vendors with Men's Wearhouse vendors, which they knew or recklessly disregarded would have a devastating ripple-down corrosive effect on margins, as, unlike Men's Wearhouse, Jos. A. Bank directly sourced products that yielded better product margins. By replacing Jos. A. Bank's directly sourced products with Men's Wearhouse's more expensive branded suits and products, defendants knew that Men's Wearhouse would necessarily need to raise prices for Jos. A. Bank suits, and could not run the same promotions on these suits that customers expected and responded well to, to maintain sufficient margins. But, as Jos. A. Bank senior executives informed Men's Wearhouse senior executives (including defendants Ewert and Blake and JAB President Fitzpatrick) at weekly Monday marketing meetings, their prior analysis and testing showed that Jos. A. Bank customers were extremely sensitive to price, and changing the sales price of a Jos. A. Bank suit by as little as $1 would have a tremendous negative impact on sales.

(b) As soon as the acquisition closed, defendants intended to eliminate the lucrative Buy-One-Get-Three Jos. A. Bank promotions and introduce tailored branded suits and slim fit suits into Jos. A. Bank stores, which defendants knew or recklessly disregarded would cause sales to decline by 30%. Before and throughout the Class Period, Jos. A. Bank senior executives attended marketing meetings on Monday mornings to discuss key aspects of the business. After the merger, senior Men's Wearhouse executives, including defendants Ewert and Blake (and JAB President Fitzpatrick), also participated in these meetings. During initial post-merger meetings, the Men's Wearhouse executives commented to the Jos. A. Bank executives that Jos. A. Bank's margins were low and the Buy-One-Get-Three promotions would be eliminated. In response, Jos. A. Bank executives emphasized to the Men's Wearhouse executives (including defendants Ewert and Blake and JAB President Fitzpatrick) that the Buy-One-Get-Three promotions generated a tremendous amount of revenue that could not be made up without the promotions. The Jos. A. Bank executives also informed the Men's Wearhouse executives (including defendants Ewert and Blake and JAB President Fitzpatrick) at many of the Monday morning meetings that if the Buy-One-Get-Three promotions were discontinued, Jos. A. Bank sales would decline by 30%.

(c) Defendants' synergies push also had the impact of eliminating hundreds of experienced Jos. A. Bank personnel, including field-level managers and executives who were familiar with the Jos. A. Bank customer, and replacing them with Men's Wearhouse personnel who lacked knowledge of the Jos. A. Bank customer base, which was entirely distinct from Men's Wearhouse, with only 7% overlap between the brands.

(d) Despite telling investors they would "be judicious" and "be careful to make sure we don't take our eye off our loyal [JAB] customers by seeking their permission through testing before making widespread changes," defendants did not do so. Before the merger, if Jos. A. Bank planned to sell a new item, it ordered a small amount of that item to gauge its prospects for success.

Men's Wearhouse declined to take this measured approach. In late 2014, Men's Wearhouse embarked on a $50 million inventory reduction project at Jos. A. Bank by collecting tens of millions of dollars of Jos. A. Bank inventory from stores that was then incinerated. This inventory was incinerated to make room for new products placed in Jos. A. Bank stores by the 2014 holiday season, including branded tailored suits (including Tommy Hilfiger) and slim fit suits, without first testing customer response. Defendants did so against the advice of Jos. A. Bank senior executives who had previously tested slim fit suits and knew that typical Jos. A. Bank customers did not purchase such suits. As the Jos. A. Bank executives warned, the Men's Wearhouse slim fit suits and branded tailored suits did not resonate with the typical Jos. A. Bank customer base that preferred a quality, classic fit suit. Sales immediately declined, leaving the stores full of unsold product.

(i) Defendants were aware of these adverse developments, as Men's Wearhouse electronically polls stores nightly and receives real-time sales data daily in the corporate office. The polling data is broken down by style, size and color and is assessed on a daily, weekly, monthly and yearly basis. This daily sales polling demonstrated to defendants that the branded tailored suits (like Tommy Hilfiger) and slim fit suits were not resonating with the typical Jos. A. Bank customers and were not selling. The sales problem exacerbated the margin compression problem created by the synergy-driven sourcing change to more expensive tailored branded suits, as defendants, at a minimum, recklessly disregarded that Jos. A. Bank could not alter the pricing or promotions without alienating its existing customers and causing a 30% sales decline.

(ii) Of all the brands under the Men's Wearhouse umbrella, Jos. A. Bank received the most complaints and had the most employees dedicated to responding to calls from both customers and stores alike at the Houston Contact Center. As the changes in brand/fit/style of suits occurred, the call volume from Jos. A. Bank customers and stores increased so dramatically and was so great that Men's Wearhouse had to mandate overtime and hire temporary workers to attempt to

handle the call volume, many of which dropped because the phone system lacked sufficient capacity to manage the dramatic influx of calls. Customer complaints, concerns, inquiries, and compliments were stored in Salesforce and regularly downloaded into various reports, including Doug Dash Reports and Top Brands Complaint Reports, which were regularly prepared on Mondays to be distributed to defendant Ewert and other senior Men's Wearhouse executives. These reports contained the amount of phone calls received, reasons for the calls, and what the issues/complaints were by brand. Beginning after the holiday 2014 season, Jos. A. Bank customers regularly and in high volume complained about the name brand suits (like Tommy Hilfiger) and slim fit suits, which complaints were reflected in these reports.

(e) In addition to changing the brands/fit/style of Jos. A. Bank suits and promotional type and cadence, defendants also began implementing Men's Wearhouse's sales strategies in Jos. A. Bank stores, which were not resonating with the typical loyal Jos. A. Bank customer and further eroded revenue. Whereas Jos. A. Bank's sales strategies were focused on service and engaging with the shopper to develop loyal repeat customers, Men's Wearhouse's more aggressive strategies focused on sales. At post-acquisition regional meetings hosted by Men's Wearhouse senior executives, including defendant Ewert, Jos. A. Bank employees (including Regional Directors, Regional Managers and Store Associates) openly voiced their opposition to Men's Wearhouse's changes and emphasized that the typical Jos. A. Bank customers were not receptive to the changes. The Men's Wearhouse executives were dismissive of the concerns, noting how well the strategies had worked at Men's Wearhouse.

(f) As a result of (a)-(e), defendants' 2015 and 2017 guidance lacked a reasonable basis when made and omitted material facts necessary to make the guidance not misleading.

**March 27, 2015 Form 10-K**

86. On March 27, 2015, the Company filed its Form 10-K, for the period ended January 31, 2015, with the SEC. Defendants Ewert and Kimmins signed the Form 10-K and defendants Ewert and Kimmins each certified that the document "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

87. The Form 10-K was false and misleading when filed with the SEC because it failed to disclose known trends, demands, commitments, events, or uncertainties regarding Jos. A. Bank which comprised approximately 36% of the Company's sales. The material omitted information that was required to be disclosed to investors, including trends or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii)-(iii) and the SEC's interpretive releases thereto, included the information described in ¶85 above.

88. The Form 10-K also included certain risks and uncertainties regarding the Company's business. The risk factors were materially false and misleading because defendants failed to disclose the true facts, as required by 17 C.F.R. §229.503(c), which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytic tools described herein, including the material changes in the Company's risk factors as detailed in ¶85 above.

**Men's Wearhouse Announces "1905" Label at Jos. A. Bank**

89. On April 15, 2015, *Women's Wear Daily* published an article titled "Jos. A. Bank Targets Millennial Market," which stated, in part:

> Joseph Abboud will create a new label for Jos. A. Bank for fall that is based on the retailer's classic heritage.

* * *

> "We're going to be launching a new label at Jos. A. Bank – 1905 – which was the year the company was founded," Abboud told the gathering. He said the collection will be targeted to the Millennial consumer.
>
> * * *
>
> Doug Ewert, chief executive officer of Men's Wearhouse, said, "1905 will target a younger customer who appreciates traditional style. The collection will be available in all Jos. Bank stores this fall."

**Mid-Quarter April 2015 Investor Meetings with Management**

90. On April 2, 2015, Jefferies, LLC issued a report titled "Investor Meetings Provide Clarity On the MW/JOSB Evolution; Reiterate Buy." The report stated that the "Key Takeaway" was that:

> Following a series of investors meetings across the Midwest with MW mgmt, we remain upbeat on the evolution of this story. With the knowledge that 2015 is a transition year, mgmt delved into the various puts & takes implicit in the JOSB integration model to provide additional clarity around the 2015 cadence & earnings potential into 2016 & beyond as cost synergies take hold and revenue opportunities develop. Reiterate Buy and $62 PT.
>
> * * *
>
> **Turning the Caterpillar Into a Butterfly**. What's becoming more evident over time is how ineffectively mismanaged JOSB was prior to the merger. Clearly mgmt.'s biggest (& riskiest) task is unwinding the destructive cycle of promotions & margin erosion. However, MWs customer research shows the Jos Bank as a still well regarded brand. In 3Q, mgmt plans to roll out new product lines in more modern, yet classic fits that target a broader age range of customers, at which point the company can then also begin to tell a new promo story that focuses on product instead of just price promotion. While the ubiquitous BOG3 Free promotion is apt to linger, over time, we believe mgmt. can reduce the amount of SKUs that play in that arena, while capitalizing on additional revenue opportunities (shoes, big & tall), thus reducing overall promotional posturing & delivering higher quality sales & margins, lower inventories and stronger brand equity. Longer term, there's opportunity to refresh stores & also rationalize the fleet where it's too concentrated & open stores in underpenetrated regions, essentially keeping the store count net neutral.

91. On April 16, 2015, *The Baltimore Sun* published an article titled, "Expanded assortment, fewer discounts in future of Jos. A. Bank Clothiers, CEO says," which stated, in part:

> Customers of Jos. A. Bank Clothiers Inc. can expect an expanded assortment of shoes, new styles of tailored and slim fit clothes, and more big and tall apparel in

> stores this year as the chain moves away from "hyper-aggressive" promotions, the CEO of Men's Wearhouse, Jos. Bank's owner, said this week.
>
> The Jos. Bank brand has suffered from a "hyper aggressive promotional strategy, so we're weaning off of that," said Douglas Ewert during an appearance Wednesday on "Squawk on the Street" on CNBC. "We're going to be introducing new product, new fits, new styles, give the customer more reasons to shop than just price. We think 2015 is going to be a transformational year for the Jos. A. Bank brand."
>
> The company hopes to expand the demographic appeal to attract new customers while retaining the loyal Jos. Bank following, Ewert said. Plans call for continuing with some discounting, while also "giving them additional product to . . . give them other reasons to shop with us other than just buy one get three free," Ewert said.

**Men's Wearhouse and Defendant Ewert Enter Into Amended and Restated Employment Agreement**

92. On April 22, 2015, Men's Wearhouse and defendant Ewert entered into a new employment agreement that doubled his salary from $605,000 per year to $1.25 million per year.

**May 2015 Offering Documents for Exchange of 7.00% Bonds**

93. On May 26, 2015, the Company filed a Form 424B3 prospectus for the offering and exchanged of $600 million in 7% Senior Notes. The Form 424B3 prospectus was false and misleading because it failed to disclose known trends, demands, commitments, events, or uncertainties regarding Jos. A. Bank which comprised approximately a quarter of the Company's sales. The material omitted information that was required to be disclosed to investors, including trends or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii)-(iii) and the SEC's interpretive releases thereto, included the information described in ¶85 above.

94. Heading into the 1Q15 earnings release, Jefferies, LLC analysts noted that "key near-term themes to focus on include . . . how early pricing changes are being received by the JB customer."

**1Q15 Earnings Release, Conference Call and Form 10-Q**

95. On June 10, 2015, Men's Wearhouse announced the Company's 1Q15 results, including adjusted EPS of $0.54, and stated that "Jos. A. Bank integration remains on track." Defendant Ewert also stated that:

> "We are very pleased to report another strong quarter with all brands performing well. Comparable sales increased 6.8% at Men's Wearhouse, 0.8% at Moores and 7.3% at K&G and decreased 1.5% at Jos. A. Bank. Traffic increased year over year at all of our U.S. brands and while Moores' traffic decreased, their average ticket increased. While the retail business has continued to perform well, the tuxedo business slowed this quarter with a decrease in comps of 1.2% at Men's Wearhouse. Based on recent studies, the overall wedding industry is experiencing a slow-down but we believe that our market share is holding and possibly increasing.
>
> "We made another important step in the Jos. A. Bank integration as we completed the merchandise systems conversions at the beginning of May," added Ewert. "This conversion will help us in unlocking retail inventory efficiency and distribution synergies. Cost synergies continue to be on plan and we are beginning to see some revenue synergies. We continue to expect Jos. A. Bank comparable sales to be down in the second quarter with ***improvement in the back half of the year and gross margin increases to follow a similar pattern***.
>
> "We continue to be confident in our 2015 and 2017 EPS guidance," concluded Ewert.

96. On June 11, 2015, Men's Wearhouse hosted a conference call led by defendants Ewert and Kimmins to discuss the Company's 1Q15 results. Defendant Kimmins stated that:

> We were comfortable with the Jos. A. Bank margin performance, given the better than expected sales performance. We did after all produce higher than expected margin dollars.
>
> As previously discussed, we believe that ***our ability to improve sales and gross margins simultaneously will begin in the second half of this year*** . . . .

97. Defendant Ewert informed participants that:

> Turning your attention to Jos. A. Bank, we completed the quarter with a 1.5% comp sales decline, which was stronger than we had projected. We lapped an 8.4% comp increase from the previous year, and we're encouraged with the consumer response to the changes we're making to the model. To give you some color, we made incremental progress in reducing the number of promotional events, improving the clarity and aesthetic of the messaging, and increasing the efficiency of the media spend.

We were pleased with the overall results, and saw increased traffic and units per transaction, which were offset by a lower clearance-driven AUR. As we indicated last quarter, we see opportunity to improve the value equation by permanently lowering the ticketed prices on select products. During the quarter, we repriced a significant portion of our assortment, including neck wear, accessories, casual pants, and select dress shirts and sport shirts.

We also began delivering some new products to stores, like Joseph Abboud shoes are now in all stores, and ***Joseph Abboud suits are in 75 stores, and began improving the balance of inventory between traditional fit, tailored fit and slim fit***. While it's too soon to draw conclusions from these changes to date, ***we're encouraged by the early reads, and remain optimistic that the newness coming in this Fall and next year will be well received and help return Jos. A. Bank to a healthy growth trajectory***. ***We continue to believe that both comp sales and margin will turn positive in the second half of the year, as new inventory arrives, and we lap easier comps***.

* * *

***The merger integration is on track and going very well***. We've now completed a critical phase of the systems integration, as the merchandising, allocation and distribution systems have all been converted. The merchandising and marketing functions have been relocated to our California offices, and we're very pleased with the quality of talent that we've been able to retain, as well as the quality of talent we're attracting from outside the Company.

Bottom line, a lot of risk is now behind us, and ***the integration is going very well*** . . . .[13]

* * *

. . . . [W]e're excited about the future, and ***based on everything we're seeing in the business, I feel comfortable reaffirming our forward guidance***.

98. Defendant Ewert then engaged in the following colloquy with an equity analyst:

**Alex Pham** – Mizuho Securities USA – Analyst:

It's Alex Pham on for Betty Chen, congrats on the nice quarter. We're just wondering if you could talk a little bit more about the sequential improvement at Jos. Banks. What's inventory composition like, and anything you can share in regards to

[13] During this conference call, defendant Ewert also explained that "As far as the merch systems, the merch systems that we operate our businesses on are very robust, very detailed, and have great reporting capabilities, and allow the merchants to be very nimble in evaluating their business in a realtime way. And so we're thrilled to have the Jos. Bank business now on these much more robust systems, and we've been live now since basically the beginning of May, and we're learning some great things about the business, as we now have a much clearer visibility into what's going on."

the opportunity for improved product rollout and revenue synergies in the second half? Thanks.

**Doug Ewert** – The Men's Wearhouse, Inc. – CEO:

Hi, Alex. There has not been much newness brought in, in Spring. We inherited the Spring on order. What we were able to do is change some of the uncut on order, which is why we are able to start affecting the balance of inventory between the three fits. ***So we're bringing in more slim fit, more tailored fit, much less traditional fit, and starting to right-size the imbalance that we saw between the three fits***. And then the little bit of newness that we were able to bring in was primarily in shoes, so much more to come, but that's essentially what we are able to affect at this point.

99. Defendants' Men's Wearhouse, Ewert and Kimmins' June 10-11, 2015 statements were materially false and misleading when made in that they omitted the true facts, which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytical tools described herein, including that:

(a) Their plan to attain \$100-\$150 million in merger synergies (of which COGS was \$40 million) included replacing Jos. A. Bank's merchandise sourcing vendors with Men's Wearhouse vendors, which they knew or recklessly disregarded would have a devastating ripple-down corrosive effect on margins, as, unlike Men's Wearhouse, Jos. A. Bank directly sourced products that yielded better product margins. By replacing Jos. A. Bank's directly sourced products with Men's Wearhouse's more expensive branded suits and products, defendants knew that Men's Wearhouse would necessarily need to raise prices for Jos. A. Bank suits, and could not run the same promotions on these suits that customers expected and responded well to, to maintain sufficient margins. But, as Jos. A. Bank senior executives informed Men's Wearhouse senior executives (including defendants Ewert and Blake) at weekly Monday marketing meetings, their prior analysis and testing showed that Jos. A. Bank customers were extremely sensitive to price, and changing the sales price of a Jos. A. Bank suit by as little as \$1 would have a tremendous negative impact on sales.

(b) As soon as the acquisition closed, defendants intended to eliminate the lucrative Buy-One-Get-Three Jos. A. Bank promotions and introduce tailored branded suits and slim fit suits into Jos. A. Bank stores, which defendants knew or recklessly disregarded would cause sales to decline by 30%.

(i) Before and throughout the Class Period, Jos. A. Bank senior executives attended marketing meetings on Monday mornings to discuss key aspects of the business. After the merger, senior Men's Wearhouse executives, including defendants Ewert and Blake (and JAB President Fitzpatrick), also participated in these meetings. During initial post-merger meetings, the Men's Wearhouse executives commented to the Jos. A. Bank executives that Jos. A. Bank's margins were low and the Buy-One-Get-Three promotions would be eliminated. In response, Jos. A. Bank executives emphasized to the Men's Wearhouse executives (including defendants Ewert and Blake) that the Buy-One-Get-Three promotions generated a tremendous amount of revenue that could not be made up without the promotions. The Jos. A. Bank executives also informed the Men's Wearhouse executives (including defendants Ewert and Blake and JAB President Fitzpatrick) at many of the Monday morning meetings that if the Buy-One-Get-Three promotions were discontinued, Jos. A. Bank sales would decline by 30%.

(ii) At a 1Q15 managers conference in Ft. Lauderdale, Florida, Jos. A. Bank senior executives advised Men's Wearhouse senior executives, including defendants Ewert and Blake (and JAB President Fitzpatrick), that eliminating the Buy-One-Get-Three promotions would cause Jos. A. Bank sales to drop by 30%. The 30% drop analysis, which was subsequently discussed in detail during a carve-out meeting of executives, demonstrated that Jos. A. Bank had previously tested dropping or changing the promotions and learned that the losses would be catastrophic if the type or cadence of sales was altered.

(c) Defendants' synergies push also had the impact of eliminating hundreds of experienced Jos. A. Bank personnel, including field-level managers and executives who were familiar with the Jos. A. Bank customer, and replacing them with Men's Wearhouse personnel who lacked knowledge of the Jos. A. Bank customer base, which was entirely distinct from Men's Wearhouse, with only 7% overlap between the brands.

(d) Despite telling investors they would "be judicious" and "be careful to make sure we don't take our eye off our loyal [JAB] customers by seeking their permission through testing before making widespread changes," defendants did not do so. Before the merger, if Jos. A. Bank planned to sell a new item, it ordered a small amount of that item to gauge its prospects for success. Men's Wearhouse declined to take this measured approach. In late 2014, Men's Wearhouse embarked on a $50 million inventory reduction project at Jos. A. Bank by collecting tens of millions of dollars of Jos. A. Bank inventory from stores that was then incinerated. This inventory was incinerated to make room for new products placed in Jos. A. Bank stores by the 2014 holiday season, including branded tailored suits (including Tommy Hilfiger) and slim fit suits, without first testing customer response. Defendants did so against the advice of Jos. A. Bank senior executives who had previously tested slim fit suits and knew that typical Jos. A. Bank customers did not purchase such suits. As the Jos. A. Bank executives warned, the Men's Wearhouse slim fit suits and branded tailored suits did not resonate with the typical Jos. A. Bank customer base that preferred a quality classic fit suit. Sales immediately declined, leaving the stores full of unsold product.

(i) Defendants were aware of these adverse developments, as Men's Wearhouse electronically polls stores nightly and receives real-time sales data daily in the corporate office. The polling data is broken down by style, size, and color and is assessed on a daily, weekly, monthly, and yearly basis. This daily sales polling demonstrated to defendants that the branded tailored suits (like Tommy Hilfiger) and slim fit suits were not resonating with the typical Jos. A.

Bank customers and were not selling. The sales problem exacerbated the margin compression problem created by the synergy-driven sourcing change to more expensive tailored branded suits, as defendants, at a minimum, recklessly disregarded that Jos. A. Bank could not alter the pricing or promotions without alienating its existing customers and causing a 30% sales decline.

(ii) Of all the brands under the Men's Wearhouse umbrella, Jos. A. Bank received the most complaints and had the most employees dedicated to responding to calls from both customers and stores alike at the Houston Contact Center. As the changes in brand/fit/style of suits occurred, the call volume from Jos. A. Bank customers and stores increased so dramatically and was so great that Men's Wearhouse had to mandate overtime and hire temporary workers to attempt to handle the call volume, many of which dropped because the phone system lacked sufficient capacity to manage the dramatic influx of calls. Customer complaints, concerns, inquiries and compliments were stored in Salesforce and regularly downloaded into various reports, including Doug Dash Reports and Top Brands Complaint Reports, which were regularly prepared on Mondays to be distributed to defendant Ewert and other senior Men's Wearhouse executives. These reports contained the amount of phone calls received, reasons for the calls, and what the issues/complaints were by brand. Beginning after the holiday 2014 season, Jos. A. Bank customers regularly and in high volume complained about the name brand suits (like Tommy Hilfiger and Joseph Abboud) and slim fit suits, which complaints were reflected in these reports.

(e) In addition to changing the brands/fit/style of Jos. A. Bank suits and promotional type and cadence, defendants also began implementing Men's Wearhouse's sales strategies in Jos. A. Bank stores, which were not resonating with the typical loyal Jos. A. Bank customer and further eroded revenue. Whereas Jos. A. Bank's sales strategies were focused on service and engaging with the shopper to develop loyal repeat customers, Men's Wearhouse's more aggressive strategies focused on sales. At post-acquisition regional meetings hosted by Men's

Wearhouse senior executives, including defendant Ewert, Jos. A. Bank employees (including Regional Directors, Regional Managers and Store Associates) openly voiced their opposition to Men's Wearhouse's changes and emphasized that the typical Jos. A. Bank customers were not receptive to the changes. The Men's Wearhouse executives were dismissive of the concerns, noting how well the strategies had worked at Men's Wearhouse.

(f) As a result of (a)-(e), defendants' 2015 and 2017 guidance lacked a reasonable basis when made and omitted material facts necessary to make the guidance not misleading.

100. Also on June 11, 2015, Men's Wearhouse's 1Q15 Form 10-Q for the period ended May 2, 2015, which was prepared, reviewed and signed by defendants Ewert and Kimmins, was filed with the SEC. Defendant Kimmins signed the Form 10-Q and defendants Ewert and Kimmins each certified that the document "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

101. The Form 10-Q was false and misleading when filed with the SEC because it failed to disclose known trends, demands, commitments, events or uncertainties regarding JAB which comprised approximately a quarter of the Company's sales. The material omitted information that was required to be disclosed to investors, including trends or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii)-(iii), and the SEC's interpretive releases thereto, included the information described in ¶99 above.

102. The Form 10-Q also stated that "[t]here has not been a material change to the risk factors set forth in the Form 10-K for the fiscal year ended January 31, 2015, except as [identified therein relating only to the Company's variable rate indebtedness]." The risk factors were materially false and misleading because defendants failed to disclose the true facts, as required by 17 C.F.R.

§229.503(c), which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytical tools described herein, including the material changes in the Company's risk factors as detailed in ¶99 above.

103. On June 11, 2015, Jefferies raised its price target for Men's Wearhouse from $62 per share to $67 per share. Jefferies' report that day stated "1Q results delivered a nice top and bottom line surprise, but more importantly it showed a positive customer reaction to early adjustments to advertising and a pull back on some promos at Jos Bank."

104. As a result of defendants' materially false and misleading statements, Men's Wearhouse stock reached its Class Period high of $66.18 per share on June 22, 2015.

**2Q15 Earnings Release, Conference Call and Form 10-Q**

105. On September 8, 2015, Men's Wearhouse announced the Company's 2Q15 results, including $1.07 adjusted EPS, and defendant Ewert stated that:

> "The Jos. A. Bank business struggled in the second quarter with comparable sales decreasing 9.4%," added Ewert. "Now that we have a full year under our belt, ***we have become even more convinced that changing the promotional messages to be clear and compelling without unusual quantity requirements, like buy one get three free offers, will broaden the appeal of the Joseph A. Bank brand***. This fall we will be well positioned to fully implement our strategy as all systems will be integrated, new products will be introduced, the new customer rewards program will be available, we will have new sales force incentives supported with extensive training and we will have new marketing strategies in place.
>
> "We are focused on rebuilding the Jos. A. Bank profit model. In doing so, we expect top-line volatility as we establish a promotional model with broader customer appeal and strengthen the margin profile. Taking this into consideration, as well as the impact of the second quarter results, ***we still expect to be within our EPS guidance range of $2.70 to $2.90 and continue to be confident in our 2017 guidance***," concluded Ewert.

106. On September 9, 2015, Men's Wearhouse hosted a conference call led by defendants Ewert and Kimmins to discuss the Company's 2Q15 results. During Ewert's opening remarks, he stated:

We're now 14 months into the Joseph Bank merger. Overall, the integration has gone very well and ***we remain bullish on Joseph Bank***. We've been working hard to get through the integration phase as quickly as possible. As the saying goes, we've chopped a lot of wood.

I'm pleased to report that the operational integration is largely complete. We've centralized all shared services, relocated specialized talent into our corporate offices in Fremont, our support center in Houston and our product development office in New York, and moved Joseph Bank on to the entire suite of technology applications we operate all of our businesses on. Most importantly, ***we've achieved significant cost synergies with more to come*** as we leverage our supply chain.

With the operational integration largely in hand, the biggest challenge we face at Joseph Bank is unlocking the market-facing opportunities. The current Joseph Bank promotional model has been in place for years. Historical practices include aggressive quantity discounting that frequently relies on buy, one get three or more free offers, requiring customers to buy more than they would naturally want at one time.

It makes prospective customers question the value proposition. We know most men don't want to buy suits four at a time. Our research with the Joseph Bank customer tells us this, which is reinforced by our own experience. These promotional offers are not working for our customers and they're not working for us.

Our original plan was to evolve the pricing and promotional strategy gradually over time, rather than take it on as we were integrating operations. With the integration largely complete, and given current market response to the Joseph Bank promotional strategies, ***we've decided to accelerate our timeline in a more aggressive and comprehensive way***.

In the coming weeks we will align the promotional offers with the buying preferences of our customers. ***This may create further top-line volatility as we update the promotional model to move away from buy one, get three free quantity discounting, and give customers the ability to buy a great suit at a great price one or two at a time***.

We expect there may be declines in units per transaction as customers adapt to our new promotional strategies. Offsetting variables are expected to include new, updated and expanded assortments, higher margins, lower costs, new promotional and brand-building marketing that is clear and compelling, a new rewards-based customer loyalty program, better selling behaviors and an updated incentive compensation structure for our store employees.

We've been testing newness at Joseph Bank and are encouraged by the early results. Some examples of newness include an expanded shoe collection, including the new Joseph Abboud dress shoes. During the second quarter the shoe business ran a 17% comp increase with a 25% improvement in margin dollars.

> We also intensified our ownership of slim fit product and saw a 41% comp increase in slim fit sales. This fall we'll deliver much more newness to our stores, including Joseph Abboud suits, our new 1905 collection, big and tall sizes and updated styling throughout the assortment.
>
> ***It's this focus on newness that will give us the best shot at winning a larger share of closet with existing customers and expanding our reach to new and younger customers***. Bottom line, we need to give customers new reasons to shop at Joseph Bank and our stores more ammunition to grow their business.

107. Defendant Kimmins also explained that:

> As Doug described, we're accelerating our plans for Joseph A. Bank. Now that we have all systems and controls in place, we plan to go after gross margin a little faster than previously discussed. We expect this to cause further declines in top line, which is different than previous guidance. ***We also expect more rapid improvement in the gross margin rate and therefore we expect gross margin dollars to remain on plan***. Obviously we'll monitor results and we'll adjust as needed, but our focus relating to Joseph Bank will be on rebuilding the profit model.

108. During the September 9, 2015 Q2 2015 earnings conference call, defendant Ewert engaged in the following colloquy with an equity analyst:

> **Taposh Bari** – Goldman Sachs – Analyst:
>
> Hi thanks, and good morning, everybody. Doug, I had a question on the change of strategy at Joseph A. Bank. I'm trying to better understand when it is that you saw you that did the change strategy. Was this a three-quarter, or Q2 event or was it something that's been going on for a while and just became more necessary in light of the fact that you concluded the large part of the integration on the back end? And I'm also trying to get a better understanding as to why you think this is, in fact, the right move for that business.
>
> **Doug Ewert** – Men's Wearhouse Inc. – CEO:
>
> Well, Taposh, Joseph Bank struggled with this aggressive promotional strategy long before we acquired them a year ago. And we struggled with it for the last year. It's just become increasingly less effective, as we saw in the second-quarter numbers. This really isn't a change in strategy for us. We've been talking consistently about where we were trying to take this business. What is changing is how quickly we're going to get there. So based upon the struggles that we've had in the business for the last year and the struggles that the business has had in the years leading up to our acquisition, we think this is the best time to move forward.
>
> We have a lot of ammunition to help reshape this business. We have the ***new assortments*** that are coming into play now. We have better systems to manage the business so we're going to be able to deliver better assortments to each store by size,

by SKU. We have the higher margins that are going to be flowing through the business because of the synergies. We have a ***new loyalty rewards program*** in place. We're putting a ***new commission program*** in place. We have ***new selling behaviors*** in the stores. We have ***new marketing strategies*** that talk about both the promotional side of the business and the branding side of the business. And we have the easier comps that we're going to be lapping in the back half of this year. So as I said before, ***this isn't a change in strategy; this is a change in timing of the strategy***.

**Taposh Bari** – Goldman Sachs – Analyst:

That's helpful. As we look out over the next, call it 6 to 12 months, can you give us some more detail around the big – in terms of the biggest consumer-facing initiatives that we should be evaluating as investors, whether it be a new website, new marketing, new product? If you can give us some more granularity around the timing of these events, that would be helpful.

**Doug Ewert** – Men's Wearhouse Inc. – CEO:

Well, this isn't going to be a Big Bang reinvention. This is – the new assortments, some of the new product has already been arriving in stores. It will continue to roll out this fall and into next year and beyond. We're not going to – some of the new advertising is starting to go on air now. Some of the new product introductions, like the new shoe assortment, 1905 will go on air in October, once that gets in the store. ***This will be an accelerated, essentially, relaunch***.

**Taposh Bari** - Goldman Sachs – Analyst: Great.

And I have one more and I'll pass it along. It sounds like you're more focused on gross margin than you are top line, at least interim at Joseph A. Bank. In our model it looks like the gross profit dollar declined 5%. It wasn't really that different from where the trend line has been, despite the comp being worse. I was curious to see if that was in line with your expectations on a gross profit dollar basis. And how are you thinking about gross profit dollar trajectory at Joe Banks? I know usually you're planning to a gross profit plan, but can you share with us whether that plan is for gross profit to be up or flat or even down over the next six months? Thanks.

**Doug Ewert** – Men's Wearhouse Inc. – CEO:

Well, we're certainly going to be very gross margin dollar focused. We acknowledge and guide you to expect there to be continuing top-line volatility. ***Obviously we're going to be eliminating those four-suit transactions*** and so we expect we're going to bleed units. But with all of the newness that essentially we have in the business, and the cost synergies, ***we think we can more than offset that on the margin dollar side of the business***. So that's essentially the strategy.

109. During the same conference call, defendant Ewert engaged in the following colloquy with another analyst:

**David Mann** – Johnson Rice & Company – Analyst:

And in terms of this move away from the multi-unit promotions, is there going to be a change in unit pricing that you're going to be implementing to try and provide a better value to – visible value to the customer? How do we think about that promotion cadence?

**Doug Ewert** – Men's Wearhouse Inc. – CEO:

What we're going to do is we're going to give the customers compelling values on our great quality product, and not requiring them to buy larger quantity than they want to buy. We can give great prices on single-unit purchases or two-for pricing, buy one, get one frees. ***But it's really going to be a shift in talking to our customers about what they're going to pay for the goods instead of what they're going to save on the goods***.

110. Also during the same conference call, defendant Ewert engaged in the following colloquy with yet another skeptical equity analyst:

**Janet Kloppenburg** – JJK Research – Analyst:

Good morning, everyone. Doug, I was wondering if you could talk a little bit about the inventory content at Joseph A. Bank. I think the comp was disappointing, so I'm wondering if you came into the third quarter with seasonal clearance that was higher than you expected, and your outlook for clearing that, and the implications for margins at Joe Banks given that.

And also, bigger picture, I was wondering if you could provide any sensitivity that you have to lowering the promotional cadence going away from the buy one, get three free program, and what the reaction has been there. Perhaps something you're seeing in August, so quarter to date. Thank you so much.

I guess, Doug, what I'd like to say is you've guided to a certain level of performance for – implied performance – for Joseph A. Banks in the third quarter, and I'm wondering if there's been some testing or analytics behind that. Thank you.

**Doug Ewert** – Men's Wearhouse Inc. – CEO:

Hi, Janet. Of course, there's a lot of background noise there, but let me take a shot at this. I think I understood the essence of your questions.

* * *

As far as lowering the promo activity, I just want to caution you to think of it a little differently. Joseph Bank is a very promotional retailer, will remain a very promotional retailer. We have to drive traffic to our stores. We're in destination locations, so we can't live off the mall flow. What you're going to hear is a change

in the promotional messaging, but not a reduction in the promotional activity. We're still going to be a very promotional –

**Janet Kloppenburg** – JJK Research – Analyst:

No, I understand that you're going to do category promotions. My question is, have you done any testing there to see what the response rate is versus the buy one, get three, and what the margin trends look like? And did that influence your guidance? Thank you.

**Doug Ewert** – Men's Wearhouse Inc. – CEO:

Well, certainly. We've been testing a lot of different ways to skin the promotional part of the business. At the end of the day, we think BOGO3 is very toxic. Customers have been trained to wait for it. ***We think we have to take it out of the picture to really understand and normalize what the rest of the promotional cadence looks like. We have a pretty high degree of confidence that this is the right move***. Certainly we've been running promotional businesses in this sector for a long time at Men's Wearhouse and Moores, and so we have a lot of experience in how to drive sustainability in a promotional business like this. All of those years of learning are going to come into play here at Joseph Bank. So our testing has really been across all of our name plates, not just at Joseph Bank. ***We're pretty convinced this is the right thing to do***. ***We were convinced this is the right thing to do a year ago***. It's just now we're in a much better position to accelerate that strategy.

111. Defendant Ewert had one final exchange with a Goldman Sachs analyst during that same conference call:

**Unidentified Participant** – Analyst:

Good morning. It's actually Chad following up for Taposh. Wanted to get another follow-up in there about the status of buy one, get three free. Going forward, are you expecting it to go away entirely in terms of that promotion?

And then another question as it relates to 2Q. Did you change anything in the second quarter in terms of the number of buy one, get three free days, or anything like that? Thanks.

**Doug Ewert** – Men's Wearhouse Inc. – CEO:

No material change in what we did in 2Q versus the previous quarters. ***Our strategy is to phase out of the BOG3 offer this fall***. We aren't coming out with a specific timeline right now.

112. Defendants Men's Wearhouse's, Ewert's, and Kimmins' September 8-9, 2015 statements were materially false and misleading when made in that they omitted the true facts, which

were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various analytical tools described herein, including that:

(a) Their plan to attain $100-$150 million in merger synergies (of which COGS was $40 million) included replacing Jos. A. Bank's merchandise sourcing vendors with Men's Wearhouse vendors, which they knew or recklessly disregarded would have a devastating ripple-down corrosive effect on margins, as, unlike Men's Wearhouse, Jos. A. Bank directly sourced products that yielded better product margins. By replacing Jos. A. Bank's directly sourced products with Men's Wearhouse's more expensive branded suits and products, defendants knew that Men's Wearhouse would necessarily need to raise prices for Jos. A. Bank suits, and could not run the same promotions on these suits that customers expected and responded well to, to maintain sufficient margins. But, as Jos. A. Bank senior executives informed Men's Wearhouse senior executives (including defendants Ewert and Blake) at weekly Monday marketing meetings, their prior analysis and testing showed that Jos. A. Bank customers were extremely sensitive to price, and changing the sales price of a Jos. A. Bank suit by as little as $1 would have a tremendous negative impact on sales.

(b) As soon as the acquisition closed, defendants intended to eliminate the lucrative Buy-One-Get-Three Jos. A. Bank promotions and introduce tailored branded suits and slim fit suits into Jos. A. Bank stores, which defendants knew or recklessly disregarded would cause sales to decline by 30%.

(i) Before and throughout the Class Period, Jos. A. Bank senior executives attended marketing meetings on Monday mornings to discuss key aspects of the business. After the merger, senior Men's Wearhouse executives, including defendants Ewert and Blake (and JAB President Fitzpatrick), also participated in these meetings. During initial post-merger meetings, the Men's Wearhouse executives commented to the Jos. A. Bank executives that Jos. A. Bank's

margins were low and the Buy-One-Get-Three promotions would be eliminated. In response, Jos. A. Bank executives emphasized to the Men's Wearhouse executives (including defendants Ewert and Blake) that the Buy-One-Get-Three promotions generated a tremendous amount of revenue that could not be made up without the promotions. The Jos. A. Bank executives also informed the Men's Wearhouse executives (including defendants Ewert and Blake and JAB President Fitzpatrick) at many of the Monday morning meetings that if the Buy-One-Get-Three promotions were discontinued, Jos. A. Bank sales would decline by 30%.

(ii) At a 1Q15 managers conference in Ft. Lauderdale, Florida, Jos. A. Bank senior executives advised Men's Wearhouse senior executives, including defendants Ewert and Blake (and JAB President Fitzpatrick), that eliminating the Buy-One-Get-Three promotions would cause Jos. A. Bank sales to drop by 30%. The 30% drop analysis, which was subsequently discussed in detail during a carve-out meeting of executives, demonstrated that Jos. A. Bank had previously tested dropping or changing the promotions and learned that the losses would be catastrophic if the type or cadence sales was altered.

(c) Defendants' synergies push also had the impact of eliminating hundreds of experienced Jos. A. Bank personnel, including field-level managers and executives who were familiar with the Jos. A. Bank customer, and replacing them with Men's Wearhouse personnel who lacked knowledge of the Jos. A. Bank customer base, which was entirely distinct from Men's Wearhouse, with only 7% overlap between the brands.

(d) Despite telling investors they would "be judicious" and "be careful to make sure we don't take our eye off our loyal [JAB] customers by seeking their permission through testing before making widespread changes," defendants did not do so. Before the merger, if Jos. A. Bank planned to sell a new item, it ordered a small amount of that item to gauge its prospects for success. Men's Wearhouse declined to take this measured approach. In late 2014, Men's Wearhouse

embarked on a $50 million inventory reduction project at Jos. A. Bank by collecting tens of millions of dollars of Jos. A. Bank inventory from stores that was then incinerated. This inventory was incinerated to make room for new products placed in Jos. A. Bank stores by the 2014 holiday season, including branded tailored suits (including Tommy Hilfiger and, later in Spring 2015, Joseph Abboud) and slim fit suits, without first testing customer response. Defendants did so against the advice of Jos. A. Bank senior executives who had previously tested slim fit suits and knew the typical Jos. A. Bank customers did not purchase such suits. As the Jos. A. Bank executives warned, the Men's Wearhouse slim fit suits and branded tailored suits did not resonate with the typical Jos. A. Bank customer base that preferred a quality classic fit suit. Sales immediately declined, leaving the stores full of unsold product.

(i) Defendants were aware of these adverse developments, as Men's Wearhouse electronically polls stores nightly and receives real-time sales data daily in the corporate office. The polling data is broken down by style, size and color and is assessed on a daily, weekly, monthly and yearly basis. This daily sales polling demonstrated to defendants that the branded tailored suits (like Tommy Hilfiger) and slim fit suits were not resonating with the typical Jos. A. Bank customers and were not selling. In addition, when Men's Wearhouse placed Joseph Abboud-branded suits in Jos. A. Bank stores (without testing first) and the suits lingered for several months without selling, Men's Wearhouse removed the suits, relabeled them "JAB Reserve," and put them back in Jos. A. Bank stores to try to recoup its costs. The sales problem exacerbated the margin compression problem created by the synergy-driven sourcing change to more expensive tailored branded suits, as defendants, at a minimum, recklessly disregarded that Jos. A. Bank could not alter the pricing or promotions without alienating its existing customers and causing a 30% sales decline.

(ii) Of all the brands under the Men's Wearhouse umbrella, Jos. A. Bank received the most complaints and had the most employees dedicated to responding to calls from both

customers and stores alike at the Houston Contact Center. As the changes in brand/fit/style of suits occurred, the call volume from Jos. A. Bank customers and stores increased so dramatically and was so great that Men's Wearhouse had to mandate overtime and hire temporary workers to attempt to handle the call volume, many of which dropped because the phone system lacked sufficient capacity to manage the dramatic influx of calls. Customer complaints, concerns, inquiries and compliments were stored in Salesforce and regularly downloaded into various reports, including Doug Dash Reports and Top Brands Complaint Reports, which were regularly prepared on Mondays to be distributed to defendant Ewert and other senior Men's Wearhouse executives. These reports contained the amount of phone calls received, reasons for the calls, and what the issues/complaints were by brand. Beginning after the holiday 2014 season, Jos. A. Bank customers regularly and in high volume complained about the name brand suits (like Tommy Hilfiger and Joseph Abboud) and slim fit suits, which complaints were reflected in these reports.

(e) In addition to changing the brands/fit/style of Jos. A. Bank suits and promotional type and cadence, defendants also began implementing Men's Wearhouse's sales strategies in Jos. A. Bank stores, which were not resonating with the typical loyal Jos. A. Bank customer and further eroded revenue. Whereas Jos. A. Bank's sales strategies were focused on service and engaging with the shopper to develop loyal repeat customers, Men's Wearhouse's more aggressive strategies focused on sales. At post-acquisition regional meetings hosted by Men's Wearhouse senior executives, including defendant Ewert, Jos. A. Bank employees (including Regional Directors, Regional Managers and Store Associates) openly voiced their opposition to Men's Wearhouse's changes and emphasized that the typical Jos. A. Bank customers were not receptive to the changes. The Men's Wearhouse executives were dismissive of the concerns, noting how well the strategies had worked at Men's Wearhouse.

(f) As a result of (a)-(e), defendants' 2015 and 2017 guidance lacked a reasonable basis when made and omitted material facts necessary to make the guidance not misleading.

113. Also on September 9, 2015, Men's Wearhouse's 2Q15 Form 10-Q for the period ended August 1, 2015, which was prepared, reviewed and signed by defendants Ewert and Kimmins, was filed with the SEC. Defendant Kimmins signed the Form 10-Q and defendants Ewert and Kimmins each certified that the document "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

114. The Form 10-Q was false and misleading when filed with the SEC because it failed to disclose known trends, demands, commitments, events or uncertainties regarding Jos. A. Bank which comprised approximately a quarter of the Company's sales. The material omitted information that was required to be disclosed to investors, including trends or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii)-(iii), and the SEC's interpretive releases thereto, included the information described in ¶112 above.

115. The Form 10-Q also stated that:

> There has not been a material change to the risk factors set forth in the Form 10-K for the fiscal year ended January 31, 2015 and our Form 10-Q for the period ended May 2, 2015, except for the risk factor in our Form 10-K entitled, "If we are not in compliance with our obligations under the registration agreement related to the Senior Notes, then additional interest will accrue on the principal amount of the original notes." This risk factor is no longer applicable as we have complied with the obligations under the registration agreement related to the Senior Notes.

116. The risk factors were materially false and misleading because defendants failed to disclose the true facts, as required by 17 C.F.R. §229.503(c), which were then known to or recklessly disregarded by these defendants based on historical and real-time reports, meetings and various

analytical tools described herein, including the material changes in the Company's risk factors as detailed in ¶112 above.

117. In response to defendants' September 8-9, 2015 disclosures, by the close of trading that day, the price of Men's Wearhouse common stock declined 12%, or $6.76 per share. While this decline caused substantial harm to the Company's investors, Men's Wearhouse's stock continued to trade at artificially inflated prices.

118. At the end of October 2015, Jos. A. Bank held its final Buy-One-Get-Three promotional event. In an October 22, 2015, *Washington Post* article discussing the final Buy-One-Get-Three promotion, defendant Ewert stated "'[w]e're going to flip the promotional messaging to talk about what they're going to pay instead of what they're going to save.'" The article also explained that "[i]n addition to the new approach to deals, Jos. A. Bank is also trying to ditch its reputation for bulky, un-stylish suits. Key to that effort will be its new 1905 clothing collection, a suite of suits, casual clothes and outerwear designed by Joseph Abboud." The article continued, explaining that "[m]any 1905 pieces are designed in the slim-cut style that Jos. A. Bank so far has been slow to adopt."

***Preliminary* 3Q15 Earnings Results and Conference Call**

119. After the market closed on November 5, 2015, Men's Wearhouse announced disastrous preliminary 3Q15 results, which revealed sales declines of "between 20% and 25%" and EPS "in the range of $0.46 to $0.51 for the third quarter," a miss of more than 40% due to the known (or recklessly disregarded) impact of eliminating the Buy-One-Get-Three promotions at Jos. A. Bank on the Company's revenue and earnings:

> The Company is providing an update today to reflect significant comparable sales weakness at Jos. A. Bank. During the third quarter comparable sales decreased 14.6% at Jos. A. Bank, far below the Company's earlier expectations. This decrease was primarily driven by a decline in traffic as the Company began the transition away from the Buy-One-Get-Three promotional events.

* * *

Based on these preliminary results, the Company now expects adjusted EPS to be in the range of $0.46 to $0.51 for the third quarter, down from the Company's previous expectation of $0.87.

Fourth quarter comparable sales at Jos. A. Bank are now expected to decrease between 20% and 25% resulting from both a decline in traffic continuing from the third quarter trend and a previously expected decline in units per transaction as customers adapt to the shift in the promotional strategy. The Company expects its legacy retail brands to average a comparable sales increase of 3% to 4%.

Jos. A. Bank gross margin rates for the fourth quarter are still expected to improve significantly. Clothing margin before occupancy is expected to increase approximately 500 basis points over the prior year and, including occupancy, to increase approximately 200 basis points. The gross margin dollars, however, are now expected to be well below last year's fourth quarter given the anticipated traffic declines.

With the updated outlook, the Company now believes adjusted EPS for fiscal 2015 will be between $1.75 and $2.00. This compares to our previous guidance of $2.70 to $2.90 for adjusted EPS. Synergies remain on target for the quarter and the year.

120. During the conference call with analysts that evening, defendant Ewert stated:

We are disappointed by the third-quarter results at Jos. A. Bank. As we've discussed, we believe that the historical promotional pricing strategies, specifically the buy 1 get 3 or more free events, are toxic to the business and have caused the business to struggle for some time. This adverse impact became much more pronounced as the third-quarter progressed, in spite of prior-year comps that became progressively easier and provided further evidence that change is needed and needed now.

Our customer research indicates that while our existing customers appreciate our quality and value, many dislike being forced to buy in quantity. Additionally, many of our prospective customers found our promotional offers confusing and questioned the quality of our products.

We believe that deploying these promotional strategies over time has resulted in the pull forward of volume with existing customers while limiting new customer acquisition. Given the deteriorating results and the clear customer feedback, we've introduced new strategies to begin building a sustainable model and restore the brand to health.

During the third week of October, we held the final buy 1 get 3 free event, signally an end to the historical promotional practices. We are now following that with new promotional offers that don't require unnatural quantity purchases and are better aligned with how our customers have told us how they want to shop.

> Supporting the promotional messaging, we are making investments in customer acquisition. We've launched new branding messaging that speaks to a quality promise, and introduces the new 1905 collection that targets a younger customer. In addition, we've introduced a loyalty program that will reward our customers and encourage more frequent purchases.
>
> Along with the changes to our marketing strategies, we've introduced new selling techniques and a new store compensation program that aligns incentives with the improved selling behaviors. At this time, it's too early to report any results on this new strategy, but we will update everyone in December with what we have learned to date when we report actual third-quarter results.
>
> Let's turn now to the remainder of the year. Fourth-quarter comparable sales at JoS. A. Bank are now expected to decrease between 20% and 25%, resulting from both a decline in traffic continuing from the third-quarter trend and a previously expected decline in units per transaction.
>
> JoS. A. Bank gross margin rates for the fourth quarter are still expected to improve significantly. Clothing margin before occupancy is expected to increase approximately 500 basis points over the prior year; and including occupancy, to increase approximately 200 basis points. That said, the gross margin dollars are now expected to be well below last year's fourth quarter.
>
> Additionally, we expect the legacy retail brands to average a 3% to 4% comp sales increase. Adjusted EPS for fiscal 2015 is now estimated to be in the range of $1.75 to $2.00. We will be prepared to discuss both 2016 and 2017 guidance when full-year results are reported in March.
>
> In summary, when we acquired JoS. A. Bank, we knew we were buying a business that had struggled under strategies that may have worked for a time but, in our opinion, were not aligned with best practices and modern consumer preferences. We identified many significant opportunities to improve the health of the business by leveraging our experience, scale, and shared services platform.
>
> Our work to date has deepened our understanding of the challenges and opportunities, unlocked considerable cost efficiencies, and set a foundation to begin restoring the brand to health. We've recently introduced many significant improvements to the business. And while we are confident that we are on the right course, we are mindful that changing brand perception and customer buying patterns will take time.

121. The market's reaction to this stunning revelation was swift, with Men's Wearhouse's stock price plunging 28% to less than $29 per share in after-hours trading. As *Dow Jones* reported:

> Analysts hailed the merger of Jos. A Banks and Mens Wearhouse, but the combination may be a poor fit. MW shares are plunging 31% after it warned of weak 3Q sales and sharply lower profits for the year. "During the third quarter

> comparable sales decreased 14.6% at Jos. A. Bank, far below the Company's earlier expectations," the company says. ***The culprit? MW's decision to move away from Jos. A Bank's popular "buy-one-get-three" deals. Turns out shoppers are unwilling to visit or buy Jos. A Banks shirts and suits unless they were getting lots of free stuff in return***. It was an "unsustainable promotional strategy," says WM's CEO, but getting customers to come along is proving painful.

122. Analysts and the media quickly expressed their shock at the impact of defendants' changes to the Jos. A. Bank business model. For example, on November 5, 2015, Cowen & Co. issued a report lowering its price target from $53 to $30 and stating that:

> **EPS Guidance Implies JOSB Is Seeing Enormous Margin Pressure**
>
> Given the synergies that management guided MW to be at by the end of FY15, $50MM to $55MM with an annual run rate of $75MM, it is difficult for us to conceptualize how depressed JOSB's margins are in the 2H of the year. The Q3 and implied Q4:15 EPS guidance implies enormous margin pressure on the business. We are concerned that JOSB brand equity is very damaged and could take MW management significant time to repair. The last "Buy One Get Three or More Free" promotion ended this October.

123. On November 5, 2015, *Fortune* published an article, "The Painful Lesson Men's Wearhouse Is Just Learning," which reported that "[s]hoppers won't part easily with their beloved deals, as countless retailers have found out the hard way." The article continued:

> The clothier on Thursday reported that comparable sales at its Jos. A Bank chain of stores fell 14.6% in the quarter ended October 31, a result it called "far below" its forecasts.
>
> ***The culprit of the bloodbath? Jos. A Bank's now abandoned classic "buy one, get-three-free" sales events***. The company held its last such sale in October and called the aggressive pricing strategy "unsustainable" in its bid to turn Jos. A Bank into a billion-dollar retailer.
>
> Dialling back the intensity of the promotions without dropping them altogether is a key part of Men's Wearhouse CEO Doug Ewert's strategy to update a 110-year-old brand that isn't drawing younger men. Jos. A Bank, which Men's Wearhouse bought in 2014 for $1.8 billion, is adding big-and-tall options, slim-fit styles and a shoe collection to expand its clientele.
>
> "Jos. A. Bank is a brand that just needs some updating, and we're updating that brand as aggressively as we can," Ewert told Bloomberg in a recent interview. "There's a lot to talk about besides just price."

> But for now, customers are still clearly focused on deals: the company expects the declines to worsen in the current quarter, forecasting comparable sales will fall between 20% and 25% as fewer shoppers come in and customers "adapt to the shift in the promotional strategy."

124. The next day, November 6, 2015, *Dow Jones* reported that:

> There's a 40% Off Sale at Men's Wearhouse (MW) today. Unfortunately, it's the retailer's stock. MW is getting punished after executives warned of struggles with the acquisition of Jos. A Bank. After that chain's F3Q same-store sales skidded 15% amid MW's effort to wean Jos. A Bank customers off 4-for-1 promotions, it projects a 20-25% slump this quarter. "We've seen the movie before where a major change in tactics takes a long time to resonate," says Jefferies, which downgrades MW from buy and halves its price target to $32. It's down 43% at $22.81, hitting a 5-year low and notching what would easily be the stock's biggest-ever decline.

125. As a direct result of this news, Men's Wearhouse's stock price fell precipitously from $40.10 per share on November 5, 2015 to close at $22.70 on November 6, 2015, a 43% decline on 28 times the average daily trading volume during the Class Period – the largest single-day decline ***ever*** in Men's Wearhouse's share price. While this decline caused substantial harm to the Company's investors, Men's Wearhouse's stock continued to trade at artificially inflated prices.

**3Q15 Earnings Results, Conference Call, and Form 10-Q**

126. On December 9, 2015, Men's Wearhouse announced the Company's 3Q15 results, including adjusted EPS of $0.50, revealing that "Jos. A. Bank comparable sales for the third quarter decreased 14.6% due primarily to a decrease in average transactions per store as the Company began the transition away from the Buy-One-Get-Three Free promotional events," and that "due to the decrease in the Jos. A. Bank sales, the Company performed an interim valuation of the Jos. A. Bank tradename which resulted in a $90.1 million non-cash impairment charge." The release also disclosed that "[t]hrough the first week of December, ***the quarter-to-date comparable sales at Jos. A. Bank were down 35.1%***." Defendant Ewert stated that:

> "***When we acquired Joseph Bank, we knew that we needed to correct the promotional model***. However, we underestimated the impact to the near-term performance as we began to execute the difficult, but necessary, corrective steps. We

> remain confident that these steps will restore a long-term, sustainable, profit model and reshape the business for a healthy and growing Jos. A. Bank.
>
> "Beyond promotions, we have taken several other significant steps to grow revenue opportunities at Jos. A. Bank by re-engaging with current and lapsed customers while attracting new ones. We have introduced a new loyalty program, we are recalibrating our marketing strategy and have introduced a new incentive program that aligns with the new selling techniques. Additionally, we are enhancing the assortment to better service our core customers and to give new customers a compelling reason to discover Jos. A. Bank.
>
> "We are also taking additional steps to course correct. We are currently performing a deep dive on data analysis using both our customer data and a third party to uncover actionable insights. With the topline resetting to a lower level for the near-term, we are looking at every opportunity for cost reduction including store rationalization, labor, advertising and all relevant shared service costs and we are partnering with Alix Partners on specific elements of this work. We are challenging all assumptions and are fully focused on accelerating the Jos. A. Bank recovery."

127. On December 10, 2015, defendants faced a group of stunned analysts when Men's Wearhouse hosted a conference call led by defendants Ewert and Kimmins to discuss the Company's full 3Q15 results. Defendant Kimmins acknowledged what defendants had known, or recklessly disregarded, what would occur if the promotional cadence and mix of suits were dramatically altered (as defendants acknowledged occurred during the quarter): "***the Jos. Bank sales for the first five weeks of the current quarter are down by 35.1%***."

128. Yet another analyst, Karru Martinson of Deutsche Bank, asked: "You mentioned that you're not seeing the Bank customer crossing over to Men's Wearhouse. When you have a 35% drop in comp, where is that customer going? Who's siphoning that off from you?" Defendant Ewert responded: "We believe that Jos. Bank is the most compelling value for this customer. ***We believe they're sitting on the sideline***. They're either shopping out of their closet or they're waiting to be inspired by us to come visit the store."

129. But for the final advertised Buy-One-Get-Three promotional event in October 2015, which had the effect of artificially pulling in sales from the next quarter, Men's Wearhouse's 3Q15 sales for the Jos. A. Bank division would have been even worse than reported.

130. Men's Wearhouse's changes to the Jos. A. Bank business model had a devastating impact on the brand's sales:







131. Market reaction was once again swift and negative: as a direct result of this news, Men's Wearhouse's stock price declined 17% on 22 times the average daily trading volume during the Class Period. Analysts' and the media's reaction expressed deep concern about the Company:

(a) On December 10, 2015, Cowen & Co. lowered its price target from $30 to $18 and stated that Men's Wearhouse's problems with Jos. A. Bank appeared to be more complex than the Company had disclosed to investors and the public:

> **There Are Deeper Issues Than The Elimination Of One Promotion**
>
> Management reported that it experienced SSS [i.e., "Same Store Sales"] deterioration at JOSB through the first week of December in Q4:15, down -35% vs. its other brands up +5.5%. This SSS implosion is in part due to the company's planned elimination of its BOGO-3 promotions at JOSB in October – but the brand remains extremely promotional and we think there are deeper issues than just eliminating BOGO-3.



1269698_1

(b) Tigress Financial Partners issued a research highlight on December 11, 2015, stating that "[t]his has been an unbelievable example of corporate greed and arrogance by B level players as over $2 billion in equity market value has been destroyed."

(c) On December 10, 2015, *Fortune* reported that "Buying Jos. A Bank Has Been a Catastrophe for Men's Wearhouse," in an article that explained the Company "eliminated Jos. A Bank's legendary 'buy one suit, get three free' deals" and that "[s]hoppers have stayed away in droves."

132. On December 11, 2015, *Bloomberg* published an article titled "Men's Wearhouse Confronts a New Label: 'Uninvestable,'" which stated, in part:

> Men's Wearhouse Inc. looks like it's starting to unravel.
>
> Eighteen months after buying rival Jos. A. Bank Clothiers Inc. in what is now widely seen as a disastrous $1.5 billion deal, the apparel chain is fighting to show it can survive. Its shares and bonds have plunged as investors question the company's ability to reverse a nerve-shaking decline in sales at the Jos. A. Bank division.
>
> "We view Men's Wearhouse as effectively uninvestable," Barclays Plc credit analyst Hale Holden said in a research note. ***The decline at Jos. A Bank is "alarming and provides no confidence that management has a handle on it*****.**"




> The problems gained fresh urgency Thursday after Men's Wearhouse said same-store sales at the Jos. A. Bank division dropped 35 percent in the first five weeks of this quarter, which may force the company to miss a forecast it gave just last month.

> Chief Executive Officer Doug Ewert's big idea to improve Jos. A Bank's sagging results was to discard the "buy one suit, get three free" promotion that had anchored its results for years. Ewert saw the giveaways as unsustainable and shifted to more traditional discounting, such as two suits for $500. Unfortunately for Men's Wearhouse, loyal customers used to the sweeter deals stayed away.

133. On December 12, 2015, *Barrons* reported that the Company's decision to terminate the Buy-One-Get-Three promotions caused same-store sales to plunge 35% and noted "now that [Men's Wearhouse] stopped giving away the suits, nobody wants them."

**Post-Class Period Events**

134. On January 31, 2016, Men's Wearhouse announced that it had reorganized into a holding company structure called Tailored Brands. On February 2, 2016, *Mergers & Acquisitions*, in an article entitled "Turnaround Talk: Men's Wearhouse Devises Tailored Brands Holding Company to Protect Assets in Potential Bankruptcy," reported:

> Men's Wearhouse has created a new holding company, but it remains to be seen if the move will make investors forget about the retailer's steady stock decline and profit losses in the wake of purchasing Jos. A. Bank in 2014.
>
> * * *
>
> Men's Wearhouse has faced financial hurdles, stemming from the $1.8 billion purchase of men's specialty apparel retailer Jos. A. Bank of Hampstead, Maryland, completed in June 2014. The transaction was funded with a $1.1 billion term loan facility, $600 million in senior unsecured notes and borrowings under its asset-based credit facility. Men's Wearhouse expected that the combined entity would have more than 1,700 U.S. stores and annual sales of roughly $3.5 billion.
>
> Things have not run so smoothly, however. In November, Men's Wearhouse ended a popular promotional campaign of Jos. A. Bank's that offered shoppers a buy-one, get-two [sic] bargain. The move triggered a stock price drop of more than 30%.

135. On February 16, 2016, Men's Wearhouse again announced abysmal preliminary 4Q15/FY15 results, revealing that "***Jos. A. Bank comparable sales decreased 31.9%*** primarily due to a decline in average transactions per store" and that "due to recent results for Jos. A. Bank, the Company is performing its annual impairment testing, which is likely to result in a significant non-cash impairment charge." The release also stated that, "[b]ased on these preliminary results, the

Company estimates that adjusted EPS for fiscal 2015 will be near the bottom of the previously announced guidance range of $1.75 to $2.00, excluding non-operating items and non-cash impairment charges."

136. On March 9, 2016, Men's Wearhouse announced actual 4Q15/FY15 results, including 4Q15 adjusted EPS loss of $0.30 and FY15 adjusted EPS of $1.80, and ***revealed that Jos. A. Bank comparable sales decreased 31.9%***. As a result, ***the Company took a $1.1 billion goodwill and intangible asset impairment charge***, a $25.8 million asset impairment charge and an $11.0 million inventory write-down – writing off the majority of Jos. A. Bank's $1.8 billion acquisition price. The release also stated that the Company planned to close approximately 250 stores during fiscal year 2016, including 80-90 full-line JAB stores and all 49 JAB outlet stores. The release also stated that "'[r]eflective of the many operational changes being made and the expectation for a slow recovery at Jos. A. Bank, we believe that fiscal year 2016 adjusted EPS will be in the range of $1.55 to $1.85.'"

137. On March 25, 2016, Men's Wearhouse filed its Form 10-K, for the period ended January 30, 2016, with the SEC, and made the following new risk disclosure:

> ***Our strategy related to the Jos. A. Bank brand may negatively impact our short-term and long-term profitability***.
>
> Reengineering the Jos. A. Bank brand to a long-term, sustainable profit model is a key party of our business strategy. There can be no assurance the strategic initiatives being implemented at Jos. A. Bank will favorably impact the Jos. A. Bank's operations or will be successfully executed or executed in the time period projected . . . .

138. Defendants' undisclosed plan to dramatically alter Jos. A. Bank's business and concealment of the known (or recklessly disregarded) impact those plans were having on the Company has had a lasting impact on Tailored Brands and its stock, which currently trades at approximately $10.29 per share, or 84% below its Class Period high.

139. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Men's Wearhouse common stock, by publicly issuing false and misleading

statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

140. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Men's Wearhouse's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating a misleading assessment of Men's Wearhouse and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

141. During the Class Period, as detailed herein, defendants engaged in a scheme and wrongful course of business that was designed to and did artificially inflate the price of Men's Wearhouse stock, which misconduct operated as a fraud and deceit on those who transacted in the Company's stocks during the Class Period. Defendants did this by issuing materially false and misleading statements and omissions regarding Men's Wearhouse's business, specifically, the Jos. A. Bank division. As the falsity of defendants' statements began to be revealed, Men's Wearhouse's stock price fell on September 9, 2015, November 6, 2015 and December 10, 2015, as detailed above, as the artificial inflation dissipated. As a result of their transactions in artificially inflated Men's

Wearhouse stock during the Class Period, Lead Plaintiff and other Class members suffered significant economic losses, *i.e*., damages.

142. The market for Men's Wearhouse stock was open, well-developed and efficient at all relevant times, with average daily trading volume of more nearly 1 million shares during the Class Period. As a result of these materially misleading statements and failures to disclose the true state of the Company's business performance and financial circumstances, Men's Wearhouse stock traded at artificially inflated prices. Lead Plaintiff and other Class members transacted in Men's Wearhouse stock relying upon the integrity of the market relating to Men's Wearhouse stock and suffered economic loss as a result thereof.

143. Defendants' false or misleading statements had the intended effect and caused Men's Wearhouse stock to trade at artificially inflated prices.

144. By the close of the market on September 9, 2015, news of Men's Wearhouse's sudden announcement of changes to Jos. A. Bank's business were disclosed to the market. On this disclosure, the price of Men's Wearhouse stock declined 12%, a loss of $6.76 per share, a significant decline on heavy trading volume of more than 7.2 million shares, or more than 7 times the average daily trading volume during the Class Period.

145. By the close of the market on November 6, 2015, the preliminary results of Men's Wearhouse's changes to Jos. A. Bank's business were disclosed to the market. On this disclosure, the price of Men's Wearhouse common stock dropped 43%, a loss of $17.40 per share, a significant decline on heavy trading volume of 28.6 million shares, or more than 28 times the average daily trading volume during the Class Period.

146. By the close of the market on December 10, 2015, the actual results of Men's Wearhouse's changes to Jos. A. Bank's business were disclosed to the market. On this disclosure, the price of Men's Wearhouse common stock dropped 17%, or $3.30 per share, on heavy trading

volume of 22.1 million shares, or more than 22 times the average daily trading volume during the Class Period.

147. These price declines removed the artificial inflation from Men's Wearhouse's stock price, causing real economic loss to investors who transacted in Men's Wearhouse's stock during the Class Period.

148. The declines in the price of Men's Wearhouse's stock during the Class Period were the direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to and/or leaking into the market. The timing and magnitude of Men's Wearhouse's significant price declines negate any inference that the losses suffered by Lead Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct:

(a) As illustrated in the chart below, on September 9, 2015, the same day that Men's Wearhouse's stock price closed down 12%, the S&P 500-stock index closed down slightly from the prior day's close:



(b) As illustrated in the chart below, on November 6, 2015, the same day that Men's Wearhouse's stock price dropped 43%, the S&P 500-stock index remained relatively unchanged compared to the prior day's close:




(c) As illustrated in the chart below, on December 10, 2015, the same day that Men's Wearhouse's stock price dropped 17%, the S&P 500-stock index was up slightly compared to the prior day's close.




149. The economic losses suffered by Lead Plaintiff and other members of the Class on September 9, 2015, November 6, 2015 and December 10, 2015 were a direct result of defendants'

materially false statements and omissions and fraudulent scheme to artificially inflate the price of Men's Wearhouse common stock and the subsequent and significant declines in the value of that stock when defendants' prior misrepresentations and omissions were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

150. Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

151. Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Men's Wearhouse stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Men's Wearhouse stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient market;

(b) Men's Wearhouse stock traded in large weekly volumes of millions of shares;

(c) As a regulated issuer, Men's Wearhouse filed periodic public reports with the SEC and NYSE;

(d) Men's Wearhouse was eligible to file SEC Form S-3 registration statements;

(e) Men's Wearhouse regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f) Men's Wearhouse was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

152. As a result of the foregoing, the market for Men's Wearhouse stock promptly incorporated current information regarding Men's Wearhouse from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who transacted in Men's Wearhouse stock during the Class Period suffered similar injury through their transactions in Men's Wearhouse stock at artificially inflated prices and a presumption of reliance applies.

153. Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other members of the Class purchased or acquired Men's Wearhouse stock between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Men's Wearhouse stock, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

154. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Men's Wearhouse stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

155. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Men's Wearhouse stock was actively traded on NYSE. Record owners

and other members of the Class may be identified from records maintained by Men's Wearhouse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Lead Plaintiff, Men's Wearhouse reported more than 48 million shares outstanding owned by approximately 925 shareholders of record and approximately 10,000 beneficial shareholders as of March 17, 2015. Accordingly, Lead Plaintiff reasonably believes that there are thousands of members in the proposed Class.

156. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

157. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

158. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether defendants' acts as alleged herein violated the federal securities laws;

(b) Whether defendants' statements made to the investing public misrepresented or omitted material facts about Men's Wearhouse's business, operations and financial conditions;

(c) Whether the price of Men's Wearhouse stock was artificially inflated during the Class Period; and

(d) To what extent the Class members have sustained damages and the proper measure of damages.

159. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

160. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

161. Defendants are liable for making false statements and failing to disclose adverse facts known to them about Men's Wearhouse. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in Men's Wearhouse's stock during the Class Period was a success, as it: (i) deceived the investing public regarding Men's Wearhouse's business and financial condition; (ii) artificially inflated the price of Men's Wearhouse stock; and (iii) caused Lead Plaintiff and other Class members to transact in Men's Wearhouse stock at inflated prices.

162. During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their transactions in Men's Wearhouse stock during the Class Period.

164. Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Men's Wearhouse's business, operations and financial condition as specified herein.

165. The defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon those who transacted in Men's Wearhouse stock during the Class Period.

166. The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Men's Wearhouse's operating condition and financial status from the investing public and supporting the artificially inflated price of its stock.

167. As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Men's Wearhouse stock was artificially inflated during the Class Period. In ignorance of the fact that the market prices of the Company's stock was artificially inflated, and relying directly or indirectly on the false and

misleading statements, or upon the integrity of the market in which the Company's stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in defendants' public statements during the Class Period, Lead Plaintiff and the other Class members acquired Men's Wearhouse stock during the Class Period at artificially high prices and were ultimately damaged thereby.

168. At the time of said misrepresentations and omissions, Lead Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and other Class members and the marketplace known the truth regarding the problems that Men's Wearhouse was experiencing, which defendants did not disclose, Lead Plaintiff and other Class members would not have transacted in Men's Wearhouse stock, or, if they had transacted in its stock during the Class Period, would not have done so at the artificially inflated prices which they paid.

169. By reason of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5.

170. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Men's Wearhouse stock.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

171. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

172. The Individual Defendants acted as controlling persons of Men's Wearhouse within the meaning of §20(a) of the 1934 Act:

(a) By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false

statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff contends are false and misleading;

(b) The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c) Because of their positions as CEO, CFO and CCO, the Individual Defendants directly participated in the Company's management and were directly involved in Men's Wearhouse's day-to-day operations. The Individual Defendants also controlled the contents of Men's Wearhouse's quarterly reports and other public filings, press releases, conference calls and presentations to securities analysts and the investing public. The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

173. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff respectfully prays for relief and judgment, as follows:

A. Declaring that defendants are liable pursuant to the 1934 Act;

B. Determining and certifying that this action is a proper class action and certifying Lead Plaintiff as a class representative and Lead Plaintiff's counsel as class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C. Awarding compensatory damages in favor of Lead Plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D. Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E. Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: May 26, 2017

ROBBINS GELLER RUDMAN
& DOWD LLP
PATRICK J. COUGHLIN
HELEN J. HODGES
DANIELLE S. MYERS

s/ DANIELLE S. MYERS

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
JOHN C. HERMAN
Monarch Tower, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)

Lead Counsel for Plaintiff

EDISON, McDOWELL & HETHERINGTON LLP
Andrew M. Edison
Attorney-in-Charge
Southern District Bar No. 18207
andrew.edison@emhllp.com

1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone: 713/337-5580
713/337-8850 (fax)

Local Counsel

CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 26, 2017.

s/ DANIELLE S. MYERS

DANIELLE S. MYERS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: danim@rgrdlaw.com

# Mailing Information for a Case 4:16-cv-00838 Makhlouf v. Tailored Brands, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rajeev K Adlakha**
  rkadlakha@vorys.com
- **Thomas E Bilek**
  tbilek@bileklaw.com,lmank@bileklaw.com
- **Andrew J Brown**
  andrewb@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com
- **Jeffrey W Chambers**
  jeffchambers@chambers-law-group.com,amandaleonard@chambers-law-group.com
- **Patrick J Coughlin**
  patc@rgrdlaw.com
- **Andrew M Edison**
  andrew.edison@emhllp.com,ana.sanchez@emhllp.com
- **Helen J Hodges**
  helenh@rgrdlaw.com
- **Danielle S Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Anthony J O'Malley**
  ajomalley@vorys.com
- **Monica Fitzgerald Oathout**
  moathout@vorys.com,ccafero@vorys.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Stanley D Bernstein**
Bernstein Liebhard
10 E 40th St
New York, NY 10016