United States District Court
Southern District of Texas
**ENTERED**
April 03, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PETER  MAKHLOUF, Individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-00838 |
| | § | |
| TAILORED BRANDS, INC., *et al*, | § § | |
| Defendants. | § § | |

## OPINION AND ORDER

Pending before the Court in the above referenced Federal Rule of Civil Procedure 23(a) and (b)(3) securities class action on behalf of all persons who purchased or otherwise acquired Tailored Brands, Inc. ("Tailored Brands" or the "Company") securities between June 18, 2014 and December 9, 2015 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act") of  1934 against Tailored Brands and executive officers Douglas S. Ewert, Jon W. Kimmins, and Mary Beth Blake, is the Defendants' Motion to Dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) (Doc. 63).

This federal securities suit arises out of the contentious acquisition by Tailored Brands of one-time rival Joseph A. Bank Clothiers, Inc. ("Jos. A. Bank") and optimistic, but allegedly misleading, statements made during and after the acquisition.   Ultimately Tailored Brands purchased Jos. A. Bank, which was subsequently determined to be a deeply troubled company, at an excessive price, with the integration not proceeding as materially misrepresented to Tailored Brands shareholders and with adverse facts not disclosed to them during the Class Period. Tailored Brands' stock became artificially inflated, Class members purchased it at highly inflated

prices, and they suffered economic loss when revelations of its actual financial situation reached the market.

After carefully reviewing the Amended Complaint, the briefs, and the applicable law, for the reasons stated below, the Defendants' Motion is granted. Plaintiff's claims against the Defendants are dismissed without prejudice for failing to allege scienter.

## Standards of Review

Federal Rule of Civil Procedure 8(a)(2) provides: "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. WRIGHT & A. MILLER, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action."). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957) ["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*, 556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) ("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974. "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 129 S. Ct. at 1940, the Supreme Court observed the tenet that "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 129 S. Ct. at 1949. The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

As noted, on a Rule 12(b)(6) review, although generally the Court may not look beyond the pleadings, the Court may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994). *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) ("[T]he court may consider . . . matters of which judicial notice may be taken"). Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).

In addition to Rules 8(a) and 12(b)(6), fraud claims must also satisfy the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b): "In allegations alleging fraud…., a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." A dismissal for failure to plead with particularity as required by this rule is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). The Fifth Circuit interprets Rule 9(b) to require "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d

690, 696 (5th Cir. 2005).  *See also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) ("To satisfy Rule 9(b)'s pleading requirements the plaintiffs must specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.") (*quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997)).

"When a corporation is alleged to have made false representations, the court must [identify and] look to 'the state of mind of the corporate official or officials who make or issue the statement.'  It follows that '[a] corporation can be held to have a particular state of mind [e.g., fraudulent intent] when that state of mind is possessed by a single individual.'"  *7-Eleven Inc. v. Puerto Rico-7 Inc.,* Civ. A. No. 3:08-CV-00140-B, 2008 WL 4951502, *2 (N.D. Tex. Nov. 19, 2008), *quoting Southland Sec. Corp.*, 365 F.3d 353, 366-67 (5th Cir. 2004).

Private litigants who bring securities fraud claims must also satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") before any discovery is allowed.  "To state a securities fraud claim under section 10(b) and Rule 10b-5, plaintiff must plead (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which the plaintiffs relied, and (5) that proximately caused the plaintiff's injuries. *Southland*, 365 F.3d at 362.  For a misrepresentation to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-31 (1988).  "The appropriate inquiry is whether, under all the circumstances, the omitted fact or prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it

alters the total mix of information available about the proposed investment.'" *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994), *quoting Krim v. BancTexas Group*, 989 F.2d 1435, 1445 (5th Cir. 1993).

For false statements of a material fact or a misleading omission of material fact, Plaintiff must "specify each statement alleged to have been misleading and the reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 15 U.S.C. § 78u-4(b)(2). *See also ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 351 (5th Cir. 2001) ("To summarize, a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud clam must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) and 78u-4(b)(3)(A):  (1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.  Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:  (7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.").

Plaintiffs must also "state with particularity facts giving rise to a strong inference that defendants acted with the required state of mind," scienter, i.e., "not merely simple or even inexcusable negligence," but instead a mental state embracing "intent to deceive, manipulate, or defraud, or that 'severe recklessness' in which the danger of misleading buyers or sellers . . . is

either known to the defendant or is so obvious that the defendant must have been aware of it." 15 U.S.C. § 78u-4(b)(2); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004), *quoting Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981) (*en banc*).

To determine whether a plaintiff has adequately pleaded scienter under the PSLRA, all facts must be evaluated collectively, not in isolation, and the "court must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008), *citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The inference that the defendant acted with scienter need not be irrefutable, but it must ultimately be cogent and compelling, not merely reasonable or permissible. *See Tellabs*, 551 U.S at 314 ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as 'strong' within the intendment of § 21D(b)(2), we hold, an inference of scienter must be  more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

The Fifth Circuit has rejected the contention that allegations of motive and opportunity standing alone will satisfy the scienter requirement, but it has found that they may meaningfully enhance the strength of the inference of scienter. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (*citing Ind. Elec.*, 537 F.3d at 533), *cert.*

*denied*, 558 U.S. 873 (2009).

The Fifth Circuit has also rejected group pleading of scienter and requires the plaintiffs to plead facts showing "the state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Id.* Where the corporate documents have no stated author or for statements where the documents are not attributed to any individual, a corporate officer's signature on the document is sufficient to charge the document to him. *Southland*, 365 F.3d at 365. "[T]he corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation." *Id.*

Under the PSLRA a plaintiff must prove that the defendant's act or omission alleged to have violated the Exchange Act caused the loss for which the plaintiff seeks to recover damages. 15 U.S.C. § 78u-4(b)(4). To establish loss causation an investor must plead facts showing a causal relationship between his damages and the defendant's material misstatement or omission. The Supreme Court has held that the traditional elements of proximate causation and economic loss must be alleged to establish loss causation under § 10(b). *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). For loss causation the plaintiff may not simply allege that the price of security on the date of purchase was inflated because of the alleged misrepresentation. *Id.* at 342 ("[A]s a matter of pure logic, at the moment that a transaction takes place, the plaintiff [who has purchased securities at an inflated price] has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses

equivalent value." (emphasis in original)).

Nor does a decline in stock price following a public announcement of bad news, by itself, demonstrate loss causation supporting a securities fraud claim. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. An investor must show that the misstatement or omission *itself* is the actual cause of his economic loss, as opposed to changed economic circumstances, changed investor expectations, new industry-specific facts, conditions, or other events." *Dura Pharms.,* 544 U.S. at 342; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, (5th Cir. 2009) ("The loss must be caused because this truth 'ma[de] its way into the marketplace,' not as a result of 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions' or other factors independent of the fraud."), *citing Dura Pharms.*, 544 U.S. at 342-43.

The Fifth Circuit requires that a plaintiff must allege either (1) a "facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciations of the stock and plaintiff's loss" or (2) "enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009). "[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Id.* at 261. The Fifth Circuit has ruled that notice pleading under Rules 8(a) and 12(b)(6), not heightened pleading, is sufficient to plead loss causation.

**Factual Allegations of the Amended Complaint (Doc. 58)**

Lead Plaintiff, Strathclyde Pension Fund, on behalf of itself and all persons similarly situated, brings this securities fraud class action against Defendants Tailored Brands and three of its senior executive officers, Douglas S. Ewert (the Chief Executive Officer), Jon W. Kimmins (the Chief Financial Officer), and Mary Beth Blake (the Chief Merchandising Officer), for violations of the Securities Exchange Act of 1934.  The action is brought on behalf of purchasers of Men's Wearhouse common stock between July 29, 2014 and December 9, 2015, inclusive (the "Class Period").  During the Class Period, Men's Wearhouse stock was listed and traded on the New York Stock Exchange as MW; after the Class Period, Men's Wearhouse changed its name to Tailored Brands.   There were more than 48 million shares of Men's Wearhouse stock outstanding during the Class Period.

Defendant Ewert was the Company's CEO during the Class Period.  He joined the Company in 1995, became an executive officer in 2000, and since March 2016, has served as President.  As CEO and President, he spoke on the Company's behalf in releases, conference calls, and SEC filings and certified the Company's Forms 10-Q and Form 10-K during the relevant period.   Defendant Kimmins was the Company's Executive Vice President, CFO, Treasurer, and Principal Financial Officer during the Class Period.  As CFO, Treasurer and Principal Financial Officer, he spoke on the Company's behalf in releases, conference calls, and SEC filings and certified the Company's Forms 10-Q and Form 10-K during the relevant period. Defendant Mary Beth Blake was the Company's Executive Vice President and Chief Merchandising Officer during the Class Period until September 10, 2014 when her title changed to President and Chief Merchandising Officer. As CMO, she spoke on behalf of Men's Wearhouse during a July 29, 2014 Analyst Day conference call.

As background, in October 2013, Jos. A. Bank launched an unsolicited bid to buy Men's

Wearhouse for $2.3 billion.  Men's Wearhouse rejected the offer without seriously considering it, a move which upset its largest shareholder, who supported a merger with Jos. A. Bank.  That shareholder threatened to call a shareholder meeting to vote on passing bylaw amendments which would permit the removal of directors without cause. First Amended Complaint (FAC), Doc. 58 at 14.  Two weeks later, under immense pressure from this shareholder, Men's Wearhouse reversed course and offered to buy Jos. A. Bank.  The merger ultimately occurred in June 2014, with Men's Wearhouse purchasing Jos. A. Bank for $1.8 billion.  The Men's Wearhouse executives maintained their corporate positions and were rewarded with special one-time bonuses upon the closing of the merger. *Id.* at 3.

Defendants also received special accelerated stock and option awards in September 2014, the vesting of which was directly linked to their ability to achieve specific adjusted earnings per share targets for fiscal year 2017 and the Company's total shareholder return compared to that of other select companies over a pre-defined period. *Id.* at 4.  After the merger, Defendants promised investors $100-150 million in merger synergies by improving Jos. A. Bank's business and operations.  Defendants announce guidance of $5.50-$6.00 per share in adjusted earnings per share ("EPS") through 2017.  *Id.* at 5.  Defendants assured investors they would move "slowly and deliberately" to enact the changes, testing them first on a small scale before proceeding on a large scale, and would take care not to alienate preexisting Jos. A. Bank customers.  *Id.*

Throughout the Class Period, Defendants continued to assure investors that they had confidence in these figures and that they were taking precautions against risk.  However, what actually played out is that Defendants changed the Jos. A. Bank model drastically and quickly, while allegedly being aware of but failing to disclose the material negative impact the intended changes would have on Jos. A. Bank's business.  These drastic, untested changes resulted in Jos.

A. Bank losing loyal customers and suffering large reductions in sales.

Specifically, the changes enacted by Defendants included replacing Jos. A. Bank's long-time, low-cost suppliers with the more expensive suppliers used by Men's Wearhouse.  The new suits added to the inventory were more expensive, brand-name, and came in more modern cuts such as "slim fit."  With the more costly suppliers, Defendants knew they would have to do away with Jos. A. Bank's margin-erosive, yet popular and previously lucrative "Buy One Get Three Free" or "BOG3" suit promotional events.  Yet, Plaintiff alleges, "defendants were warned on numerous occasions that changing the price of a Jos. A. Bank suit by as little as $1, eliminating the ubiquitous yet essential BOG3 promotions, or altering the mix/style/fit of the Jos. A. Bank suits in an attempt to attract younger Millenial customers to the brand would be devastating and have a disastrous 30% negative impact on sales as loyal customers would flee in droves." FAC at 5-6.  In spite of these warnings, Defendants continued with their plan to change the suit prices and inventory at Jos. A. Bank while assuring investors at the time of the acquisition that Jos. A. Bank would be accretive to the Company's earnings, create significant cost synergies, and general meaningful shareholder returns. *Id.*

Defendants' alleged Class Period misrepresentations and omissions occurred at more than ten different events detailed in the First Amended Complaint, including: (1) at a July 24, 2014 Analyst Day; (2) at the time of the 2Q14 earnings release; (3) at a mid-quarter analyst meeting with management in November 2014; (4) at the time of the 3Q14 earnings release; (5) at the time of the 4Q14/FY14 earnings and results release; (6) on the March 27, 2015 Form 10-K; (7) on May 2015 offering documents; (8) at the time of the 1Q15 earnings release; (9) at the time of the 2Q15 earnings release; and (10) at the time of the 3Q15 earnings release.

*July 24, 2014 Analyst Day*

On July 29, 2014, about a month after the merger, Men's Wearhouse hosted an Analyst Day led by Ewert, Kimmins, and Blake.  There, Blake stated that the "long term strategy is to wean off the most margin erosive sale events." FAC at 23.  Ewert explained to analysts that "we will move slowly and deliberately making sure that significant changes are tested on a small scale before proceeding on a large scale." *Id.* at 24.  He noted that the goal was to "further engage, but not alienate the Joseph Bank existing customer" while also trying to attract new customers. *Id.*  Ewert also told analysts that no sudden changes would be made to the aggressive price promotion offers, and instead the potential changes price and promotion strategies would be tested and enacted in a localized way to avoid risk. *Id.*

Plaintiff alleges that these statements were materially false and misleading when made because they omitted the true facts, which were then known or recklessly disregarded by the Defendants.  One "true fact" allegedly omitted was the fact that Defendants planned to replace Jos. A. Bank's merchandise sourcing vendors with Men's Wearhouse vendors while knowing or recklessly disregarding that the resulting, necessary price increase would have a "tremendous negative impact on sales." *Id.* at 25.

Additionally, Defendants omitted the fact that they intended to eliminate the BOG3 as soon as the acquisition closed, which they knew or recklessly disregarded would cause sales to decline by 30%. *Id.*  Plaintiff alleges this "knowledge" of the "true facts" about the impact of ending the BOG3 promotion was shared with the Men's Wearhouse executives by the former Jos. A. Bank executives during "Monday morning meetings" that took place weekly among the former Jos. A. Bank executives and Defendants Ewert and Blake after the merger. *Id.* at 25-26.

*2Q14 Earnings Release, Conference Call and Form 10-Q*

On September 10, 2014, after announcing 2Q14 results, Ewert stated that they "continue

to expect between $100 and $150 million in synergies" and upon questioning from investors, expressed that he was "very confident" about that guidance. FAC at 26-27.  The next day, on a conference call, Ewert assured investors that the Company would be careful to retain existing Jos. A. Bank customers "by seeking their permission through testing before making widespread changes." *Id.*

Plaintiff alleges those statements were materially false and misleading when made in that they omitted the true facts, which were then known to or recklessly disregarded by Defendants. Again, the "facts" alleged by Plaintiff to be omitted were that Defendants planned to switch to the Men's Wearhouse supplier, which would necessitate raising prices, which would have a "tremendous negative impact on sales." *Id.* at 28.  Further, Defendants omitted the fact that they intended to eliminate the BOG3 as soon as the acquisition closed, which they knew or recklessly disregarded would cause sales to decline by 30%.  *Id.*  Plaintiff alleges that by omitting these two "facts," Defendant's 2017 guidance lacked a reasonable basis when made and omitted material facts necessary to make the guidance not misleading. *Id.* at 29.

Additionally, Plaintiff points to Men's Wearhouse's 2Q14 Form-10Q for the period ending on August 2, 2014, which was prepared, reviewed, and signed by defendants Ewert and Kimmins and filed with the SEC. Defendants Ewert and Kimmins each certified the document "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." *Id.*

However, Plaintiff alleges the Form 10-Q was false and misleading because it failed to disclose the known trends and uncertainties described above.  This omitted information was required to be disclosed to investors by Item 303 of Regulation S-K, 17 C.F.R. §

229.303(a)(3)(ii)-(iii).

*3Q14 Earnings Release, Conference Call and Form 10-Q*

In a December 10, 2014 release announcing the Company's 3Q14 results, Ewert stated: "We remain confident in our 2017 guidance and our cost synergy run-rate at the end of the third quarter is well ahead of our original $15 million projection for the end of the 2014 fiscal year." FAC at 33.  Kimmins echoed the same sentiment in a conference call the next day.  Also during that conference call, Ewing was questioned about the timeline by securities analyst Janet Kloppenburg, who observed that the reduction in promotional activity was hurting the Company's top line.  In response, he told her: "We see revenue synergies starting to gain traction in 2015, as we start to right-size the fit and fashion and make it more trend right. It will certainly start building in spring and gain more traction in fall." *Id.* at 35.

Plaintiff alleges these statements were materially false and misleading for the same reasons as recited above.  Additionally, despite telling investors they would be judicious and take care to retain loyal Jos. A. Banks customers "by seeking their permission through testing before making widespread changes," Defendants instead introduced name-brand and slim fit suits into the inventory without first testing customer response. *Id.* at 36.  Sales immediately declined and Defendants were aware of these adverse developments due to electronic polls from stores received nightly at the corporate office documenting which styles of suits are being sold on a daily, weekly, monthly, and yearly basis. *Id.* at 37.  Plaintiff alleges that this data about the daily sales statistics "demonstrated to defendants that the branded tailored suits. . . and slim fit suits were not resonating with the typical Jos. A. Bank customers and were not selling." *Id.*  Yet, despite having this data, Defendants "recklessly disregarded" the fact that "Jos. A. Bank could not alter the fit, pricing, or promotions without alienating its existing customers and causing a

30% sales decline." *Id.*

Additionally during this period, Men's Wearhouse released its 3Q14 Form 10-Q for the period ending November 1, 2014, signed by Ewert and Kimmins, who certified it was not misleading. Plaintiff alleges that the Form 10-Q was indeed false and misleading because it omitted material information about trends and uncertainties required to be disclosed to investors under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii)-(iii). *Id.* at 37-38. Further, the Form 10-Q stated that there had been no material changes to the risk factors since they were set forth in the Form 10-Q for the period ending on February 1, 2014. Yet, Plaintiff contends, the risk factors had materially changed since that date. *Id.* at 38.

*4Q14/FY 14 Earnings Release and Conference Call*

On March 11, 2015, Men's Wearhouse released the Company's 4Q14 and Fiscal Year 14 results, which included an adjusted EPS of $2.58. FAC at 38. Ewert expressed continued confidence in the 2017 EPS guidance, and the Company actually increased its adjusted EPS from the range of $5.50 to $6.00 to the range of $5.75 to $6.25. *Id.* at 38-39. In a conference call the next day, Kimmins told investors "we are on track with our internal plans for sales." Ewert added that the "Jos. A. Bank customer is loyal and has been responding well to the small amount of newness that they've seen." *Id.* at 39-40.

Plaintiff alleges these statements were materially false and misleading when made in that they omitted true facts then known by the defendants. In support of this allegation, Plaintiff refers to the same facts as above: Defendants' plan included replacing Jos. A. Bank vendors with Men's Wearhouse vendors, which would cause a price increase, which was "known" to have a negative impact on sales; Defendants intended to eliminate the BOG3 sales, which was "known" to result in a 30% decline in sales; Defendants were not taking a measured approach to

implementing changes despite telling investors they would "be judicious" and be careful to maintain preexisting Jos. A. Bank customers. *Id.* at 41-44.

Plaintiff states that Defendants continued to assure investors that they were confident and that their plan was working as hoped, while, in reality, sales were declining rapidly as a result of the changes enacted by Defendants.  Importantly, Plaintiff alleges that Defendants "were aware of these adverse development" thanks to the daily sales polling data showing that the brand-name and slim fit suits were not selling.  *Id.* at 43.  Defendants recklessly disregarded the fact that Jos. A. Bank could not alter the pricing or promotions without alienating its existing customers or causing a 30% decline in sales.  *Id.* Yet, Defendants did not report any of this information to investors or disclose it in their 2015 and 2017 guidance.  *Id.* at 44.

### *1Q15 Earnings Release, Conference Call and Form 10-Q*

On June 10, 2015, Men's Wearhouse released the Company's 1Q5 results, which included an adjusted EPS of $0.54 and stated that "Jos. A. Bank integration remains on track." FAC at 48.  On a conference call the next day, Ewert told investors that "merger integration is on track and going very well" and "a lot of the risk is now behind us." *Id.* at 49.  Plaintiff alleges these statements were materially false and misleading when made in that they omitted the true facts, including that the slim fit and name brand suits were not selling well and Defendants were aware of these adverse developments.  *Id.* at 52.

Additionally during this period, Men's Wearhouse released its 1Q15 Form 10-Q for the period ending May 2, 2015, signed by Ewert and Kimmins, who certified it was not misleading. Plaintiff alleges that the Form 10-Q was indeed false and misleading because it omitted material information about trends and uncertainties required to be disclosed to investors under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii)-(iii). *Id.* at 54.  Further, the Form 10-Q stated

that there had been no material changes to the risk factors since they were set forth in the Form 10-Q for the period ending on January 31, 2015.   Yet, Plaintiff contends, the risk factors had materially changed since that date.   Plaintiff alleges that as a result of these materially false and misleading statements, Men's Wearhouse stock reached its Class Period high of $66.18 per share on June 22, 2015.  *Id*. at 55.

*2Q15 Earnings Release, Conference Call and Form 10-Q*

On September 8, 2015, Men's Wearhouse released the Company's 1Q15 results, which included an adjusted EPS of $1.07.  FAC at 55.  Ewert again expressed continued confidence in the 2017 guidance, but announced that the Company would "accelerate" their plan to change the "pricing and promotional strategy" and would pursue those changes "in a more aggressive and comprehensive way." *Id.* at 56.

The next day on a conference call with investors, Ewert participated in the following exchange with investor Janet Kloppenburg regarding the plan to accelerate the elimination of the Buy-One-Get-Three-Free promotion:

> Janet Kloppenburg: I was wondering if you could provide any sensitivity that you have to lowering the promotional cadence going away from the buy one, get three free program, and what the reaction has been there. Perhaps something you're seeing in August, so quarter to date.  I guess, Doug, what I'd like to say is you've guided to a certain level of performance for – implied performance – for Joseph A. Banks in the third quarter, and I'm wondering if there's been some testing or analytics behind that. . . . . My question is, have you done any testing there to see what the response rate is versus the buy one, get three, and what the margin trends look like?
>
> Doug Ewert: Well, certainly. We've been testing a lot of different ways to skin the promotional part of the business. At the end of the day, we think BOGO3 is very toxic. Customers have been trained to wait for it. We think we have to take it out of the picture to really understand and normalize what the rest of the promotional cadence looks like. We have a pretty high degree of confidence that this is the right move. Certainly we've been running promotional businesses in this sector for a long time at Men's Wearhouse and Moores, and so we have a lot of experience in how to drive sustainability in a promotional business like this. All of those years of learning are going to come into play here at Joseph Bank.

> So our testing has really been across all of our name plates, not just at Joseph
> Bank. We're pretty convinced this is the right thing to do. We were convinced
> this is the right thing to do a year ago. It's just now we're in a much better
> position to accelerate that strategy.

*Id.* at 59-60.

Plaintiff alleges these statements were materially false and misleading when made in that they omitted the true facts which were then known to or recklessly disregarded by Defendants. Among the omitted "true facts" was the fact that after the merger, at a 1Q15 managers conference in Ft. Lauderdale, Florida, Jos. A. Bank senior executives advised Men's Wearhouse executives including Ewert and Blake that eliminating the BOG3 promotions would result in a 30% drop in sales.  Plaintiff alleges that "[t]he 30% drop analysis, which was subsequently discussed in detail during a carve-out meeting of executives, demonstrated that Jos. A. Bank had previously tested dropping or changing the promotions and learned that the losses would be catastrophic if the type or cadence [of] sales was altered." *Id.* at 62.

Additionally during this period, Men's Wearhouse released its 2Q15 Form 10-Q for the period ending August 1, 2015, signed by Ewert and Kimmins, who certified it was not misleading.  Plaintiff alleges that the Form 10-Q was indeed false and misleading because it omitted material information about trends and uncertainties required to be disclosed to investors under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii)-(iii). *Id.* at 65.  Further, the Form 10-Q stated that there had been no material changes to the risk factors since they were set forth in the Form 10-Q for the period ending on January 31, 2015.  Yet, Plaintiff contends, the risk factors had materially changed since that date.

*3Q15 Earnings Release, Conference Call and Form 10-Q*

On December 10, 2015, during a conference call with analysts to discuss the Company's 3Q15 results, Kimmins stated that "the Jos. Bank sales for the first five weeks of the current

quarter are down by 35.1%." FAC at 71. Plaintiff alleges that Defendants had known for some time that the 30% decrease would inevitably result from the changes made to the Jos. A. Bank business model, but materially mislead the investing public about the negative impacts they knew would occur. *Id.* at 74.

*Loss Causation and the Class Members' Economic Loss*

Plaintiff alleges that during the Class Period, Defendants engaged in a scheme designed to artificially inflate the price of Men's Wearhouse stock by issuing materially false and misleading statements and omissions regarding its Jos. A. Bank business and operations. Upon revelations of these misleading statements, the artificial inflation dissipated and Men's Wearhouse's stock price fell, resulting in significant economic loss for Lead Plaintiff and other Class members. FAC at 76-77.

*Counts 1 and 11*

Plaintiff alleges Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 because they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state true facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices  and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their transactions in Men's Wearhouse stock during the Class Period. FAC at 84. Plaintiff also alleges Defendants are liable pursuant to § 20(a) of the 1934 Act because they were acted as controlling persons of Men's Wearhouse within the meaning of that section. *Id.* at 85.

*Summary of the First Amended Complaint*

In summary, Lead Plaintiff alleges that during the Class Period, Defendants made a series

of statements that omitted material facts about Jos. A. Bank's business and operations, the omission of which rendered Defendants' statements false and misleading.   Specifically, Defendants concealed from investors known trends and uncertainties associated with enacting large changes to the Jos. A. Bank business model.   Still, defendants enacted those risky changes while knowing, or recklessly disregarding, that they would alienate Jos. A Bank's existing customers and cause sales declines of 30% at Jos. A. Bank. FAC at 2-3.

Plaintiff's claims hinge largely on the fact that the Men's Wearhouse executives were informed by the former Jos. A. Bank executives that, according to their research, certain changes would have a devastating impact on sales.  The changes that the Jos. A. Banks executives warned Defendants of included raising prices, ending the popular "buy one, get three free" suit sale events, and changing the inventory to include modern and slim fit suits. Nevertheless, the Defendants implemented those changes.   The Defendants did not disclose the information that the former Jos. A. Bank executives had shared with the Men's Wearhouse executives.

Additionally, Plaintiff alleges that as Defendants enacted these changes, they collected live data from polling their stores showing that the changes were not being well-received. Instead of disclosing this known, adverse information, Defendants continued to reiterate that they were confident that the changes would lead to desired, positive outcomes.

**Defendants' Motion to Dismiss (Doc. 63)**

Characterizing the Amended Complaint as impermissibly premised on fraud by hindsight, Defendants summarize the Amended Complaint as Plaintiff's attempt to "shoehorn" what amounts to disapproval of Defendants' protected business judgment into an actionable federal securities fraud claim. Doc. 63 at 9.

Defendants, in their Memorandum of Law in support of their Motion to Dismiss, make five separate points in support of their Motion. First, Defendants argue that they are immune from liability under the PSLRA's safe harbor for forward looking statements. Second, Defendants argue that the Amended Complaint fails to allege facts giving rise to a strong inference that the Defendants acted with scienter. Third, the Amended Complaint fails to alleged Defendants' misstatements or omissions with the specificity required by the heightened pleading standards of the PSLRA. Fourth, Lead Plaintiff has failed to allege any facts supporting loss causation. Fifth, Lead Plaintiff cannot state a claim for control person liability.

       i.     *Whether the safe harbor for forward looking statements applies*

In Defendants' first point, they contend that Plaintiff's allegations present a classic case for the application of the PSLRA's safe harbor for forward-looking statements. All the statements alleged to be false and misleading, Defendants argue, are forward-looking and accompanied by meaningful cautionary language. Therefore, under the PSLRA, Defendants are immune from any liability for securities fraud in connection with those statements. The relevant portion of the PSRLA provides that a defendant "shall not be liable with respect to any forward-looking statement" that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1).

Defendants argue that their statements regarding Men's Warehouse's plans for Jos. A. Bank are forward-looking statements. A "forward-looking statement," whether made orally or in writing, is statutorily defined, in part, as a statement (1) containing a projection of revenues, income, or earnings per share; (2) regarding the plans or objectives of management for future operations; (3) regarding future economic performance; or (4) containing a projection of estimate

of other items required by SEC regulations.  *See* 15 U.S.C. § 78u-5(i)(1)(D); *Southland Sec.*
*Corp.*, 365 F.3d at 371.

According to Defendants, the more than 290 statements identified by Plaintiff in the
Amended Complaint, alleged to be "materially false and misleading when made in that they
omitted the true facts," are all challenged only on their forward-looking aspects.  Specifically,
Plaintiff points to Defendants' 2015 guidance and 2017 guidance, which were allegedly
misleading due to the omission of "true facts." However, Defendants reply that these instances of
"guidance" were undeniably statements containing projections of revenues, income, earnings,
expenditures, dividends, or other financial items, falling squarely within the safe harbor and thus
insulated from action.

Defendants also contest Plaintiff's contention that Defendants' Forms 10-Q contained
false and misleading forward-looking statements because they omitted "trends or uncertainties
that defendants reasonably expected would have a material unfavorable impact on revenues in
violation of Item 303 of Regulation S-K" and "failed to disclose the true facts" in its risk factors.
Doc. 58 at ¶¶ 62, 63, 78, 79, 87, 88, 101, 102, 114.  Defendants argue that these allegations
attack not the content of the financial information reported, but the Company's identified risk
factors, which are a non-exhaustive list of risks and uncertainties that could affect the
Company's business.  Therefore, these risk factors concern the Company's future economic
performance and are protected by the safe harbor.

Furthermore, Defendants emphasize, under the safe harbor, if a forward-looking
statement is identified as such and is accompanied by meaningful cautionary disclosures, it is
insulated from liability and non-actionable.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i); *Southland Sec.*
*Corp.*, 365 F.3d at 371.  Defendants maintain that the statements concerning Men's Warehouse's

guidance and risk factors satisfy these requirements because they all included disclaimers that they contained forward-looking statements and were accompanied by meaningful cautionary language.  For example, Defendants point to Men's Warehouse's July 29, 2014 Form 8-K which began by stating, "This Current Report on Form 8-K contains forward looking information," and the other challenged statements that had similar disclaimers. Doc. 63 at 23.  Additionally, the Company's Forms 10-K and Forms 10-Q contained the following language:

> These forward-looking statements may include, but are not limited to, references to, sales, earnings, margins, costs, number and costs of store openings, future capital expenditures, acquisitions, demand for clothing, market trends in the retail and corporate apparel clothing business, currency fluctuations, inflation and various economic and business trends. Forward-looking statements may be made by management orally or in writing, including, but not limited to . . . other sections of our filings with the Securities Exchange Commission.

*Id.*

In support of the contention that the statements were accompanied by cautionary disclosures, Defendants argue that during the Class Period, on at least five occasions, Men's Wearhouse specifically warned investors:

> The following factors, among others, could cause actual results to differ materially from those expressed or implied in the forward-looking statements: (1) the **possibility that the expected benefits from the Jos. A. Bank transaction will not be realized within the anticipated time period**, (2) **the risks related to the costs and difficulties related to the integration** of Jos. A. Bank's business and operations with Men's Wearhouse's business and operations, (3) the inability to obtain, or delays in obtaining, cost savings and synergies from the transaction...

Doc. 63 at 24 (emphasis added). These disclosures were also incorporated into Defendants' seven conference calls with investors.  Defendants argue that these cautionary disclosures provide disclosures concerning a potential cause of the behavior about which plaintiff complains and are sufficient to meet the requirements of the safe harbor provision.

Men's Wearhouse made the following addition to its disclosure in September 14, 2011, which was provided to investors at least thirteen times over the fifteen-month Class Period,

cautioning that Defendants' forward-looking statements may be impacted by Men's Wearhouse's

success or lack thereof in executing its internal operating plan for Jos. A. Bank:

> [S]uccess, or lack thereof, in executing our internal operating plans and new store
> and new market expansion plans, including integration of acquisitions, such as
> Jos. A Bank Clothiers, Inc. . . . Future results will also be dependent upon our
> ability to continue to identify and complete successful expansions and
> penetrations into existing and new markets and our ability to integrate such
> expansions with our existing operations.

Doc. 63 at 25.  Defendants also claim the Company specifically identified comparable sales

volatility as a risk factor. *See id.* They contend that they adequately warned investors to "expect

top-line volatility" as Jos. A. Bank transitioned away from the "buy one get three free" model.

In sum, their disclosures and risk factor warnings addressed the risks which Plaintiff complains

of, and are therefore meaningful within the definition of the PSLRA, satisfying the requirements

of the safe harbor provision.

ii.     *Whether the facts alleged give rise to a strong inference of scienter*

In Defendants' second main point, they argue that Lead Plaintiff's Amended Complaint

fails to allege facts giving rise to a strong inference that Defendants acted with scienter.  The

PSLRA requires that "the complaint shall, with respect to each act of omission alleged to violate

this chapter, state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Defendants argue that Plaintiff did

not meet its burden of pleading specific facts that give rise to a strong inference "that the party

knew that it was publishing materially false information, or that the party was severely reckless

in publishing such information." *In re Key Energy Servs. Sec. Litig.*, 166 F. Supp. 3d 822, 833

(S.D. Tex. 2016).

"A complaint will survive. . . only if a reasonable person would deem the inference of

scienter cogent and at least as compelling at any opposing inference one could draw from the

facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).
Defendants argue that Plaintiff has not met this burden of showing scienter, and posits that the
more compelling inference is that Defendants genuinely believed, in their business judgment,
that the changes to the Jos. A. Bank business model would benefit the Company.

As for motive, Defendants emphasize that Plaintiff has not suggested any plausible
reason Defendants might have had to intentionally ruin Jos. A. Bank's business.  They argue that
without a cogent motive theory, the strength of the circumstantial allegations indicating a
defendant's conscious behavior must be even greater.  *See Tuchman v. DSC Commc'ns. Corp*, 14
F.3d. 1061.  Further, Plaintiff must plead scienter with respect to each and every statement or
alleged misrepresentation, which it has failed to do.

Defendants argue that Plaintiff's motive theory is not cogent, nor is it as compelling as
the competing inference that Defendants acted without fraudulent intent.  Motive is one device
that can be used to support an inference of fraudulent intent.  *See Lampkin v. UBS Painewebber,
Inc. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, No. MDL 1446, 2017 U.S. Dist.
LEXIS 28458, at *11 (S.D. Tex. Feb. 28, 2017); *Newby*, 2016 U.S. Dist. LEXIS 101230, at
*115.  Plaintiff's motive theory appears to be based on Defendants Ewert, Kimmins, and Blake's
attempts to increase their compensation by artificially inflating Men's Wearhouse's stock price.
Doc. 63 at 29.  Plaintiff also contends that the executives were acting under immense pressure
from their largest shareholder.  Defendants argue that the theory that they were motivated by
their compensation scheme "makes no sense" because the executives' compensation was largely
based on actual financial performance, not artificially inflated stock prices.  *Id.* Therefore,
motive cannot be relied upon to create an inference of fraudulent intent.

Beyond motive, Plaintiff relies on other circumstantial evidence to demonstrate scienter.

Circumstantial allegations of scienter must be very specific, and Defendants argue Plaintiff's allegations of scienter are not specific enough to survive the motion to dismiss. *See In re Key Energy*, 166 F. Supp. 3d at 867.  Plaintiff's allegations reference a 2015 management conference in Ft. Lauderdale, Florida; "Monday marketing meetings"; "initial post-merger meetings"; "Monday morning meetings"; "a carve-out meeting of executives"; "advice of Jos. A. Bank senior executives"; "daily sales polling"; and "post-acquisition regional meetings." Doc. 63 at 32.  At these vaguely referenced events and meetings, Plaintiff alleges that Defendants learned material facts which they omitted from later public statements.

For instance, it was at these meetings that Defendants supposedly obtained knowledge that their proposed changes to the Jos. A. Bank business model would definitively fail.  These allegations concerning what Defendants Ewert, Kimmins, and Blake supposedly knew or were told and omitted from their public statements, presumably based on counsel's investigation and "consultation with persons familiar with each entity's business," come from confidential sources who are not described with specificity in the complaint. Nor do Plaintiff's allegations contain information regarding the specific dates, locations, or content of these meetings. Without these specifics dates, details, or information, Defendants posit that it is impossible to determine any defendant's state of mind at the particular moment he or she said any of the alleged statements in the Amended Complaint, a deficiency which requires dismissal.

Because Plaintiff's scienter allegations largely depend on confidential sources, not public statement and filings, the weight of the allegations must be discounted. *See Ind. Elec. Workers' Pension*, 537 F. 3d at 535 ("[C]ourts must discount allegations from confidential sources."). Such allegations must be disregarded altogether if the source is not described "with sufficient particularity to support the probability that a person in the position occupied by the source . . .

would possess the information pleaded." *Id*.  "Sufficient particularity" requires identification of the source's job description, individual responsibilities, and specific employment dates.  *See In re Key Energy*, 166 F. Supp. 3d at 839.

The Amended Complaint does not describe the unnamed sources beyond that they were former Jos. A. Bank executives, leaving Defendants and the Court left to speculate about the nature of counsel's investigation.   This failure to identify the sources means the Court lacks a sufficient basis on which to evaluate the allegations that Defendants acted with scienter, and so those allegations cannot support a strong inference of fraud.  Defendants also point out that the Amended Complaint fails to specifically tie Defendant Kimmins and Blake to any knowledge or information that could create an inference that their statements were made with scienter, and scienter cannot be imputed to these two defendants by use of a group pleading. *See* Doc. 63 at 35-39.

### iii.     Whether the misstatements or omissions are alleged with specificity

In addition to the two previous arguments to which Defendants devoted the most energy, they also offer three additional grounds for dismissal.  In their third point, Defendants argue that Lead Plaintiff's Amended Complaint fails to allege Defendants' misstatements or omissions with the specificity required by the heightened pleading standards of the PSLRA.   They state that the PSLRA and Rule 9(b) require fraud to be pled with particularity by including the "who, what, when, where, and how" with respect to each statement, which they allege Plaintiff failed to do. *See N. Port Firefighters' Pension v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 736-37 (N.D. Tex. 2013).   Instead, Plaintiff merely listed the 290 statements, often in block quote form, without specifying how or why each was materially false and misleading.  Defendants contend that this constitutes failure to identify the specific statement believed to be false or misleading

and failure to establish the causal connection between the statements and the reason they are alleged to be misleading, and is grounds for dismissal.  *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 857-58 (N.D. Tex. 2005).

### iv.    Whether the facts alleged support loss causation

Fourth, Defendants argue that Lead Plaintiff has failed to allege any facts to support loss causation.  The PSLRA requires that Lead Plaintiff plead facts showing "that the act or omission . . .caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). To meet this standard, Lead Plaintiff's allegations must show that Defendants' corrective disclosures made "the existence of the actionable fraud more probable than it would be without the alleged fact." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 688 (5th Cir. 2014).

Plaintiff alleges that "[t]he declines in the price of Men's Wearhouse's stock during the Class Period were the direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to and/or leaking into the market." FAC at 77.  Defendants classify this as a conclusory, "bald assertion," unsupported by any allegations in the Amended Complaint. Doc. 63 at 35.  Rather, Defendants contend that the "disclosures" identified by Lead Plaintiff do not bring to light Defendants' alleged securities fraud. *Id.*

Since Lead Plaintiff has failed to plead anything other than that Defendants' statements revealed to the public the result and the impact of Men's Wearhouse's business decision to make certain changes at Jos. A. Bank, Defendants argue the Amended Complaint must be dismissed.

### v.    Whether Lead Plaintiff can state a claim for control person liability

Last, Defendants argue that Lead Plaintiff cannot state a claim for control person liability under Section 20(a) of the Securities and Exchange Act of 1934, because a claim under Section 20(a) must be predicated by pleading claim under Section 10(b) and Rule 10b-5. *See In re Enron*

*Corp. Secs.*, 235 F. Supp. 2d 549, 595 n.34 (S.D. Tex. 2002).  Since this predicate has not been met, Defendants argue, Plaintiff's claim for secondary liability must be dismissed as well.

### Lead Plaintiff's Response in Opposition (Doc. 68)

Lead Plaintiff responds to Defendants' motion by reiterating the basis of its suit:  "The claims are premised on defendants' false and misleading statements and omissions associated with their radical alterations to the business model of newly acquired Jos. A. Bank Clothiers, Inc." Doc. 68 at 8.  Specifically, Plaintiff contends, Defendants made many statements touting significant cost savings and other merger synergies, while concealing internal testing that confirmed the planned changes would actually have a devastating effect on Jos. A. Bank sales.  Plaintiff addresses each of Defendant's points in turn, arguing that it has properly pleaded a claim under § 10(b) and the motion should not be dismissed.

### i.    *Whether the safe harbor for forward looking statements applies*

Plaintiff argues in response to Defendants' safe harbor challenge that it fails as a matter of law because Defendants failed to specifically identify which statements they believe are protected by the safe harbor; rather, Defendants merely state that "each of the allegedly fraudulent statements at issue here is a forward-looking statement," without listing each statement.  Plaintiff cites to case law from the Fifth Circuit which they interpret to hold that each statement benefitting from the safe harbor must be addressed individually. *See Lormand*, 565 F.3d at 245.[1]

Additionally, Plaintiff argues that none of Defendants' challenged statements fall within the protection of the PSLRA's safe harbor provision because (1) many of the statements in question concern historical or current facts; (2) Defendants' misrepresentations were made with

---

[1] The Court disagrees with Plaintiff's application of *Lormand*, and agrees with Defendants that it was meant to instruct a Court's analysis. *See infra* at p. 26.

actual knowledge that they were false or misleading; and (3) Defendants' misrepresentations were accompanied only by boilerplate cautionary language that failed to warn of a known risk. Plaintiff cites a case from the Northern District of Texas which held that the safe harbor does not protect these three types of statements. *See In re UICI Sec. Litig.*, No. 3:04-cv-1149-P, 2006 U.S. Dist. LEXIS 73753, at *17 (N.D. Tex. Sept. 29, 2006).

Regarding the first criterion, Plaintiff disputes Defendants' assertion that the challenged allegations involve only forward-looking statements.  Rather, Plaintiff contends that the statements listed in the Amended Complaint concern historical or current facts, which describe past or present conditions and do not trigger the PSLRA's safe harbor.  Among the statements referring to then-present, then-existing factual conditions are:

- "[We are] beginning to test ways to improve Joe Bank's promotional and advertising strategies and to stabilize gross margins"
- "[M]anagement's tactics are beginning to show early progress"
- "Jos. A. Bank customer is. . . responding well to the small amount of newness that they've seen"
- "[W]e are beginning to see some revenue synergies"
- "[W]e're encouraged with the consumer response to the changes we're making to the model."

Doc. 68 at 14.

Further, Plaintiff cites a Fifth Circuit decision which states that "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzburg v. Houston Amer.*, 758 F.3d 676, 691 & nn.25-27 (2014).  Plaintiff argues that several statements fall into this category of present statements and are not entitled to the safe harbor, including the following statements:

- "[O]ur cost synergy run-rate at the end of the third quarter is well ahead of our original $15 million projection for the end of the 2014 fiscal year"
- "[W]e're ahead of schedule in getting to [the promised synergy] numbers"
- "[W]e are on track with our internal plans for sales"

*Id.*

In its second point, Plaintiff counters Defendants' contention that all forward-looking statements identified as such and accompanied by meaningful cautionary disclosures are completely non-actionable.  Plaintiff points to case law from the Fifth Circuit holding that where a plaintiff adequately alleges that "the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations." *Lormand*, 565 F.3d at 244; *see also In re Tetra Techs., Inc.*, No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687, at *63-*64 (S.D. Tex. July 9, 2009).  Plaintiff argues that because it sufficiently alleges that Defendants had actual knowledge of the falsity of their statements, the safe harbor defense is defeated.

Third, Plaintiff disputes that Defendants' statements were accompanied by meaningful cautionary language, as Defendants assert was the case. Plaintiff cites to case law explaining that not all types of cautionary language are sufficient; the language must be meaningful and requires "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372.  Further, if "reasonable minds could. . . disagree as to whether the mix of information" provided by the warnings and statements is misleading, "the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law." *Lormand*, 565 F. 3d at 248.  Plaintiff argues that the risk factors listed by Defendants in support of their argument that the safe harbor applies are generic, generally applicable, and vague.  The risk disclosures in dispute include the following:

- "'The following factors, among others, could cause actual results to differ materially from those expressed or implied in the forward-looking statements: (1) the possibility that the expected benefits from the Jos. A. Bank transaction will not be realized within the anticipated time period, (2) the risks related to the costs and difficulties related to the integration of Jos. A. Bank's business and operations with Men's Wearhouse's business

and operations, (3) the inability to obtain, or delays in obtaining, cost savings and synergies from the transaction . . . .'"

- "'[S]uccess, or lack thereof, in executing our internal operating plans and new store and new market expansion plans, including integration of acquisitions, such as Jos. A. Bank Clothiers, Inc. . . . . Future results will also be dependent upon our ability to continue to identify and complete successful expansions and penetrations into existing and new markets and our ability to integrate such expansions with our existing operations.'"

- "'Our comparable sales have fluctuated significantly in the past on both an annual and quarterly basis and are expected to continue to fluctuate in the future. We believe that a variety of factors affect comparable sales results including, but not limited to . . . spending patterns . . . the timing and level of promotional pricing or markdowns . . . [and] changes in fashion trends and our merchandise mix . . . .'"

Doc. 68 at 17.

Plaintiff claims this language fails to adequately warn of the substantial known risk associated with the drastic changes being implemented to the Jos. A. Bank business model. Defendants had been warned prior to enacting those changes by Jos. A. Bank executives that they would result in a "devastating 30% negative impact on sales due to the differences in customer profile between Men's Wearhouse and Jos. A. Bank." *Id.* at 18.  Yet despite this concrete advice, the cautionary language only vaguely refers to such potential difficulties and sales fluctuations.  Plaintiff cites case law showing that general cautionary language does not excuse Defendants' failure to reveal known, material, adverse facts.  *See Rubinstein*, 20 F.3d at 171.

Plaintiff additionally criticizes the risk disclosures for being inadequate because they are boilerplate, cut-and-paste phrases repeated over and over again despite significant changes in the operation over time, which indicates that they were not substantive or tailored to the specific project. *See Lormand*, 565 F.3d at 245; *Helwig*, 251 F.3d at 559.  In sum, because Defendants'

misstatements and omissions were not accompanied by meaningful, company-specific warnings based on a realistic assessment of the situation, Plaintiff argues the PSLRA's safe harbor provision does not apply.

      *ii.*      *Whether the facts alleged give rise to a strong inference of scienter*

Plaintiff responds to Defendants' second main point by insisting that the Amended Complaint does indeed contain allegations sufficient to justify a strong inference of scienter. "The required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness." *Lormand*, 565 F. 3d at 251.  Plaintiff argues it may plead severe recklessness by alleging "defendants' knowledge of facts or access to information contradicting their public statements" or "facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." *See In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *32 (E.D. Tex. June 10, 2004).

Plaintiff further points out that the inquiry is whether all the facts alleged, considered collectively, give rise to a strong plausible inference of scienter, not whether each statement individually meets the standard.  *See Tellabs*, 551 U.S. at 322-24.  Plaintiff argues that the allegations in the Amended Complaint, considered collectively and taken as true, give rise to a strong plausible inference of scienter.

Plaintiff criticizes and dismisses Defendants' point that Plaintiff did not allege a cogent theory or motive explaining the reason behind Defendants' actions.  Plaintiff cites to case law stating that "the absence of a motive allegation is not fatal." *Id.* at 325.  Even so, Plaintiff explains that the Complaint does put forth a plausible motive explaining Defendants' alleged fraud:  Essentially, the Defendants were under great pressure to deliver on their promised results

after the acquisition of Jos. A. Banks and concealed the known risks "in the hopes that the known sales disruption would simply not come to pass." Doc. 68 at 23.  Furthermore, part of Ewert, Kimmins, and Blake's compensation was tied to their ability to achieve strong results during and following the integration of Jos. A. Bank. *Id.*

Aside from motive as an indicator of scienter, Plaintiff points to numerous other allegations in the Amended Complaint which it argues amply lay a foundation for a strong inference of scienter.  Plaintiff contends the Amended Complaint alleges with specificity that Defendants were aware of undisclosed facts that undermined their statements regarding Jos. A. Bank's business and operations and the underlying guidance.

Specifically, Plaintiff indicates portions of the Complaint that state:

- Jos. A. Bank senior executives informed Men's Wearhouse senior executives that prior testing showed that raising prices or changing the type of suits sold at Jos. A. Banks would have a large negative impact on sales.

- Defendants were immediately aware that the new suits introduced for sale at Jos. A. Bank were causing sales to drop because they received live sales data daily.

- Defendants knew that Jos. A. Bank customers were complaining in high volume about the new suits being offered for sale.

- Jos. A. Bank senior executives warned Men's Wearhouse senior executives that the implementations they sought to enact had previously been tested, and based on those tests, it was predicted that the proposed changes would result in catastrophic losses.

Plaintiff argues that together, these allegations support a strong inference of scienter because they show that the Defendants misled the public by concealing material facts of which they were aware.

Next, Plaintiff addresses Defendants' argument that Plaintiff's allegations were not specific enough and lacked details surrounding the unnamed sources.  Plaintiff urges that it

35 / 46

would be impossible for it to allege all facts related to its claims at the pleading stage because only defendants know all the facts related to the alleged fraud. *See ABC Arbitrage v. Tchuruk*, 291 F. 3d 336, 354-56 (5th Cir. 2002) ("[E]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation.").

Plaintiff disagrees with Defendants that its "failure to identify with whom its counsel consulted requires dismissal of the Amended Complaint." Doc. 68 at 27. Citing a case from the Fifth Circuit, Plaintiff states that the PSLRA "requires plaintiffs to plead only facts and makes no mention of the sources of these facts." *ABC Arbitrage*, 291 F. 3d at 353; *see also Marcus v. J.C. Penney Co.,* 2015 U.S. Dist. LEXIS 131613, *5, 2015 WL 5766870 (E.D. Tex. 2015) ("Even under the PSLRA, plaintiffs are only required to plead facts, not to produce admissible evidence."). Rather, a plaintiff need only "plead with particularity *sufficient* facts to support their allegations of false or misleading statements made on information and belief." *ABC Arbitrage*, 291 F. 3d at 353.

Plaintiff argues it has met this burden by pleading the "who, what, when, where, and how" of the alleged fraud as required under Rule 9(b) and the PSLRA. *See id.* at 530. The "who" are Men's Weahouse, Ewert, Kimmins, and Blake; the "what" are statements concerning the business operations of Jos. A. Bank and Defendants' guidance regarding merger synergies and adjusted earnings per share; the "when" is the multiple dates listed in the Amended Complaint spanning from July 29, 2014 to November 5, 2015; the "where" includes the Analyst Day presentation, press releases, conference calls, investor meetings, and SEC filings; the "how" is by concealing from investors "known risks, trends, and uncertainties" associated with the planned alterations to the Jos. A. Bank business model; and the "why" is to "justify spending

$1.8 billion to save their jobs and to relieve pressure from investors with the hope that the known sales decline would correct before a shift in the market." Doc. 68 at 28.

Taking these allegations in the Amended Complaint as true, Plaintiff urges, they provide sufficient facts pursuant to the PSLRA to support a strong inference that Defendants were aware of undisclosed facts which seriously undermined their statements.  Last, Plaintiff disputes the contention that it attempts to rely on group pleadings to impute scienter to Defendants Kimmins and Blake, pointing out many allegations inclusive of or specific to the two defendants in question. Doc. 68 at 28-34.

  *iii. Whether the misstatements or omissions are alleged with specificity*

Plaintiff counters Defendants' categorization of its complaint as a "puzzle pleading" and maintains that the Amended Complaint "precisely details each problematic statement, alleges that each statement is false and misleading, and alleges the reasons as to why each statement was false or misleading." Doc. 68 at 35.  Plaintiff argues it has specified with particularity which statements are challenged, by whom each statement was made, that each statement was false or misleading, and why each statement was false or misleading, meeting the pleading requirements of the PSLRA.

  *iv. Whether the facts alleged support loss causation*

Next, Plaintiff argues that it has satisfied the standard to plead loss causation by alleging "facts that support an inference that Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *See Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014). For one example, Plaintiff points to the revelation from Defendants on November 5, 2015 that

"comparable sales decreased 14.6%" for the third quarter.  Doc. 68 at 39.  In reaction to these disclosures, on November 5 and 6, 2015, Men's Wearhouse stock declined in price by 43%, a loss of $17.40 per share. *Id.*

In response to Defendants' contention that statements such as these do not constitute "corrective disclosures," Plaintiff responds that they do qualify as such because the "disclosed information [reflects] part of the 'relevant truth'—the truth obscured by the fraudulent statements."  *See Ala. Elec. Pension Fund v. Flowserve Corp.,* 572 F. 3d 221, 230 (5th Cir. 2009).  Thus, Plaintiff's allegations are sufficient to support an inference that Defendants concealed circumstances that bear upon the loss suffered.

> v.    *Whether Lead Plaintiff can state a claim for control person liability*

Defendants argue that the § 20(a) claim must be dismissed because the underlying § 10(b) claim fails.  Plaintiff responds that it has adequately alleged a § 10(b) claim, creating a valid basis for the § 20(a) claim. *See In re Elec. Data Sys. Corp. Sec. & ""ERISA" Litig.,* 298 F. Supp. 2d 544, 561 (E.D. Tex. 2004).

### Defendants' Reply (Doc. 69)

Much of the Reply is redundant of arguments made in Defendants' motion to dismiss. Defendants emphasize that securities class actions attacking business judgments, corporate mistakes, and dashed hopes, such as they claim is the situation here, are precisely what the PSLRA is designed to stop.  Defendants repeat that a securities fraud case pleading must meet the specific, rigorous requirements of the PSLRA, which Plaintiff has failed to do.  In particular, Defendants argue the Amended Complaint is unsubstantiated by particularized facts supporting strong inferences of intent to defraud or severe recklessness, and should be dismissed.

> i.    *Whether the safe harbor for forward looking statements applies*

In response to Plaintiff's argument that Defendants are required to specifically identify each statement claimed to be protected by the PSLRA safe harbor as "forward-looking," Defendants dispute Plaintiff's interpretation and application of *Lormand*. Defendants argue that *Lormand* does not stand for the contention that in a motion to dismiss, defendants much address each statement individually; rather, the opinion was focused on how a court should determine whether a forward-looking statement contains meaningful cautionary language.

Additionally, Defendants counter Plaintiff's assertion that the risk disclosures were merely boilerplate, emphasizing instead that they contained substantive, specific descriptions of actual risk factors that might negatively impact future results.  Defendants insist that the risk disclosures contained the unique company-specific and industry-specific cautionary language required by the PLSRA safe harbor.  In support of this argument, Defendants cite to other cases which identify generic or boilerplate language, and distinguish their own disclosures from the ones held to be deficient.  *See Marcus v. J.C. Penney Co.*, No. 13-cv-736, 2015 U.S. Dist. LEXIS 121683 (E.D. Tex. Sep. 11, 2015); *Lormand*, 565 F. 3d at 244.

Defendants argue that it disclosed risks unique to the retail industry, a legally sufficient level of specificity, such as comparable sales impacted by consumer spending, promotional activity, and fashion changes.  Further, even if the risk disclosures did not "warn against the exact behavior that Plaintiffs complain of," it is legally sufficient to "warn of the root cause." *See N. Port Firefighters' Pension v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 760 (N.D. Tex. 2013). Here, the "root cause" was the decline in sales following the elimination of the buy-one-get-three-free promotions; disclosures included warning that "comparable sales have fluctuated significantly in the past" and "are expected to continue to fluctuate in the future." Doc. 69 at 18.

Defendants offer more arguments about the sufficiency of the cautionary language

accompanying their challenged statements, and also contend that the "actual knowledge" exception to the PSLRA's safe harbor does not apply in the present situation because Plaintiff has failed to plead facts sufficient to trigger the actual knowledge exception.  Notably, however, Defendants do not offer any reply to Plaintiff's first argument: that many of the statements in question are not forward-looking at all, but rather concern historical or current facts, and are therefore not eligible for the safe harbor defense for forward-looking statements.

ii.       *Whether the facts alleged give rise to a strong inference of scienter*

Defendants also urge that Plaintiff's scienter arguments are legally incorrect and unpersuasive, emphasizing two of its previous points: (1) Plaintiff has not articulated a plausible motive theory and (2) the Amended Complaint lacks sufficient facts to support Plaintiff's allegations of false or misleading statements, which are based on confidential, personal sources.

Lead Plaintiff must "set forth specific facts that raise an inference of fraudulent intent, for example, facts that show the defendant's motive." *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, No. MDL 1446, 2016 U.S. Dist. LEXIS 101230, at *115 (S.D. Tex. Aug. 2, 2016).  Defendants continue to attack Plaintiff's motive theory, alleging it is not possible, let alone plausible, because if Defendants had "known" the devastating impact that would result from the changes, they would have behaved differently. *See* Doc. 69 at 9.  The more plausible and compelling theory is that Defendants honestly underestimated the immediate impact the changes would have on sales and the value of the Company's shares.

Defendants also dispute Plaintiff's suggestion that the executives' compensation schemes establish motive and scienter.  Defendants repeat their assertion that the compensation was tied predominately to net consolidated earnings, which would have incentivized them to enhance the Company's actual financial performance, not just artificially inflate the stock prices.  There was

one form of compensation that was indeed tied to the stock price—the equity-based long-term incentive award—but these awards were not scheduled to vest until April 3, 2018.

Furthermore, Defendants maintain that the facts actually pleaded by Plaintiff must be supported by something other than speculation, conjecture, or belief, which they are not, and must satisfy the "[e]xacting pleading requirements" of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, which they do not. *See Tellabs*, 551 U.S. at 313.   Defendants cite *Indiana Electric Workers' Pension Trust Fund* to argue that when a plaintiff seeks to meet its substantial burden using confidential sources, as it does here, the facts supporting an inference of scienter must be even stronger.   537 F.3d at 535.    Plaintiff must clearly demonstrate the reliability of the source and the reliability of the facts supplied.

Defendants point to the analysis outlined by the Fifth Circuit in *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) and argue that Plaintiff has failed to satisfy any of the three requirements put forth in that opinion.   Under *ABC Arbitrage*, there are three ways to satisfy the pleading requirements:

> (1) if plaintiffs rely on confidential personal sources and other facts, their sources need not be named in the complaint so long as the other facts, i.e., documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading;
> (2) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief;
> (3) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false and the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

291 F.3d at 353.

Defendants argue that the allegations that Defendants made false or misleading statements by omitting "true" facts derive entirely from confidential personal sources. Since Plaintiff did not name its sources, it must identify them though general descriptions, including the source's job description, responsibilities, and employment dates, which it did not do. *See In re Key Energy*, 166 F. Supp. 3d at 839. As a result, there is no basis by which to determine whether the confidential sources would have possessed the type of information necessary to support the allegations, fraud has not been pleaded with the required particularity, and dismissal is warranted.

In sum, the Amended Complaint lacks sufficient, non-conclusory allegations through which the Court could find it plausible that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### iii.    Whether the misstatements or omissions are alleged with specificity

Defendants argue that Plaintiff bears the burden "to present succinct pleadings which clearly lay out the elements as required by this Circuit." *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005). A securities fraud complaint must be dismissed at the pleading stage unless the complaint contains particularized facts demonstrating both materially false statements and a strong, cogent inference of fraudulent intent. *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). Defendants argue this standard is not met by the Amended Complaint because it contains lengthy block quotations followed by conclusory statements that the Defendants' statements were materially false and misleading, accompanied by a copied-and-pasted list of "true" facts—Plaintiff never identifies why each particular statement is allegedly false or misleading.

*iv.*      *Whether the facts alleged support loss causation*

To adequately plead loss causation, Plaintiff must identify a "corrective disclosure" which revealed a concealed truth and contains a logical link to the drop in the company's stock price. *See Spitzburg v. Houston Am. Energy Corp.*, 758 F. 3d 676, 688 (5th Cir. 2014). Corrective disclosures do not include confirmatory statements or reports of financial results. *See Catogas v. Cyberonics*, 292 Fed. Appx. 311, 314 (5th Cir. 2008). Defendants argue that Plaintiff does not allege any corrective disclosures making the existence of the alleged fraud "more probable that it would be without the alleged facts (taken as true)." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d at 688. Therefore, Plaintiff has failed to plead facts sufficient to establish loss causation.

## Court's Decision

After considering the allegations in the Amended Complaint as a whole, the Court finds that Defendants' motion to dismiss should be granted.

With regard to the applicability of the safe harbor, the Court agrees with Plaintiff that many of the statements in question do not qualify as "forward-looking" because they concern historical or current facts. As they are not "forward-looking," they cannot and do not fall under the PSLRA's safe harbor, and Defendants' assertion of that defense fails.

Nevertheless, the Court finds that the Amended Complaint has not adequately pled scienter. Both sides presented arguments about Defendants' potential motive driving the alleged fraud, or lack thereof. The arguments about motive were inconclusive, but motive is not a dispositive issue. *Tellabs*, 551 U.S. at 325. The pressure to perform faced by Defendants, as well as their compensation scheme, may have provided a motive for them to promote artificially inflated stock prices; however, as Defendants point out, their compensation scheme was also

based largely on maintaining a healthy company long-term, measured by its actual financial performance, not just by inflated stock prices.

Even assuming Plaintiff's motive theory makes sense, as the Supreme Court held in *Tellabs*, 551 U.S. at 323-24,

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. . . .[T]he inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Therefore, the Court agrees with Defendants that Plaintiff has still not met its burden of showing that the fraudulent explanation is equally as cogent or compelling as the non-fraudulent explanation.  Rather, the Court finds based on the facts alleged in the Amended Complaint that the non-fraudulent explanation of the Defendants' actions is more cogent and compelling: Defendants were genuinely attempting to implement positive changes in the Jos. A. Bank business model by introducing new inventory and ending the "margin erosive" buy-one-get-three-free promotional events.

While the previous Jos. A. Bank executives firmly advised against enacting the changes the Defendants pursued, the facts alleged support the inference that Defendants' decision to pursue those business changes was made in good faith.  The inference that they acted fraudulently – knowing their decisions would have catastrophic results, and covering up this alleged knowledge – is not supported by the current pleading.  The more compelling explanation presented is that they did not believe the predictions of the former Jos. A. Bank executives would come to fruition under their leadership.

44 / 46

Furthermore, as argued by Defendants, the complaint does not provide much information about the referenced studies conducted by the former Jos. A. Bank's executives, so the Court cannot analyze how credible those predictions were and whether they constitute "true facts" recklessly disregarded by Defendants.  The "Buy-One-Get-Three-Free" model did not appear to be sustainable, from the facts included in the complaint, and the Defendants appear to have been trying to mold Jos. A. Bank's future as a profitable company by seeking alternatives to the "Buy-One-Get-Three-Free" model.

Regarding specificity, the Complaint would benefit from more clarity and brevity.  To avoid dismissal, a plaintiff pleading a false or misleading statement or omission as the basis for a Section 10(b) and Rule 10b–5 securities fraud claim must:

> (1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;
> (2) identify the speaker;
> (3) state when and where the statement was made;
> (4) plead with particularity the contents of the false representations;
> (5) plead with particularity what the person making the misrepresentation obtained thereby; and
> (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in relevant securities fraud jurisprudence and under the PSLRA. *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

The Court advises Lead Plaintiff to take care to plead with particularity the contents of the false representations and explain specifically, precisely, and explicitly why each statement is misleading or fraudulent.  Often in the Amended Complaint the Court was left to assume the link Plaintiff was trying to make between the alleged misleading statement and the reason it was misleading.

Because Plaintiff fails to state a primary violation of § 10(b) of the Exchange Act and

Rule 10b-5, its claim for control person liability under § 20 also fails at this time.

## Conclusion

For the foregoing reasons, the Court finds that Lead Plaintiff's Amended Class Action Complaint does not state a claim for violations of Section 10(b) or Section 20(a). Accordingly, Defendants' Motion to Dismiss is hereby GRANTED. The Amended Complaint is hereby DISMISSED WITHOUT PREJUDICE.

The Court does not take lightly dismissal of a claim without reaching its merits. Thus, a plaintiff will be given the opportunity to amend a complaint where it appears that more careful or detailed drafting might overcome the deficiencies on which dismissal is based.

If Lead Plaintiff is able to overcome the deficiencies stated herein, it should do so by no later than thirty (30) days from the date of this Order.

SIGNED at Houston, Texas, this 31st day of March, 2018.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE